**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------X
ROMAIN PRAGE a/k/a
ROMAINE PRAGE

                                                                    Case No.: _____
                          **Plaintiff,**

                 **-against-**

KAVULICH & ASSOCIATES, P.C.,
GARY KAVULICH, and
SJ COOPER REALTY, LLC

                          **Defendants.**
-------------------------------------------------------------------X

<u>**ORIGINAL COMPLAINT AND JURY DEMAND**</u>

Plaintiff Romain Prage ("Mr. Prage") brings suit against a debt collection law firm, Kavulich & Associates, P.C., and its principal, Gary Kavulich, for violating the Fair Debt Collections Practices Act, 15 U.S.C § 1692 *et seq*., and N.Y. Gen. Bus. Law § 349 *et seq*, and for committing the tort of conversion by executing on and refusing to release Mr. Prage's bank account which contained exclusively exempt funds. As Kavulich was acting as the agent for the judgment creditor, Plaintiff also brings suit for conversion against the judgment creditor SJ Cooper Realty, LLC.

<u>**Summary of claims**</u>: Defendants restrained and attempted to seize Plaintiff's statutorily exempt funds, objected to Mr. Prage's notice of exemption without a reasonable basis to do so, and intentionally misstated New York law in the process (both orally and in written submissions to the underlying state court). Defendants then refused to withdraw their objection in the face of indisputable documentary evidence that the funds were entirely statutorily exempt, all for the purpose of attempting to coerce Mr. Prage to make payments from an exempt source and in the hope that Mr. Prage would default by failing to appear at state court hearings on the exemption objection. Incredibly, months after the state court ruled that the money in Mr. Prage's bank

1

account was exempt, Defendants issued yet another restraint on the same bank account.

## A.  JURISDICTION AND VENUE

1.      The Court has federal question jurisdiction over the lawsuit because the action arises under the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 *et seq.*, ("FDCPA"). Jurisdiction of the Court arises under 28 U.S.C. § 1331 because this dispute involves predominant issues of federal law under the FDCPA. Declaratory relief is available pursuant to 28 U.S.C. §§ 2201 and 2202. The Court has supplemental jurisdiction under 28 U.S.C. §1367 over Plaintiff's state law claims because said claims are so related that they form part of the same case or controversy.

2.      Venue in this District is proper because all or a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in Brooklyn, New York.

## B.   PARTIES

3.      Plaintiff Romain Prage is a natural person who resides at 420 Marlborough Road, Brooklyn, New York 11226.

4.      Plaintiff is a consumer as defined by 15 U.S.C. § 1692a(3) as he is alleged to owe a debt, rent, arising primarily for family, household, or personal purposes.

5.      Defendant Kavulich & Associates, P.C. ("Kavulich & Associates") is a professional corporation with its principal place of business at 30 Church Street, Suite 26, New Rochelle, New York 10801.

6.      Defendants Kavulich & Associates and Gary Kavulich ("Mr. Kavulich") (collectively "Kavulich") are "debt collector[s]" as defined in 15 U.S.C. §1692(a)(6) as they regularly collect or attempt to collect, directly or indirectly, debts owed, or due or asserted to be due another. Specifically, Kavulich files thousands of collection lawsuits in civil court, primarily for rent, and

2

seeks to enforce putative debts obtained by others, primarily for rent. Many, if not most, of those collection lawsuits are signed by Mr. Kavulich. Kavulich also regularly executes on judgments obtained by other attorneys.

7.      Defendant Gary Kavulich is a natural person. At all times relevant to this action, Mr. Kavulich was and is the Chief Executive Officer of Kavulich & Associates. All of the pleadings filed by Kavulich & Associates related to this action were signed by Mr. Kavulich.

## C.   FACTUAL ALLEGATIONS

**The New York State Exempt Income Protection Act was enacted to prevent wrongful executions on exempt incomes, such as that of Mr. Prage.**

8.      In 2008, New York State enacted the Exempt Income Protection Act ("EIPA") to (a) protect, *inter alia*, statutorily exempt income held in bank accounts from restraint—or "freeze"— and levy and (b) expedite and standardize the process for the release of restrained funds that are statutorily exempt from restraint and levy.

9.      Prior to the enactment of EIPA, it was very common for creditors to restrain bank accounts that contained income protected from restraint and levy. EIPA was enacted to prevent such restraints.

10.      Low-income people rely on exempt income such as Social Security, unemployment benefits, and other public benefits to survive and support their families; when their bank accounts are restrained, they are barred from accessing these much-needed funds without notice, and are often put into extreme financial duress as a result of these restraints. This was certainly true as to Mr. Prage.

11.      Before the enactment of EIPA, it could take weeks before debtors would be able gain access to their exempt funds, even though state and federal law prohibits restraint and levy.

12.     As the NYS legislature noted, these conditions caused many debtors to make payments of exempt funds to judgment creditors. "All too often . . . creditors ignore[d] calls from debtors, demand[ed] a debt payment as a condition of releasing the account, or insist[ed] on proof of the exemption." Senate Introducer's Memorandum in Support, NY S.6203-B (2008).

13.     Under EIPA, when a judgment debtor's bank account is restrained pursuant to a New York Court restraining notice, the judgment debtor may claim that the funds in the restrained account are exempt by completing an Exemption Claim Form.

14.     Under EIPA, a judgment creditor must provide such an Exemption Claim Form to the judgment debtor's banking institution along with any restraining notice.

15.     An Exemption Claim Form must be mailed to the judgment debtor by her banking institution within two days of the banking institution's receipt of the restraining notice from the judgment creditor.

16.     The Exemption Claim Form must be mailed or delivered to the bank and creditor's attorney within 20 days of the date of the postmark of the letter from the bank informing the consumer of the freeze. N.Y. CPLR 5222-a(c)(1).

17.     To facilitate the prompt release of an account containing exempt funds, the Exemption Claim Form instructs judgment debtors to submit "proof" that the funds in their account are exempt. N.Y. CPLR 5222-a(b)(2).

18.     Proof of an exemption can "include an award letter from the government, an annual statement from your pension, pay stubs, copies of checks, bank records showing the last two months of account activity, or other papers showing that the money in your bank account is exempt". *Id.*

4

19.     Where an Exemption Claim Form sent to the judgment creditor "is accompanied by information demonstrating that all funds in the account are exempt" the restraint is deemed void and the judgment creditor must instruct the banking institution to release the account within seven days of the postmark on the envelope containing the Exemption Claim Form. N.Y. CPLR 5222-a(c)(4).

20.     Where the account contains some funds from exempt sources, and other funds from unknown sources, otherwise known as "commingled funds," EIPA provides that "the judgment creditor shall apply the lowest intermediate balance principle of accounting"[1] and "shall instruct the banking institution to release the exempt money in the account" within seven days of the postmark on the envelope containing the Exemption Claim Form. N.Y. CPLR 5222-a(c)(4). EIPA does not prohibit the commingling of exempt and nonexempt funds, and it does not provide that the commingling of funds will result in the loss of any federal or state exemption protections.

21.     If the judgment creditor fails to properly release an account or exempt funds after an Exemption Claim Form has demonstrated that the account contains exempt funds, "the judgment creditor shall be deemed to have acted in bad faith and the judgment debtor may seek a court award of the damages, costs, fees and penalties" as provided for in EIPA. N.Y. CPLR 5222-a(c)(4).

22.     After receiving the Exemption Claim Form, the judgment creditor may object to the claim of exemption if the judgment creditor has "a reasonable belief that [the] judgment debtor's account contains funds that are not exempt from execution." N.Y. CPLR 5222-a(d).

---

1 *See In re Foster*, 275 F.3d 924, 927 fn. 1 (10th Cir. 2001) (describing the application of the lowest intermediate balance principle ("LIBP") of accounting in the context of trusts).

23.     If the judgment creditor objects, its motion papers must include an affirmation or affidavit in support of the motion that "demonstrate[s] a reasonable belief that [the] judgment debtor's account contains funds that are not exempt from execution and the amount of such nonexempt funds. . . . The affirmation or affidavit shall not be conclusory, but is required to show the factual basis upon which the reasonable belief is based." *Id.*

24.     If a judgment creditor objects to the judgment debtor's claim of exemption, a "hearing to decide the motion shall be noticed for seven days after service of the moving papers." *Id.*

25.     At the hearing, "[t]he burden of proof shall be upon the judgment creditor to establish the amount of funds that are not exempt." *Id.*

**Mr. Prage's bank account consisted entirely of exempt unemployment benefits.**

26.     On or about June 30, 2014, Plaintiff was laid off from his job at Surgicare of Manhattan LLC. Soon after being laid off, he applied for unemployment benefits with the New York State Department of Labor (the "Department of Labor").

27.     Plaintiff was initially denied unemployment benefits and filed an appeal of the denial with the Department of Labor.

28.     On March 4, 2015 – more than eight months after Mr. Prage's initial application for benefits – the Department of Labor ruled on Mr. Prage's appeal, reversing its initial denial and ruling that Mr. Prage was qualified to receive unemployment insurance benefits, retroactive to June 30, 2014. The Department of Labor determined that Plaintiff was eligible for $405 of weekly benefits for the week of June 30, 2014 through the week of September 30, 2014, and $420 of weekly benefits starting the week of October 6, 2015.

29.     The Department's reversal came as a huge relief to Mr. Prage, who was subsisting on

borrowed money during the time period that the appeal was pending. With the Department of Labor's reversal, Mr. Prage had hope of a more stable financial future.

30.     Over the next four months however, Kavulich replaced this glimmer of hope with constant struggle by preventing Mr. Prage from accessing the life preserver of financial stability his long-fought-for unemployment benefits were to provide.

31.     Between March 16, 2015 and March 25, 2015, the Department of Labor made a series of deposits compensating Mr. Prage for his unpaid unemployment insurance benefits. In total, the Department of Labor deposited $10,665.00 into a JP Morgan Chase ("Chase") Unemployment Insurance Account controlled by Mr. Prage. Mr. Prage was able to access the unemployment benefits through a Direct Payment Card Account linked to the Unemployment Insurance Account.

32.     The Unemployment Insurance Account was set up for the specific and exclusive purpose of receiving Plaintiff's unemployment insurance benefits. There were no funds in the Unemployment Insurance Account as of March 15, 2015, and no other funds were deposited into the Unemployment Insurance Account in March 2015 aside from Mr. Prage's unemployment insurance benefits from the Department of Labor.

33.     The Unemployment Insurance Account can only receive deposits from the Department of Labor Unemployment Insurance Benefits Program. Deposits from other sources cannot be deposited into the Unemployment Insurance Account.

34.      Unemployment benefits are exempt from execution, and do not lose their exempt status by being deposited into a bank account. *See* New York Labor Law § 595 (unemployment insurance benefits "shall not be assigned, pledged, encumbered, released, or commuted and shall

be exempt from all claims of creditors and from levy, execution, and attachment, or other remedy for recovery or collection of a debt. This exemption may not be waived.")

35.    On or about March 27, 2015, Plaintiff went to a Chase branch at Newkirk Plaza, 1509 Foster Ave, Brooklyn, NY 11230. Plaintiff transferred $5,000 from his Unemployment Insurance Account to a Chase savings account in Plaintiff's name (the "Savings Account").

36.    At the time of the March 27, 2015 transfer the Savings Account had a balance of $0.

37.    After the March 27, 2015 transfer the Savings Account had a balance of $5,000.

38.    On or about March 30, 2015, Plaintiff returned to the Chase branch at Newkirk Plaza, 1509 Foster Ave, Brooklyn, NY 11230. Plaintiff transferred another $5,000 from his Unemployment Insurance Account to the Savings Account.

39.    At the time of the March 30, 2015 transfer the Savings Account had a balance of $5,000.

40.    After the March 30, 2015 transfer the Savings Account had a balance of $10,000.

41.    There were no other transactions associated with the Savings Account in March 2015, and at all times the account contained only exempt unemployment benefits.

**Defendants' efforts to freeze and execute upon the Savings Account through a debt collection lawsuit brought in state court constitute abusive debt collection practices in violation of the FDCPA.**

42.    While the merits of the underlying collection lawsuit, resulting in a default judgment against Plaintiff, and Plaintiff's subsequent efforts to vacate the default judgment, are not a basis for this federal action, Defendants' behavior and activities in connection with that lawsuit constitute violations of FDCPA.

43.    The underlying debt arose from an act of kindness and generosity. Mr. Prage's now former girlfriend Taisha Dean was having difficulty being approved to rent an apartment. To

8

help Ms. Dean obtain housing, on or about February 27, 2009, Mr. Prage signed as a guarantor for Ms. Dean on her lease agreement with SJ Cooper Realty, LLC.

44.     At some point, Ms. Dean became delinquent on her rent, and on or about December 21, 2010, SJ Cooper Realty, LLC, through its attorney Kavulich, brought a collection lawsuit seeking to collect rent allegedly owed on the apartment.

45.     Mr. Prage was never served with summons and complaint in the collection lawsuit, although he did receive a copy in the mail.

46.     On or about March 1, 2011, Mr. Prage and Ms. Dean filed separate *pro se* answers, claiming that the amount of rent claimed due was grossly inflated.

47.     When Mr. Prage filed his *pro se* answer the clerk informed him that he would be notified of his next court date via mail. However, Mr. Prage never received any notice that a court date was scheduled, and accordingly, never appeared in court.

48.     However, on information and belief Ms. Dean appeared at a court hearing on June 30, 2011 and, without Mr. Prage's knowledge or consent, executed a Stipulation of Settlement ("Stipulation") in which she agreed to pay $2,500 to SJ Cooper Realty in monthly installments of $150. Ms. Dean later defaulted on the Stipulation and Kavulich entered judgment against both Ms. Dean and Mr. Prage.

49.     The Stipulation contains a signature that purports to be the signature of Mr. Prage. However, Mr. Prage was not at the hearing where the Stipulation was signed, never signed the Stipulation, and had no knowledge of the Stipulation, the default on the Stipulation, or the judgment entered as a result of the default until years later in April 2014.

50.     Mr. Prage first learned of the Stipulation and subsequent judgment after he received a

notice from Chase on or about April 4, 2014 that his Savings Account containing his exempt income was frozen due to an Information Subpoena and Bank Restraint Notice ("ISBRN") Chase received from Kavulich. *See* **Exhibit A** (Letter from Chase dated April 3, 2014). Mr. Prage then checked the New York State Unified Court System's online e-Courts website, requested the state court file, and subsequently learned for the first time of the Stipulation and his forged name on the same.

**Kavulich not only illegally restrained Mr. Prage's Savings Account, which exclusively contained exempt funds, but refused to release the account in the face of irrefutable documentary evidence and restrained the account a second time after the state court's determination that the funds in the account were exempt. These actions constitute violations of FDCPA.**

51.     Kavulich restrained Mr. Prage's Savings Account on April 3, 2014. *Id.* The Savings Account contained exclusively exempt unemployment insurance benefits transferred by Plaintiff on March 27, 2015 and March 30, 2015 from his Unemployment Insurance Account.

52.     At each step along the way, from April 3, 2014, the date on which Kavulich froze Mr. Prage's Savings Account, through May 22, 2014 when the state court made the judicial finding that the money in the account was exempt and ordered its release, Mr. Prage provided Kavulich more and more proof that all of the money in the account constituted exempt unemployment benefits. By May 8, 2015, Mr. Prage provided Kavulich with what by any standard was irrefutable documentary proof of complete exemption. Yet Kavulich refused to release the account until directly ordered to do so by the state court on May 22, 2015, and then improperly restrained Mr. Prage's account yet again on July 30, 2015.

53.     Indeed, when Mr. Prage attempted to show the attorney from Kavulich & Associates documents demonstrating that all of the funds in the Savings Account were exempt unemployment benefits, the attorney refused to review the documents stating, "I do not want to

hear about your case unless you are willing to settle."

54.     On April 4, 2015, Mr. Prage executed the Exemption Claim Form, attached his unemployment award letter, and promptly and timely provided the same to both Chase and Kavulich. *See* **Exhibit B.**

55.     In addition, on April 13, 2014, Chase faxed Kavulich a duplicate copy of the April 4, 2015 executed Exemption Claim Form and supporting unemployment award letter attached as **Exhibit B.**

**Kavulich's baseless April 16, 2015 Objection to Mr. Prage's exemption claim**

56.     On or around April 16, 2015, Kavulich filed a motion for post-possession money enforcement, objecting to Plaintiff's exemption claim and requesting a hearing (the "Objection"). *See* **Exhibit C.**

57.     In support of this motion, Kavulich filed an affirmation (the "April 16 Affirmation"), submitted under penalty of perjury pursuant to CPLR 2106.

58.     As previously noted, upon receiving a timely executed Exemption Claim Form, counsel for a judgment creditor has seven days to file an objection. The objection must include an affirmation or affidavit in support of the motion that "demonstrate[s] a reasonable belief that [the] judgment debtor's account contains funds that are not exempt from execution and the amount of such nonexempt funds. . . . The affirmation or affidavit shall not be conclusory, but is required to show the factual basis upon which the reasonable belief is based." *Id.* The burden of proof is on the judgment creditor to demonstrate that the funds are not exempt, not on the consumer to demonstrate that the funds are exempt. *Id.*

59.     Kavulich's Objection rested on the following statements from the April 16 Affirmation:

    a.  at paragraph 12, that Plaintiff's "claim for exemption that she (sic) should not have her (sic) account garnished because it contains funds from unemployment cannot be granted as there is no accounting of the funds in the subject account(s)";

    b.  at paragraph 14, that "[i]f [exempt] funds were/are co-mingled with non-exempt funds, the law clearly states that the otherwise exempt funds lose their protected status**";**

    c.  at paragraph 16, that "[w]ithout comprehensive proof of what funds are in the subject account(s) and that they meet the statutory requirements entitling those funds to an exemption, Plaintiff/Judgment/Creditor is entitled to any non-exempt funds to satisfy the underlying judgment."

60.    These statements were not supported by any citations and directly contradict New York law, as outlined above. Upon information and belief, Kavulich willfully and knowingly misstated New York law in the April 16 2015 Affirmation.

61.    Defendants' purpose in making these statements was to discourage the least sophisticated consumer from challenging the exemption objection, to make the consumer believe that any attempt to challenge the exemption would be futile, and to cause the consumer to pay from his exempt funds instead of challenging the exemption objection in court, no matter how meritless the objection.

62.    Further, under CPLR 5222-a(d) a judgment creditor must "demonstrate a reasonable belief that [a] judgment debtor's account contains funds that are not exempt from execution and the amount of such nonexempt funds." An affidavit or affirmation submitted by the judgment creditor in accordance to CPLR 5222-a(d) "is required to show the factual basis upon which the

reasonable belief is based."

63.     The April 16, 2015 Affirmation did not show any factual basis for Kavulich's assertion that funds in the Savings Account were not exempt from execution nor does the Affirmation state the amount in the Savings Account that Deendants reasonably believed was not exempt from execution, in direct contravention of N.Y. CPLR 5222-a(d). Rather, the Affirmation contained only boilerplate and conclusory statements in support of the Objection.

64.     On April 24, 2015 Mr. Prage filed a *pro se* Order to Show Cause to vacate the default judgment contending he never signed the purported Stipulation. *See* **Exhibit D**.

65.     A hearing was scheduled for April 29, 2015 on both the Order to Show Cause and the Kavulich Objection.

66.     At the April 29, 2015 hearing Mr. Prage attempted to show the appearing Kavulich & Associates attorney the documents demonstrating that all of the money in the Savings Account was exempt. The Kavulich & Associates attorney refused to review the documents stating, "I do not want to hear about your case unless you are willing to settle."

67.     The April 29, 2015 hearing was adjourned to May 8, 2015, creating another opportunity for Mr. Prage, trying to navigate the court system as a pro se litigant, to default.

> **Mr. Prage's May 7, 2015 Affidavit provided irrefutable documentary evidence that the funds in the Savings Account were entirely exempt, but Kavulich still refused to release the money, and restrained the account again after losing in court. These acts violated the FDCPA.**

68.     On or about May 7, 2015, Mr. Prage executed a *pro se* affidavit (the "May 7 Affidavit") in support his Order to Show Cause to vacate the default judgment and to challenge the Kavulich Objection. Mr. Prage received assistance of volunteer counsel at New Economy Project to prepare the *pro se* May 7 Affidavit and to organize supporting documents – documents the

Kavulich attorney refused to even look at. *See* **Exhibit E**.

69.     The May 7 Affidavit explained that all of the funds in the Savings Account were exempt funds. Plaintiff attached evidence supporting this claim including:

     a. a letter from Chase indicating that Plaintiff's Savings Account had been restrained (Chase letter April 3, 2015);

     b. a Chase account statement showing the transfer of $10,000 to the Chase Savings Account on or before April 3, 2015 (these funds were transferred to the Savings Account from the Unemployment Insurance Account using the Direct Payment Card linked to that account) (note that the final balance in the Savings Account as of April 3, 2015 was $9,925 due to legal processing fee of $75 that was charged to the account as a result of the restraint) (Chase account statement March 27, 2015 through April 3, 2015);

     c. a Chase account statement for the Unemployment Insurance Account showing the history of the direct deposits of unemployment insurance benefits into the account and showing only two withdrawals from that account, each in the amount of $5,000, on March 27, 2015 and March 30, 2015; importantly, the dates and amounts of these withdrawals are identical to the dates and amounts of the deposits into the Chase Savings Account;

     d. two unemployment insurance benefits letters dated April 16, 2014 and March 4, 2015 showing that the Plaintiff was receiving unemployment insurance from April 16, 2014 through July 5, 2015.

The amounts and dates of these transactions show that Mr. Prage withdrew a total of $10,000 from his Unemployment Insurance Account and immediately deposited all of that

money into his Savings Account (using the Direct Payment Card as was required). The Savings Account had a zero balance before the unemployment funds were deposited, and no other funds had been deposited into the Savings Account at the time it was restrained. This evidence indisputably shows that the funds in the restrained Savings Account were entirely exempt unemployment benefits.

70.     Despite receiving irrefutable proof that all of the money in the restrained bank account was entirely exempt unemployment benefits, Kavulich continually refused to release the account.

71.     On or about May 8, 2015, Plaintiff and Kavulich & Associates appeared at a state court hearing pursuant to CPLR 5222-a(d) to determine whether the restraint on the funds in the Savings Account should be released..

72.     At the May 8, 2015 hearing, Mr. Prage gave the attorney appearing for Kavulich & Associates the May 7 Affidavit and supporting documents. Despite this irrefutable evidence that the Savings Account contained only exempt funds, Kavulich refused to withdraw the Objection.

73.     It is indisputable that the only reasons Kavulich would not withdraw its baseless and unsubstantiated Objection were to abuse Mr. Prage, to badger him to pay from exempt funds, and to make him give up. No reading of the May 7 Affidavit and supporting documents would allow an attorney to have any belief – much less a "reasonable belief" – that all of the restrained funds were not exempt.

74.     The case was adjourned to May 22, 2015 for another hearing pursuant to CPLR 5222-a(d) to determine whether the restraint on the funds in the Savings Account should be released. Plaintiff and Defendant Kavulich & Associates appeared at the May 22, 2015 hearing where Kavulich & Associates proceeded to argue its meritless Objection.

75.     At the May 22, 2015 hearing, Plaintiff, with the assistance of the Brooklyn Volunteer Lawyer for the Day Program, again provided the attorney appearing for Kavulich & Associates a copy of the May 7 Prage Affidavit and supporting documents.

76.     Undeterred, Kavulich & Associates continued to argue that the Savings Account was properly frozen and that SJ Cooper Realty, LLC was entitled to funds from the Savings Account, **despite irrefutable documentary evidence to the contrary**.

77.     At the May 22, 2015 hearing, the state court found that "the funds in the [Savings] [A]ccount are deemed exempt" and accordingly, issued an order that the "[a]ccount is released" and "any money taken from the account [is] to be returned to" Mr. Prage. *See* **Exhibit F.**

78.     While the state court nonetheless denied Mr. Prage's motion to vacate the default judgment, as previously noted, this action is not predicated on the the underlying judgment.

79.     Between April 4, 2015 and May 22, 2015, Plaintiff did not have any access to the funds in the Savings Account. The funds in the Savings Account were released on Mary 22, 2015 as directed by the state court.

80.     Incredibly, on or about July 30, 2015 Kavulich issued *yet another* restraint on the *same* account for which the state court previously ruled "the funds in the account are deemed exempt." *Id.*

81.     Mr. Prage had put no new funds into the account since May 22, 2015, making it indisputable that all of the funds in the account at that time were exempt and that Kavulich was well aware of this fact.

82.     The July 30, 2015 restraint was not released until Mr. Prage faxed the Marshal a copy of the May 22, 2015 court order that "deemed exempt" all the funds in the Savings Account.

Kavulich took no steps to release the restraint.

83.     Kavulich had no good faith basis for objecting to the exemption claim – and certainly no basis to continue the objection after receiving the May 7, 2015 Prage Affidavit. Kavulich objected and stood by its objection in order to abuse and intimidate Mr. Prage into agreeing to send payments from his exempt funds, or in hopes that Mr. Prage would default at the hearing on the exemption objection.

84.     It is the pattern and practice of Kavulich to object to exemption claims without a good faith basis, in order to coerce the least sophisticated consumers to pay money from exempt sources and in the hope that consumers will default by failing to appear at objection hearings, as baseless as such objections may be.

85.     Indeed, at the May 22, 2014 hearing, the attorney for Kavulich admitted that Kavulich has a pattern and practice of objecting to exemption claim forms.

86.   Astonishingly, on March 9, 2016, after the commencement of this action, Kavulich again attempted to restrain Mr. Prage's Chase bank account. **Exhibit G.**

~~86.~~87.   Defendants' actions inflicted damages on Mr. Prage. Access to the money in his Savings Account was required for Mr. Prage to live and meet his most basic daily needs. Plaintiff's inability to access these funds caused him suffering, financial hardship, and emotional distress.

~~87.~~88.   Throughout Defendants' wrongful garnishment of Plaintiff's exempt funds, Mr. Prage suffered emotional distress that directly impacted his daily life. Throughout this process, Mr. Prage felt powerless, violated, belittled, and worthless. He also felt that he was being treated like a criminal. Mr. Prage continuously asked himself, "how is this possible?". He contemplated whether the entire thing was a scam. He went back to state court time and again, continuously

telling Kavulich that the money in his Savings Account was exempt unemployment benefits; but Kavulich did not care. Mr. Prage could not sleep for weeks at a time and was kept up countless nights thinking about what to do. He began eating more as an attempted source of comfort. Mr. Prage was simply devastated that after finally being awarded unemployment benefits after an eight month appeal process, Kavulich swept in, froze his account, and attempted to seize his exempt benefits.

88.89.  When Mr. Prage found out that Kavulich had restrained his bank account for yet a second time, he was shocked, and dreaded the thought that he would be forced to "go through this all over again."

89.90.  To this day, Mr. Prage lives in fear that his bank account will be improperly frozen and executed upon, and that his wages will be improperly garnished. This causes Mr. Prage undue stress and anxiety when depositing money in the bank and applying for jobs. While Mr. Prage would like to move forward and live a "normal life," the threat that his money will be improperly restrained, making it impossible for him to pay bills, put food on the table, and otherwise lead a safe and healthy life, causes him grave and ongoing concern.

### D.   COUNT # 1: Violations of the Fair Debt Collection Practices Act (Against the Kavulich Defendants)

90.91.  Plaintiff repeats and realleges each and every allegation set forth in the above paragraphs of this Complaint as if fully set forth herein.

91.92.  The purpose of the FDCPA is "to eliminate abusive debt collection practices by debt collectors, to insure that debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged, and to promote consistent State action to protect consumers against debt collection abuses." 15 U.S.C. § 1692 (e); *see also Hamilton v. United Healthcare of*

*La., Inc.* 310 F.3d 385, 392 (5th Cir. 2002) ("Congress, through the FDCPA, has legislatively expressed a strong public policy disfavoring dishonest, abusive, and unfair consumer debt collection practices, and clearly intended the FDCPA to have a broad remedial scope.").

~~92.~~93.   Congress designed the FDCPA to be enforced primarily through private parties – such as plaintiff – acting as "private attorneys general." See S. Rep. No. 382, 95th Con. 1st Sess. 5, ("[t]he committee views this legislation as primarily self-enforcing; consumers who have been subject to debt collection abuses will be enforcing compliance"); and *Jacobson v. Healthcare Fin. Servs.*, 516 F.3d 85, 91 (2d Cir. 2008) ("[i]n this way, the FDCPA enlists the efforts of sophisticated consumers like [Plaintiff] as 'private attorneys general' to aid their less sophisticated Counterparts, who are unlikely themselves to bring suit under the Act, but who are assumed by the Act to benefit from the deterrent effect of civil actions brought by others.").

~~93.~~94.   The actions of Kavulich enumerated above constitute an attempt to collect a debt or were taken in connection with an attempt to collect a debt within the meaning of the FDCPA.

~~94.~~95.   Kavulich violated the following sections of the FDCPA: 15 U.S.C. §§ 1692e and 1692f. By way of example and not limitation Defendant violated the FDCPA by taking the following actions in an attempt to collect a debt or in connection with an attempt to collect a debt: using false, deceptive, or misleading representations or means; misrepresenting the character, amount, or legal status of the debt; misrepresenting the services rendered or compensation which may be lawfully received; false representation or implication that any individual is an attorney or that any communication is from an attorney; threatening to take and actually taking an action prohibited by law; communicating or threatening to communicate to any person, credit information which is known or which should be known to be false; using any false, deceptive, or misleading representations or means; using unfair or unconscionable means; and collecting or

seeking to collect any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law.

### E.   COUNT # 2: Conversion (Against All Defendants)

95.96.  Plaintiff repeats and realleges each and every allegation set forth above as if reasserted and realleged herein.

96.97.  The elements of conversion in New York State include: 1) having a possessory interest in property; and 2) having the possessory interest taken or interfered with by another in a manner that is contrary to the possessor's rights.

97.98.  Property subject to conversion includes readily identifiable funds from a bank account.

98.99.  Defendants intentionally and without authority, assumed and exercised control over Mr. Prage's money, interfering with his right to possession of the same, by: a) causing Mr. Prage's bank account to be restrained and b) by causing money to be withdrawn from Mr. Prage's bank account for bank fees.

99.100.       Defendants' improper restraint of Mr. Prage's money, which harmfully interfered with Mr. Prage's right to control his own property, constitutes conversion.

100.101.       For the reasons stated in the above Statement of Facts, and under the aforementioned Counts, Defendants' conduct is gross, wanton or deliberate, and demonstrates a high degree of moral culpability. The conduct demonstrates malice, insult, and/or willful or reckless disregard of Mr. Prage's rights, or other aggravated acts. Defendants' conduct evidences a high degree of moral culpability, or is so flagrant as to transcend mere carelessness, or constitutes willful or wanton negligence or recklessness to justify a punitive damage award.

101.102.        For these reasons, Plaintiff is entitled to exemplary and punitive damages, in addition to actual damages. Actual damages are outlined in the above statement of facts, and incorporated by reference.

### F.     COUNT 3: NEW YORK GENERAL BUSINESS LAW SECTION 349 *ET SEQ.* (AS TO KAVULICH ONLY)

102.103.        Plaintiff repeats and realleges each and every allegation set forth above as if reasserted and realleged herein.

103.104.        New York General Business Law §u349(a) prohibits "deceptive acts or practices in the conduct of any business, trade, or commerce, or in the furnishing of any service in this state…"

104.105.        An individual "injured by reason of any violation of this section may bring an action in his own name to enjoin such unlawful act or practice, an action to recover his actual damages or fifty dollars, whichever is greater, or both such action." N.Y. Gen. Bus. Law § 349(h). An individual may also be awarded punitive damages.

105.106.        As enumerated above, Kavulich violated N.Y. Gen. Bus. Law § 349 *et seq*. by using deceptive acts and practices in the conduct of their business that have broad impacts on consumers at large. This includes a pattern and practice of filing and maintaining objections to exemptions even in the face of irrefutable documentary evidence that all of the money in a restrained account is exempt from execution. Kavulich engages in this pattern and practice because it is profitable. The purpose of this pattern and practice is to pressure consumers to pay from exempt funds and to cause consumers to default by failing to appear at scheduled hearings.

106.107.      For these reason and for the other reasons stated in the statement of facts, Kavulich's conduct evidences a high degree of moral culpability, or is so flagrant as to transcend mere carelessness, or constitutes willful or wanton negligence or recklessness to justify a punitive damage award. Defendant's wrongful and deceptive acts caused injury and damages to Plaintiff.

107.108.      As a direct and proximate result of those violations of N.Y. Gen. Bus. Law § 349 *et seq*, Mr. Prage suffered compensable harm and is entitled to preliminary and permanent injunctive relief, and to recover actual, treble, exemplary, and punitive damages, together with costs and attorney's fees.

## G.   PRAYER

108.109.      WHEREFORE, Plaintiff requests the following relief:

a.      A declaration that Defendants have committed the violations of law alleged in this action;

c.      Actual damages, treble, exemplary, and punitive damages;

d.      Statutory damages under 15 U.S.C. § 1692k and under GBL § 349;

e.      An order awarding disbursements, costs, and attorneys' fees under 15 U.S.C. § 1692k and GBL § 349;

f.      Prejudgment and post judgment interest as allowed by law;

g.      All other relief, in law and in equity, both special and general, to which Plaintiff

may be justly entitled.

Dated:  Brooklyn, New York
          November 18, 2016

Respectfully submitted,

/s/

_____

Susan Shin
NEW ECONOMY PROJECT
121 West 27th Street, Suite 804
New York, NY 10001
Phone: (212) 680-5100
Fax: (212) 680-5104
Email: susan@neweconomynyc.org

/s/

_____

Ahmad Keshavarz
The Law Office of Ahmad Keshavarz
16 Court St., 26th Floor
Brooklyn, NY 11241-1026
Phone: (718) 522-7900
Fax:    (877) 496-7809
Email: ahmad@NewYorkConsumerAttorney.com