UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
ROMAIN PRAGE a/k/a ROMAINE PRAGE,

                        Plaintiff,                      No. 1:16-cv-01627-CBA-RLM

      -  against  -

KAVULICH & ASSOCIATES, P.C.;
GARY KAVULICH; and
SJ COOPER REALTY, LLC,

                        Defendants.
-----------------------------------------------------------------X

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION
FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

I. PRELIMINARY STATEMENT………………………………………………………1

II. BACKGROUND: NEW YORK EXEMPT INCOME PROTECTION ACT………………..2

III. STATEMENT OF UNDISPUTED FACTS………………………………………………4

IV. ARGUMENT…………………………………………………………………………18

    A. Rule 56 Standard for Summary Judgment…………………………………………...18

    B. Kavulich Violated the Fair Debt Collection Practices Act……………………………..18

        1. Kavulich violated section 1692e by making false, deceptive, and/or misleading statements in its attempts to collect on the alleged debt……………………………20

        2. Kavulich violated section 1692f by continuing to oppose Prage's exemption claim despite overwhelming evidence that all the restrained funds were exempt………..23

        3. Kavulich violated section 1692f by failing to notify the marshal to withdraw the levy and execution against Prage's account……………………………………………..28

    C. Kavulich Violated New York's Deceptive Acts and Practices Law, GBL § 349, by Making False and Deceptive Statements to Prage………………………………………...30

        1. Kavulich's conduct was consumer-oriented………………………………………….30

        2. Kavulich's conduct was materially misleading…………………………………….33

        3. Kavulich's conduct caused injury to Prage………………………………………….34

        4. Prage is entitled to punitive damages under GBL 349……………………………..35

    D. Defendants Kavulich and SJ Cooper Realty Are Liable for Conversion………………36

        1. Defendants committed conversion by continuing to restrain Prage's unemployment benefits despite overwhelming evidence that the restrained funds were exempt…..36

        2. Prage is entitled to punitive damages for conversion……………………………….37

    E. SJ Cooper Realty Is Vicariously Liable for Kavulich's Violations of State Law………39

V. CONCLUSION………………………………………………………………………41

## TABLE OF AUTHORITIES

*Aghaeepour v. N. Leasing Sys.*, No. 14-CV-5449 (NSR), 2015 U.S. Dist. LEXIS 161018 (S.D.N.Y. Dec. 1, 2015)……………………………………………………………………30

*Arias v. Gutman, Mintz, Baker & Sonnenfeldt, P.C.*, 875 F.3d 128 (2d Cir. 2017)……….2, 3, 19, 20, 22, 23, 24, 31, 38

*Ashare v. Mirkin, Barre, Saltzstein & Gordon, P.C.*, 106 Misc. 2d 866 (Sup. Ct. Suffolk Cty. 1980)........................................................................................................................38

*Avila v. Riexinger & Assocs.*, LLC, 817 F.3d 72 (2d Cir. 2016)……………..………………19

*Barkley v. Olympia Mortg. Co.*, 557 Fed. App'x 22 (2d Cir. 2014)……………..……………35

*Benzemann v. Citibank, N.A.*, 806 F.3d 98 (2d Cir. 2015)…………………………….……...18

*Carlin v. Davidson Fink LLP*, 852 F.3d 207 (2d Cir. 2017)……………………………………8

*Colavito v. New York Organ Donor Network, Inc.*, 827 N.Y.S.2d 96 (N.Y. 2006)…..…………36

*Cruz v. TD Bank, N.A.*, 711 F.3d 261 (2d Cir. 2013)………………..………………………….2

*Distressed Holdings v. Ehrler*, 113 A.D.3d 111, 976 N.Y.S.2d 517 (2d Dep't 2013)…………3

*Eades v. Kennedy, PC Law Offices*, 799 F.3d 161 (2d Cir. 2015)…………………………….23

*Easterling v. Collecto, Inc.*, 692 F.3d 229 (2d Cir. 2012)………………………….………..19, 23

*Ellis v. Solomon & Solomon, P.C.*, 591 F.3d 130 (2d Cir. 2010)……………………………19, 29

*Fritz v. Resurgent Capital Servs.*, 955 F. Supp. 2d 163 (E.D.N.Y. 2013)………….................33, 35

*Gallego v. Northland Grp. Inc.*, 814 F.3d 123 (2d Cir. 2016)…………………….………….24

*Giblin v. Murphy*, 73 N.Y.2d 769 (N.Y. 1988)…………………………………..…………….37

*Heintz v. Jenkins*, 514 U.S. 291 (1995)……………………………………………..…………23

*JD & K Assoc., LLC v Selective Ins. Grp., Inc.*, 118 A.D.3d 1402, 988 N.Y.S. 2d 749 (4th Dep't 2014)…………………………………………………………………………………35

*Jordan v. Tucker, Albin and Associates*, *Inc.*, No. 13-CV-6863 (JMA) (SIL), 2017 U.S. Dist. LEXIS 76702 (E.D.N.Y. May 19, 2017)……………………………………..…………....31

*Karlin v. IVF America, Inc.*, 93 N.Y.2d 282 (N.Y. 1999)……………………………………30

*Koch v. Greenberg*, 626 Fed. App'x 335, 340 (2d Cir. 2015)……………………….................33

*Kropelnicki v. Siegel*, 290 F.3d 118 (2d Cir. 2002)…………………………………….................18

*Manekas v. Allied Discount Co.*, 6 Misc.2d 1079, 166 N.Y.S.2d 366 (Sup. Ct. Kings Cty. 1957)………………………………………………………………………………………………..38

*Martinez v. LVNV Funding LLC*, No. 14-CV-00677 (RRM) (ST), 2016 U.S. Dist. LEXIS 136613 (E.D.N.Y. Sept. 30, 2016)……………………………………………………………..……………33

*Midland Funding, LLC v. Giraldo*, 39 Misc.3d 936, 961 N.Y.S.2d 743 (Dist. Ct. 2013)……….32

*Midland Funding, LLC v. Roberts*, 37 Misc.3d 617, 950 N.Y.S.2d 867 (Sup Ct Sullivan Cty. 2012)……………………………………………………………………………………21, 22, 24, 31

*Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*, 85 N.Y.2d 20 (N.Y. 1995)…………………………………………………………………………………………30, 31

*Park Ave. Realty, LLC v Schindler El. Corp.*, 129 A.D.3d 598, 12 N.Y.S.3d 47 (1st Dep't 2015)……………………………………………………………………………..………35

*Romea v. Heiberger & Assocs.*, 163 F.3d 111 (2d Cir. 1998)…………………………..……19

*Rozier v. Fin. Recovery Sys., Inc.*, No. 10-CV-3273 (DLI) (JO), 2011 U.S. Dist. LEXIS 61307 (E.D.N.Y. June 7, 2011)………………………………………………………………..33, 34

*Samms v. Abrams, Fensterman, Fensterman, Eisman, Formato, Ferrara & Wolf, LLP*, 163 F. Supp. 3d 109, 115 (S.D.N.Y. 2016)…………………………………………………….……33

*Schaffner v. Pierce*, 75 Misc.2d 21, 347 N.Y.S.2d 411 (Dist. Ct. Nassau Cty. 1973)………..…38

*Sledge v. Kooi*, 564 F.3d 105 (2d Cir. 2009)…………………………………………………18

*Stutman v. Chem. Bank*, 95 N.Y.2d 24 (N.Y. 2000)……………………………………..…30

*Vincent v. Money Store*, 736 F.3d 88 (2d Cir. 2013)………………………………………19

*Warner v. Village of Chatham*, 194 A.D.2d 980, 598 N.Y.S.2d 863 (3d Dep't 1993)………..…38

*Wilner v. Allstate Ins. Co.*, 71 A.D.3d 155, 893 N.Y.S.2d 208 (2d Dep't 2010)………………..35

**STATUTES**

N.Y. C.P.L.R. 5222……………………………………………………….………………3

N.Y. C.P.L.R. 5222-a………………………………………………………3, 4, 11, 21, 22, 24, 25

N.Y. C.P.L.R. 5232…………………………………………………………………28

N.Y. Labor Law § 595…………………………………………………………….3

Fed. R. Civ. P. 56(a)…………………………………………………………...18

## I.     PRELIMINARY STATEMENT

In 2012, Defendants Kavulich & Associates, a debt collection law firm, and Gary Kavulich, its principal (together, "Kavulich"), obtained a judgment against Plaintiff Romain Prage for defaulting on a settlement agreement that he had never signed, and which arose from an apartment lease that he had signed as a guarantor to help out a friend. In around early April 2015, Kavulich ordered Chase Bank ("Chase") to restrain Prage's bank account, which contained only exempt unemployment benefits. Pursuant to New York law, Chase left $2,100 available to Prage, but restrained the remaining balance and charged him a fee for the restraint.

During the next few weeks, Kavulich made false statements to Prage—and to a state court—about his exempt funds and the proof needed to release them, and refused to release the restraint even after receiving overwhelming evidence that the restrained funds were exempt.

When Prage told Kavulich that all the restrained funds were unemployment benefits transferred from a New York State Department of Labor card into his savings account, Kavulich falsely claimed that the transfer had rendered the unemployment benefits non-exempt. When Prage submitted an exemption claim pursuant to state law, Kavulich filed an objection containing false statements that misrepresented state law on exemption claims. When Prage presented additional documents in support of his exemption claim, at a court hearing, a Kavulich attorney responded that the only thing he would discuss was settlement. When Prage presented still more documents, at a second court hearing—documents that overwhelmingly established that the restrained funds were unemployment benefits—Kavulich still refused to release the account.

In refusing to release the restraint, Kavulich ignored well-established state protections for exempt funds. State law has long exempted certain types of income, including unemployment benefits, from debt collection. Nevertheless, widespread problems around debt collectors'

1

restraint and seizure of statutorily exempt income from New Yorkers' bank accounts led the New York State legislature to enact a remedial consumer protection statute, the Exempt Income Protection Act (EIPA), in 2008. The EIPA provides an expedited procedure for seeking the release of restrained exempt funds and imposes substantive and procedural requirements on the debt collector restraining the funds.

Prage brought this lawsuit in 2016, alleging violations of the Fair Debt Collection Practices Act (FDCPA) and state law, and now moves for summary judgment on his claims.

The allegations in this case are disturbingly similar to those in *Arias v. Gutman, Mintz, Baker & Sonnenfeldt, P.C.*, 875 F.3d 128 (2d Cir. 2017) (and for that reason this Court stayed briefing on the instant motion while the Second Circuit's decision was pending). There, the Second Circuit held, *inter alia*, that the debt collection law firm's false statements—misrepresenting, as here, the law relating to an exemption claim—could deter a consumer from defending his exemption claim and, as alleged, violated section 1692e of the FDCPA. The Second Circuit also held that the debt collection law firm's refusal to release a restraint despite overwhelming proof that the restrained funds were exempt—in order to abuse and intimidate the judgment debtor into agreeing to make payments from exempt funds, or in hopes that he would default at a hearing—supported a claim of unfair or unconscionable conduct in violation of section 1692f of the FDCPA.

The Court should grant summary judgment in favor of Plaintiff.

## II.    BACKGROUND: NEW YORK EXEMPT INCOME PROTECTION ACT

"In 2008 New York enacted the Exempt Income Protection Act ('EIPA') to better protect 'exempt funds from forcible collection—a problem that had reached epidemic proportions in New York State.'" *Arias*, 875 F.3d at 131 (quoting *Cruz v. TD Bank, N.A.*, 711 F.3d 261, 270 (2d

Cir. 2013)). "The EIPA 'remedied an imbalance to the prior law which unfairly placed the burden on debtors to show that their funds were exempt, at a time when they were being deprived access to those funds.'" *Id.* (quoting *Distressed Holdings v. Ehrler*, 113 A.D.3d 111, 115, 976 N.Y.S.2d 517, 521 (2d Dep't 2013)).

Under New York law, a judgment creditor's attorney may seek to restrain a judgment debtor's bank account by serving a restraining notice on the judgment debtor's bank, along with an Exemption Notice and two Exemption Claim Forms. N.Y. C.P.L.R. 5222(a), 5222-a(b)(1). The EIPA provides that a certain amount of funds in a judgment debtor's bank account—$2,100[1] at the time of the alleged facts—is automatically protected and cannot be restrained. N.Y. C.P.L.R. 5222(i); see *Arias*, 875 F.3d at 132 ("The bank must leave unrestrained a minimum amount for the debtor's basic needs, calculated based on the federal and New York minimum wage laws."). The EIPA also provides an expedited process through which the judgment debtor may seek the release of any exempt funds—those in excess of $2,100—that may end up restrained. N.Y. C.P.L.R. 5222-a. The process imposes certain duties and deadlines on the judgment creditor, who may also choose, "[a]t any time during the procedure specified," to "direct the banking institution to release the funds in question to the other party...." N.Y. C.P.L.R. 5222-a(f).

A judgment debtor may claim that restrained funds are exempt[2] by completing the Exemption Claim Forms, and is informed by the Exemption Notice that:

---

[1] Plaintiff's Memorandum of Law refers to the amount in effect at the time of the alleged facts, which was $2,100. The amount increases in tandem with the higher of the state or federal minimum wage, and is currently $2,640.

[2] In this case, the exempt funds in question were unemployment benefits, which are "exempt from all claims of creditors and from levy, execution, and attachment, or other remedy for recovery or collection of a debt." N.Y. Labor Law § 595 (2).

> You may be able to get your account released faster if you send to
> the creditor or its attorney written proof that your money is
> exempt. Proof can include an award letter from the government, an
> annual statement from your pension, pay stubs, copies of checks,
> bank records showing the last two months of account activity, or
> other papers showing that the money in your bank account is
> exempt.

N.Y. C.P.L.R. 5222-a(b)(3), (b)(4)(a), (c). If the judgment creditor does not object to the

exemption claim, the bank must release the restrained funds eight days after the date postmarked

on the envelope containing the executed Exemption Claim Form. N.Y. C.P.L.R. 5222-a(c)(3).

A judgment creditor may object to the exemption claim by moving for a court order, but

must, in addition to other requirements, notice the hearing to decide the motion "for seven days

after service of the moving papers" and bear the burden of proof "to establish the amount of

funds that are not exempt." N.Y. C.P.L.R. 5222-a(d). An executed Exemption Claim Form is

*prima facie* evidence that the restrained funds are exempt. *Id.*

As discussed below, *infra* at Part IV.B.1., Kavulich materially misrepresented to Prage

the protections EIPA afforded him, in addition to violating at least one provision thereof.

## III.    STATEMENT OF UNDISPUTED FACTS

The following facts correspond to Plaintiff's Local Rule 56.1 Statement ("Pl. 56.1"),

based on exhibits attached to the Declaration of Susan Shin ("Shin Decl."), dated December 18,

2017. Both documents are filed in support of Plaintiff's Motion for Summary Judgment.

The Kavulich Defendants are debt collectors that file thousands of debt collection lawsuits

in civil court each year, seeking to enforce putative debts obtained by others, primarily for rent.

¶¶ 1-5, 7. Many, if not most, of these collection lawsuits are signed by Mr. Kavulich, including all

of the pleadings relevant to the instant lawsuit. ¶¶ 6, 10.

In 2008, Plaintiff Romain Prage signed a residential apartment lease as a guarantor to help his then-girlfriend, Taisha Dean, secure an apartment. ¶¶ 11, 38. At some point, Ms. Dean became delinquent on her rent and on or about December 21, 2010, Defendant SJ Cooper Realty, LLC, through its attorney Kavulich, brought a collection lawsuit, naming Mr. Prage and Ms. Dean as defendants. ¶¶ 39-40. Mr. Prage and Ms. Dean filed separate *pro se* answers, claiming that the amount of rent claimed due was grossly inflated. ¶ 43. When Mr. Prage filed his *pro se* answer with the Civil Court, the clerk informed him that he would be notified of his next court date via mail. ¶ 44. However, Mr. Prage never received notice of a court date, and accordingly, never appeared in court. ¶ 45. Ms. Dean appeared at a June 30, 2011 court hearing and, without Mr. Prage's knowledge or consent, executed a Stipulation of Settlement ("Stipulation") in which she agreed to pay $2,500 to SJ Cooper Realty in monthly installments of $150. ¶ 46. The Stipulation contains a signature that purports to be the signature of Mr. Prage, even though he was not at the hearing when the Stipulation was signed and never signed the Stipulation. ¶¶ 48-50. Ms. Dean later defaulted on the Stipulation and Kavulich obtained judgments against both Ms. Dean and Mr. Prage. ¶ 47. The Stipulation states that judgment shall not enter unless Kavulich first provides a ten-day notice to cure, however Kavulich never provided Mr. Prage with such notice. ¶¶ 52-53.

Mr. Prage had no knowledge of the Stipulation, the default on the Stipulation, or the judgment entered as a result of the default until April 2015. ¶ 51.  He first learned of the Stipulation and subsequent judgment after he received a notice from Chase on or about April 3, 2015 that his Chase savings account containing his exempt unemployment benefits was restrained due to an Information Subpoena and Bank Restraint Notice. ¶ 54.

In or around April 2014, Mr. Prage was laid off from his job at Surgicare of Manhattan, LLC.  ¶ 12. Soon after, he applied to the New York State Department of Labor ("NYS DOL") for unemployment insurance benefits. ¶ 13. While he was initially denied unemployment benefits, Mr. Prage appealed and on March 4, 2015, approximately ten months after his initial application for unemployment benefits was submitted, the NYS DOL reversed its initial denial, determining that Mr. Prage did in fact qualify for retroactive unemployment benefits. ¶ 14-16. The reversal came as a huge relief to Mr. Prage, as he was subsisting on borrowed money while his appeal was pending. ¶ 17. Between March 16, 2015 and March 25, 2015, the NYS DOL made a series of deposits into an Unemployment Insurance Account established for Mr. Prage, compensating him for his unpaid unemployment insurance benefits, totaling $10,655. ¶¶ 19-20, 26, 28.

The Unemployment Insurance Account was set up for the specific and exclusive purpose of receiving Mr. Prage's unemployment insurance benefits and no other funds were, or could have been, deposited into the account in March 2015 aside from Mr. Prage's unemployment benefits from the NYS DOL. ¶¶ 21-24. Mr. Prage's Unemployment Insurance Account was directly linked to a NYS DOL "Direct Payment Card." ¶ 27. On March 27 and March 30, 2015, Mr. Prage went to a Chase branch and on each date, he withdrew $5,000 of his unemployment benefits from his Direct Payment Card account and immediately deposited the funds into his Chase savings account. ¶¶ 29-33. As a result, after the March 30, 2015 deposit, Mr. Prage's Chase savings account contained $10,000 – the exact combined amount of the March 27 and March 30, 2015 deposits. ¶ 34.  There were no other transactions associated with Mr. Prage's savings account in March 2015 and the balance in the account continued to be exactly $10,000 through April 3, 2015. ¶¶ 35-36.

6

As directed by Kavulich, Chase restrained Mr. Prage's Chase savings account on April 3, 2015 and then then instructed NYC Marshal Stephen W. Biegel ("Marshal Biegel") to issue a levy and demand for the restrained funds. ¶¶ 57-58. As instructed, Marshal Biegel issued a levy and demand on April 8, 2015, telling Chase to forward Mr. Prage's funds to the Marshal. ¶ 59. Mr. Prage received a notice from Chase that his bank account had been restrained on or about April 3, 2015. ¶ 62. Mr. Prage then checked the New York State Unified Court System's online e-Courts website, requested the court file, and learned for the first time of the Stipulation and his forged name on the same. ¶ 63. At the time that Mr. Prage's Chase savings account was restrained, it contained only the exempt unemployment benefits transferred by Mr. Prage on March 27 and March 30, 2015 from his Unemployment Insurance Account. ¶ 64.

On April 4, 2015, Mr. Prage faxed filled out his Exemption Claim Form and faxed it to Kavulich along with his unemployment benefits award letter and a letter stating that all the funds in the restrained savings account were exempt unemployment benefits. ¶¶ 65-67. Mr. Prage also called Kavulich on April 6, 2015 and informed Kavulich that all of the funds in the restrained account were exempt unemployment benefits. ¶ 69. Kavulich nonetheless requested that Mr. Prage make a payment as a settlement of the claims in the Collection Lawsuit. ¶ 70. Mr. Prage understood Kavulich to be saying that he should make a payment from his exempt unemployment benefits. ¶ 71. During the April 6, 2015 call, Kavulich also claimed that it had not received the Exemption Claim Form faxed by Mr. Prage on April 4, 2015. ¶ 72.

Mr. Prage faxed the Exempt Claim Form to Kavulich again after the April 6, 205 call and also faxed bank statements and receipts showing that the funds in the restrained account had all been transferred from his unemployment benefits account. ¶¶ 73-74. Mr. Prage called Kavulich again on April 9, 2015, to confirm Kavulich had received his Exemption Claim Form. ¶ 75. On

7

the call, Kavulich stated that it had received and had reviewed Mr. Prage's faxed Exemption

Claim Form and accompanying documents. ¶¶ 76-77.  Kavulich also stated that the funds in the

restrained accounts lost their exempt status because they had been transferred. ¶ 78.

On or about April 16, 2015, Kavulich filed a motion for post-possession money

enforcement, objecting to Mr. Prage's exemption claim, requesting a hearing, and including a

Notice of Motion setting April 29, 2015 as the date for the objection hearing. ¶¶ 81-82. The

Kavulich Objection included an affirmation of Gary Kavulich, submitted under penalty of

perjury pursuant to CPLR 2106 that misstated New York law. ¶¶ 83-84, 89. Specifically, the

Kavulich Affirmation stated that 1) Plaintiff's "claim for exemption that she (sic) should not

have her (sic) account garnished because it contains funds from unemployment cannot be

granted as there is no account of the funds in the subject account(s)" ¶85; 2) "[i]f [exempt] funds

were/are co-mingled with non-exempt funds, the law clearly states that the otherwise exempt

funds lose their protected status" ¶ 86; and 3) "[w]ithout comprehensive proof of what funds are

in the subject account(s) and that they meet the statutory requirements entitling those funds to an

exemption, Plaintiff/Judgment/Creditor is entitled to any non-exempt funds to satisfy the

underlying judgment" ¶ 87.

By executing and filing the objection, Kavulich represented to Mr. Prage that an attorney

had conducted a meaningful review of the facts and circumstances and determined that there was

a reasonable basis for the objection. ¶ 94. However, Kavulich did not conduct a reasonable

attorney review of the facts and circumstances of Mr. Prage's case prior to filing the objection. ¶

95. The Kavulich objection was drafted using a form template that Kavulich regularly uses when

objecting to consumers' exemption claim forms. ¶ 90.

Kavulich sent a *per diem* attorney named Jonathan Kingston to handle the April 29, 2015 hearing. ¶ 98. Mr. Prage was represented at the hearing by an attorney with the Volunteer Lawyer for the Day program through a limited scope retainer. ¶ 99. The documents Mr. Prage brought to the hearing constituted overwhelming evidence that all of the funds in the restrained account were exempt unemployment benefits. ¶ 101. Mr. Kingston emailed the documents that Mr. Prage gave him at the April 29, 2015 hearing to Kavulich. ¶ 109. Thus, by April 29, 2015, Kavulich had been provided overwhelming documentary evidence that the restrained funds were exempt unemployment benefits. ¶ 110. However, Kavulich chose not to withdraw the objection to Mr. Prage's exemption claim. ¶ 111. Instead, upon receipt of the overwhelming documentary evidence of exemption produced by Mr. Prage, Kavulich—through Mr. Kingston—maintained the objection. ¶ 107.

At the April 29, 2015 hearing, Mr. Kingston stated that the Mr. Prage's unemployment benefits were no longer exempt because they had been commingled with non-exempt funds. ¶ 104. The judge entered a written order directing Chase to release $1,000 to Mr. Prage and adjourned to May 8, 2015. ¶¶ 105, 108. In a report dated April 29, 2015, Mr. Kingston told Kavulich that "[Prage] produced [documents] which he states show the restrained funds all unemployment funds. They seem fishy, as it appears [Prage] withdrew $10K IN CASH from one account only to deposit it another, which you restrained." ¶ 106.

As a result of Kavulich's failure to withdraw the objection, Mr. Prage had to attend yet another hearing. ¶ 112. By failing to withdraw the objection prior to the May 8, 2015 hearing, Kavulich represented to Mr. Prage that an attorney had performed a meaningful review of the facts and circumstances surrounding Mr. Prage's exemption claim and had determined that there was merit to Kavulich's objection. ¶ 113. On or about May 7, 2015, Mr. Prage executed a *pro se*

9

affidavit in further support of his Order to Show Cause to vacate the default judgment and to challenge the Kavulich Objection explaining that all of the funds in his savings account were exempt from execution and providing even more proof that the restrained funds were entirely exempt. ¶¶ 114-116.

At the May 8, 2015 hearing on the OSC and the Kavulich Objection, Mr. Prage provided Mr. Kingston with his May 7 Affidavit and the attachments thereto, consisting of overwhelming evidence that the restrained funds were exempt unemployment benefits. ¶¶ 117, 119. Mr. Kingston continued to assert that the unemployment benefits were no longer exempt because they had been commingled with non-exempt funds. ¶ 118. When Mr. Prage attempted to show Mr. Kingston the documents demonstrating that all of the money in his savings account was exempt, Mr. Kingston refused to review the documents stating, "I do not want to hear about your case unless you are willing to settle." ¶¶ 100, 102. Mr. Kingston's behavior at the hearing made Mr. Prage feel belittled, humiliated, and hopeless. ¶ 103.

At his deposition, Mr. Kingston acknowledged that the Mr. Prage's May 7 Affidavit demonstrated that all the restrained funds were exempt unemployment benefits. ¶ 120. Mr. Kingston also testified that "[i]t's clear [Prage] had unemployment insurance. But the fact of the matter is there was some question as to deposits and the timing of deposits. And cash transfers amongst accounts." ¶ 121. Yet, rather than withdrawing Kavulich's motion upon receipt of the overwhelming documentary evidence of exemption produced by Mr. Prage, Kavulich—through Mr. Kingston—again maintained the objection during the May 8, 2015 court date. ¶ 122.

The May 8, 2015 hearing was adjourned to May 22, 2015. ¶ 123. After being provided with the May 7 Prage Affidavit, Kavulich continued to oppose Prage's exemption claim, refusing

to release the restraint until after the state court deemed the funds exempt. ¶ 124. By failing to withdraw his objection after receiving the May 7 Prage Affidavit, Kavulich represented to Mr. Prage that an attorney had performed a meaningful review of the facts and circumstances surrounding Mr. Prage's claim of exemption and had determined that there was merit to the objection to Mr. Prage's exemption claim form.  ¶ 125.

At his deposition, Kavulich claimed that if his firm receives, along with or subsequent to an exemption claim, documentation or information that an account he has restrained contains exempt funds, "We look at what they sent us. If they sent us proof that it should not be restrained and it is exempt, we will send a release to the bank." ¶ 126. However, Kavulich did not review the May 7, 2015 affidavit or supporting documents prior to the May 22, 2015 court hearing. ¶ 127.

The case was adjourned to May 22, 2015 for another hearing pursuant to CPLR 5222-a(d). ¶ 128. Mr. Prage and Mr. Kingston appeared at the May 22, 2015 hearing where Kavulich proceeded to argue the objection. ¶ 129. At the May 22, 2015 hearing, Mr. Prage again provided the attorney appearing for Kavulich a copy of the May 7 Prage Affidavit and supporting documents. ¶ 130. Undeterred, Kavulich & Associates continued to argue that the Chase savings account was properly restrained and that SJ Cooper Realty, LLC was entitled to funds from the Chase. ¶ 131. At the hearing, Mr. Kingston told Mr. Prage that he would make it his "life's mission" to take from me the $1,000 that the court had ordered released to me on April 29, 2015, along with the other funds in my Chase savings account. ¶ 132. At the hearing, the court found that "the funds in the [Savings] [A]ccount are deemed exempt" and accordingly, issued an order that the "[a]ccount is released" and "any money taken from the account [is] to be returned to" Mr. Prage. ¶ 133. Following the May 22, 2015 order, Kavulich did not direct Marshal Biegel to

11

tell Chase to release Mr. Prage's account. ¶ 135. At his deposition, Kavulich acknowledged that there were no records in either Kavulich's notes or the marshal's notes that Kavulich had notified the marshal of the court's May 22, 2015 order. ¶ 137. Kavulich was aware that the funds would remain restrained until Marshal Biegel instructed Chase to release the account. ¶ 138. On May 26, 2015, Kavulich sent a letter to Chase instructing the bank to release the restraint that Kavulich had ordered on Prage's account. ¶ 139.

Prior to the April 29, 2015, May 8, 2015, and May 22, 2015 hearings, Kavulich made no effort to obtain any information concerning the status of the restrained funds. ¶ 134.

Kavulich also failed to direct NYC Marshal Stephen Biegel to withdraw the levy that the marshal had separately served on Chase on April 8, 2015, ordering Chase to restrain Prage's account. ¶ 140. Kavulich understands that, where Kavulich has directed the Marshal to issue a property execution, and a court subsequently orders the release of the account, it is necessary to inform the Marshal of the order directing the release of the funds. ¶ 141. By failing to do so, Kavulich failed to prevent the marshal from serving the levy on Chase again on July 28, 2015. ¶ 142. Thus, on July 30, 2015, Mr. Prage received an email from Chase informing Mr. Prage that his Chase savings account was subject to yet another hold. ¶ 143. On or about August 3, 2015, Mr. Prage sent Marshal Biegel the May 22, 2015 court order that Mr. Prage's account be released. ¶ 144. On August 3, 2015, Marshal Biegel emailed Kavulich to inform Kavulich that Mr. Prage had sent Marshal Biegel the May 22, 2015 court order. ¶ 145. In the August 3, 2015 email, Marshal Biegel asked Kavulich to "[p]lease advise on how to proceed since the account is still being held?" ¶ 146. In its response to the August 3, 2015 email from Marshal Biegel, Kavulich directed Marshal Biegel to release the account. ¶ 147. Although the court had ordered the funds released on May 22, 2015, Kavulich did not direct Marshal Biegel to release the funds

12

until August 3, 2015. ¶ 148. On August 3, 2015, Marshal Biegel directed Chase to release the execution. ¶ 149. Chase released the account shortly after receiving Marshal Biegel's August 3, 2015 letter. ¶ 150. On March 9, 2016, after the commencement of this action, Kavulich again attempted to restrain Mr. Prage's Chase bank account. ¶ 151. Mr. Kavulich has no independent recollection of his attempts to collect the debt alleged to be owed by Mr. Prage. ¶ 152.

(Kavulich routinely fails to instruct marshals to release restrained funds and stop income executions after being ordered to cease executing. ¶ 167. In *Prana Growth Fund I, LP v. Rauda-Rodriguez*, Index No. CV-11024/09-BX, the judgment was vacated and all income executions were permanently stayed on May 9, 2014. ¶ 168. On August 3, 2015, Marshal Biegel's office emailed Kavulich asking what they should do with the seven payments in escrow. ¶ 169. Kavulich responded that the order to show cause was granted, but instructed the Marshal to hold the funds pending a final disposition. ¶ 170. On September 2, 2015, Kavulich filed a motion to restore the case to the calendar and for a judgment. ¶ 171. Pursuant to the court's September 15, 2015 order, the case was restored to the calendar but plaintiff's request for a judgment was denied. ¶ 172. On November 6, 2015 – nearly one-and-a-half years after the judgment was vacated – Marshal Biegel again emailed Kavulich reminding him that they had been holding money since April and asking what they should do with it. ¶ 173.

In *Kelly Street Realty, Inc. v. Marrero*, Index No. CV-100350/08-BX, on May 12, 2015, a decision was entered vacating the judgment and all garnishments, restraints, executions, and levies, and ordering plaintiff to return all monies collected. ¶ 174. Despite the judgment being vacated on May 19, 2015, Kavulich instructed Marshal Biegel's office to keep the case on hold. ¶ 175. On June 4, the Marshal's office attached a copy of the May 12 decision and asked Kavulich what they should do with the seven payments they were holding. ¶ 176. Kavulich instructed the Marshal to send a

13

release. ¶ 177. The Marshal followed up in emails dated June 4, June 10, June 15, June 23, July 2, July 13, and July 21, asking what they should do with the eight payments in escrow. ¶ 178. On June 9, 2015, Kavulich filed an order to show cause seeking reargument of defendant's motion to vacate the judgment and seeking an amendment or vacatur of the May 12, 2015 decision. ¶ 179. And in response to the Marshal's inquiry into the status of the case, Kavulich explained on July 22 that they were waiting on a decision on their motion to reargue. ¶ 180. The court denied Kavulich's motion to reargue on October 14, 2015. ¶ 181. But when the Marshal's office again emailed on November 6 asking what to do with the funds, Kavulich responded that there was still no decision. ¶ 182. On January 13, 2016, Kavulich filed another order to show cause to reargue, which the judge declined to sign. ¶ 183. On February 10, 2016, the case was dismissed following plaintiff's failure to appear for trial and plaintiff was again ordered to return all monies to defendant in accordance with the May 12, 2015 order. ¶ 184. The Marshal's office asked about the status of the order to show cause on March 10, to which Kavulich responded on March 14, 2016 that the case was dismissed. ¶ 185. The Marshal wrote Kavulich on March 14 – approximately ten months after the judgment was vacated and the monies were ordered returned – and stated that they would return the money. ¶ 186.

In *Novick, Edelstein, Lubell, Reisman, Wasserman & Leventhal, P.C. v. Rosemary*, Index No. CV-042539/11-BX, the judgment and all execution measures were vacated pursuant to a February 26, 2013 stipulation entered on the return date of an order to show cause to vacate the default judgment. ¶ 187. When Marshal Biegel's office asked on May 17, 2013 about the outcome of the order to show cause, Kavulich responded that the judgment was vacated. ¶ 188. On May 22, the Marshal's office asked if the $723.91 on hold should be returned to the employer. ¶ 189. Marshal Biegel's office followed up on May 31, June 17, and August 12. ¶ 190. On August 12, 2013 – more than five-and-a-half months after the judgment was vacated – Kavulich instructed the

14

Marshal to return the money. ¶ 191.

In *2246 Webster Avenue, HDFC v. Nunez and Martinez*, Index No. CV-33659/11-BX, pursuant to a May 17, 2013 decision, the default judgment and all levies, attachments, and garnishments were vacated, plaintiff was directed to return all funds to the defendants, and the case was dismissed. ¶ 192. On May 28, Marshal Biegel's office emailed Kavulich indicating the debtor had just sent the May 17 decision and asking if the Marshal should send a release to the employer. ¶ 193. On May 30 and June 3, the Marshal's office emailed Kavulich asking what they should do and saying the debtor keeps calling because his pay is still being garnishment. ¶ 194. Gary Kavulich responded: "Tell him to stop calling Marshal. We've been in touch with our client for his $ back. It takes time." ¶ 195. The Marshal's office wrote that the debtor was more concerned about the garnishment proceeding and asked if they could send a release to the employer, to which Kavulich agreed. ¶ 196. On June 26, 2013, Kavulich instructed the Marshal to stop the income execution, which the Marshal indicated they had already done. ¶ 197. On February 7, 2014 – more than eight-and-a-half months after the judgment was vacated – defendant Nunez moved the court to enforce the May 17, 2013 decision, stating that the plaintiff had not complied and plaintiff's attorneys claimed there were no documents stating they were to return the money to defendant. ¶ 198. The motion was marked withdrawn as moot, with a notation indicating that $4,242.10 had been tendered by plaintiff. ¶ 199.

In *795 Sheva Realty Assoc. LLC v. Gasparro*, Index No. LT-61457/07-NY, the default judgment was vacated on January 13, 2015. ¶ 200. That same day, Marshal Biegel's office wrote to Kavulich asking if they should return the funds to the debtor. ¶ 201. Gary Kavulich instructed the Marshal to vacate the garnishment but hold the money pending a May court date. ¶ 202. The Marshal's office reported on January 15 that "[t]he debtor keeps calling us ferociously, insisting that

I send her in writing that we're holding her money pending decision from court date 5/14/15." ¶ 203. A second decision dated May 14, 2015 also stated the judgment was vacated, all liens, restraints and garnishments were lifted, and ordered plaintiff not to enforce the remaining balance due under an April 2, 2007 stipulation without further order of the court. ¶ 204. On May 22, 2015, Marshal Biegel's office emailed Kavulich asking about the status and what they should do with the $266 in escrow. ¶ 205. The Marshal's office followed up again on June 10 and July 27. ¶ 206. On September 17, 2015, Kavulich emailed Marshal Biegel's office asking about the status of the income execution. ¶ 207. Marshal Biegel responded that the case was on hold pending Gary's update. ¶ 208. Kavulich replied that the judgment had been vacated. ¶ 209. Marshal Biegel's office notified Kavulich on September 17 and November 6 that they were still holding money in the case and asked if it should be returned. ¶ 210. Kavulich responded on November 9 that they should hold onto it because they were in the process of doing a motion to reinstate the judgment. ¶ 211. Marshal Biegel's office followed up again on February 27, 2016 – more than one year after the judgment was vacated – asking if Kavulich had reinstated the judgment and noting that they were still holding $252.00. ¶ 212.

Kavulich has been sued in a prior FDCPA action for intentionally executing on a non-existent judgment. ¶ 213. In *Ormsby v. Gary Kavulich et al*, the plaintiff alleges "[D]efendants violated the FDCPA in seeking to collect on a non-existent judgment against plaintiff for a debt plaintiff has never owed". ¶ 214.

In *Kelly Street Realty Corp. v. Velazquez*, Index No. CV-24996/10-BX, the judgment was vacated and all restraints, levys, or garnishments were lifted pursuant to a July 1, 2010 order. ¶ 215. Kavulich never obtained a second judgment against Velasquez. ¶ 216. But on August 13, 2014, Kavulich appeared to email Marshal Biegel's office an income execution. ¶ 217. The Marshal's

office responded that they were advised in 2010 that the judgment was vacated, and asked if it had since been reinstated. ¶ 218. Kavulich's office indicated that they would check with Gary, and then followed up with: "Yes proceed with IE". ¶ 219. The Marshal's office emailed again on October 3, 2014, seeking confirmation that they were to send a release to the employer and noting that Kavulich had advised them on August 13 to proceed with the income execution. ¶ 220. Kavulich confirmed the release, noting that the judgment was vacated. ¶ 221. Plaintiff's inability to access his funds caused him suffering, financial hardship, and emotional distress. ¶ 222.)

Throughout Defendants' wrongful garnishment of Plaintiff's exempt funds, Mr. Prage suffered emotional distress that directly impacted his daily life. ¶ 223. Mr. Prage felt panicked, powerless, violated, belittled, and worthless. ¶ 224. Mr. Prage also felt that Kavulich had treated him like a criminal. ¶ 225. Mr. Prage continuously asked himself, "How is this possible?" and contemplated whether the entire experience was a scam. ¶ 226. When Mr. Prage was forced to return to court again and again, he questioned whether he would be able to produce enough evidence that his restrained funds were in fact exempt. ¶ 227. Mr. Prage went back to state court time and again, continuously telling Kavulich that the money in his Chase savings account was exempt unemployment benefits. ¶ 228. Mr. Prage could not sleep for weeks and stayed awake many nights wondering what to do. ¶ 229. Mr. Prage began eating more than usual in an attempt to seek comfort. ¶ 230. Mr. Prage was simply devastated that after finally being awarded unemployment benefits after an eight month appeal process, Kavulich swept in, froze his account, and attempted to seize his exempt benefits. ¶ 231.

When Mr. Prage found out that Kavulich had restrained his bank account for yet a second time, he was shocked, and dreaded the thought that he would be forced to "go through this all over again." ¶ 232. To this day, Mr. Prage lives in fear that his bank account will be improperly

17

restrained and executed upon, and that his wages will be improperly garnished. ¶ 233. This fear is not unfounded, as Kavulich froze Mr. Prage's exempt funds on two occasions after the May 22, 2015 court order directing Kavulich to release the restraint. ¶ 234. This causes Mr. Prage undue stress and anxiety when depositing money in the bank and applying for jobs. ¶ 235. While Mr. Prage would like to move forward and live a "normal life," the threat that his money will be improperly restrained, making it impossible for him to pay bills, put food on the table, and otherwise lead a safe and healthy life, causes him grave and ongoing concern. ¶ 236.

## IV.    ARGUMENT

### A.  Rule 56 Standard for Summary Judgment

"Summary judgment is warranted when, after construing the evidence in the light most favorable to the nonmoving party and drawing all reasonable inferences in its favor, there is no genuine issue as to any material fact." *Sledge v. Kooi*, 564 F.3d 105, 108 (2d Cir. 2009); see Fed.R.Civ.P. 56(a).

### B.  Kavulich Violated the Fair Debt Collection Practices Act.

The Second Circuit has "recognized that the 'FDCPA was passed to protect consumers from deceptive or harassing actions taken by debt collectors.'" *Carlin v. Davidson Fink LLP*, 852 F.3d 207, 214 (2d Cir. 2017) (quoting *Kropelnicki v. Siegel*, 290 F.3d 118, 127 (2d Cir. 2002)); *Benzemann v. Citibank, N.A.*, 806 F.3d 98, 100 (2d Cir. 2015) ("The purpose of the FDCPA is to 'eliminate abusive debt collection practices by debt collectors, to insure that those debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged, and to promote consistent State action to protect consumers against debt collection abuses.'" (quoting *Kropelnicki*, 290 F.3d at 127)). "To accomplish these goals, the FDCPA creates a

18

private right of action for debtors who have been harmed by abusive debt collection practices." *Benzemann*, 806 F.3d at 100 (citing 15 U.S.C. § 1692k). "Because the FDPA is remedial in nature, its terms must be construed in liberal fashion if the underlying Congressional purpose is to be effectuated." *Vincent v. Money Store*, 736 F.3d 88, 98 (2d Cir. 2013) (quotation marks omitted).

The FDCPA is a strict liability statute, and the plaintiff "does not need to show intentional conduct on the part of the debt collector." *Ellis v. Solomon & Solomon, P.C.*, 591 F.3d 130, 135 (2d Cir. 2010). Section 1692e prohibits false, deceptive, or misleading representations, and section 1692f prohibits collecting or attempting to collect a debt through unfair or unconscionable means. *Arias*, 875 F.3d at 134. Although both sections expressly prohibit specific conduct, the FDCPA permits the courts to proscribe other improper conduct as appropriate; the FDCPA's list of prohibitions is "non-exhaustive." *Id.* at 134-35 (citing and quoting *Avila v. Riexinger & Assocs.*, LLC, 817 F.3d 72, 75 (2d Cir. 2016)). The Second Circuit uses the least sophisticated consumer standard to determine whether conduct violates the FDCPA. *Arias*, 875 F.3d 128; *Easterling v. Collecto, Inc.*, 692 F.3d 229, 235 (2d Cir. 2012).

Kavulich admits that it is a debt collector as defined by the FDCPA, 15 U.S.C. § 1692a(6). ¶¶ 3-7. Prage is a consumer as defined by the FDCPA, 15 U.S.C. § 1692a(3), as he is a natural person alleged to owe a debt. ¶ 37-40. The debt he allegedly owes—unpaid rent—is a debt as defined by the FDCPA, 15 U.S.C. § 1692a(5), as it arises primarily for family, household, or personal purposes. ¶ 42; *Romea v. Heiberger & Assocs.*, 163 F.3d 111 (2d Cir. 1998) (concluding that unpaid rent is a debt under the FDCPA).

As discussed below, Kavulich committed numerous violations of the FDCPA.

19

1. **Kavulich violated section 1692e by making false, deceptive, and/or misleading statements in its attempts to collect on the alleged debt.**

Kavulich made false, deceptive, and/or misleading statements to Prage both orally and in writing. When Prage informed Kavulich that the restrained account contained only unemployment benefits that he had transferred into his account, Kavulich falsely told Prage that transferring his unemployment benefits into his account made his benefits lose their exempt status. ¶¶ 74, 78. Kavulich's *per diem* attorney also falsely told Prage in state court that commingling exempt funds with non-exempt funds makes the exempt funds lose their exempt status. ¶¶ 104, 118.

Kavulich also filed an affirmation submitted under penalty of perjury in support of its objection to Prage's exemption claim. ¶¶ 81, 83-84. The affirmation contains, *inter alia*, at least two statements that are false, deceptive, and/or misleading: (1) that "[i]f the [exempt] funds were/are co-mingled with non-exempt funds, the law clearly states that the otherwise exempt funds lose their protected status"; and (2) that "[w]ithout comprehensive proof of what funds are in the subject account(s) and that they meet the statutory requirements entitling those funds to an exemption, Plaintiff/Judgment-Creditor is entitled to any non-exempt funds to satisfy the underlying judgment." ¶¶ 86-87.

As to the first statement, the Second Circuit has found that "falsely suggesting that…the commingling of exempt and non-exempt funds renders the balance non-exempt" is a misrepresentation actionable under section 1692(e) of the FDCPA. *Arias*, 875 F.3d at 136. In the instant case, Kavulich explicitly stated that "[i]f exempt funds were/are co-mingled with non-exempt funds, the law clearly states that the otherwise exempt funds lose their protected status." ¶ 86. Kavulich conceded that this statement is false. ¶ 89. Reading this false statement, the least sophisticated consumer could reasonably conclude that unless he can prove that his account

contains *only* exempt funds, all the exempt funds in his account will "lose their protected status," be deemed "non-exempt funds," and be subject to seizure by Kavulich.

The second statement—that "[w]ithout comprehensive proof of what funds are in the subject account(s) and that they meet the statutory requirements entitling those funds to an exemption, Plaintiff/Judgment-Creditor is entitled to any non-exempt funds to satisfy the underlying judgment"—is misleading because it (1) misstates the amount of proof that the judgment debtor must provide; (2) misstates what it is that the judgment debtor must prove; and (3) falsely conveys that the judgment debtor bears the burden of proof.

Under state law, the judgment debtor's executed exemption claim form is "prima facie evidence…that the funds in the account are exempt funds." N.Y. C.P.L.R. 5222-a(d). Also, state law does not require the judgment debtor to provide "comprehensive proof," as Kavulich falsely stated, but recommends attaching to the exemption claim form documents from among a list of examples: "Information demonstrating that funds are exempt includes, but is not limited to, originals or copies of benefit award letters, checks, check stubs or any other document that discloses the source of the judgment debtor's income, and bank records showing the last two months of account activity." N.Y. C.P.L.R. 5222-a(c)(4); *see, e.g.*, *Midland Funding LLC v. Roberts*, 950 N.Y.S.2d 867, 869 (Sup. Ct. Sullivan Cty. 2012) ("CPLR 5222-a does not require judgment debtors to supply any supporting documents with their exemption claim form.").

By stating that the judgment debtor must provide "comprehensive proof…that [the funds in the subject account(s)] meet the statutory requirements entitling those funds to an exemption," Kavulich also misstates what it is that the judgment debtor must prove under state law. Kavulich falsely conveys that it is not enough for the judgment debtor to establish that his account

contains, for example, unemployment benefits; the judgment debtor must also prove that unemployment benefits are exempt under the law. Nowhere is this required in state law.

By stating that without such "comprehensive proof," the judgment creditor "is entitled to any non-exempt funds to satisfy the underlying judgment," Kavulich falsely conveys that it is the judgment debtor who bears the burden of proof. State law, by contrast, provides that "[t]he executed exemption claim form shall be prima facie evidence at such hearing [on the judgment creditor's objection to the judgment debtor's exemption claim] that the funds in the account are exempt funds" and that "[t]he burden of proof shall be upon the judgment creditor to establish the amount of funds that are not exempt." N.Y. C.P.L.R. 5222-a(d).

In any event, as discussed further below, *infra* at Part IV.B.2, even after Kavulich had received undeniably "comprehensive proof" that Prage's restrained account contained only unemployment benefits, Kavulich still refused to release the account until the court ordered Kavulich to do so.

As the Second Circuit has found, such misrepresentations "can reasonably be expected to affect how or even whether a consumer responds to a debt collector's objection to a claim that the restrained funds are exempt from garnishment." *Arias*, 875 F.3d at 137-38; *Easterling*, 692 F.3d at 229 (debt collector's misrepresentation had the "capacity to discourage debtors from fully availing themselves of their legal rights"); *Roberts*, 950 N.Y.S.2d at 869 (judgment creditor's counsel had "attempted to circumvent CPLR 5222-a's protections of judgment debtors in ways calculated to suppress any response by [the judgment debtor] and to dissuade [the judgment debtor] from appearing and opposing [the judgment creditor]'s motion" by falsely stating that the judgment debtor bears the burden under the EIPA of proving a claimed exemption and that the judgment debtor failed to provide sufficient documentation).

Notably, the Second Circuit has rejected the argument that misrepresentations are not actionable where the consumer was not actually misled, citing its holding in *Easterling* that "the operative inquiry…is whether the hypothetical least sophisticated consumer" would be misled by the debt collector's misrepresentation. *Arias*, 875 F.3d at 137 (citing *Easterling*, 692 F.3d at 234). Nor do debt collectors have immunity from FDCPA liability for their litigation conduct, including the filing of an affirmation in opposition to a judgment debtor's exemption claim under NYS law. *Arias*, 875 F.3d at 137 (citing *Eades v. Kennedy, PC Law Offices*, 799 F.3d 161, 172 (2d Cir. 2015) and *Heintz v. Jenkins*, 514 U.S. 291, 294 (1995) for the holding that the FDCPA "applies to the litigating activities of lawyers"). The Second Circuit has also found misrepresentations to be "material" under the FDCPA (without deciding that a general materiality requirement exists under 1692e) where "the misrepresentations concerned the applicable burden of proof and the substantive law regarding commingling of funds under the EIPA, issues that can reasonably be expected to affect how or even whether a consumer responds to a debt collector's objection to a claim that the restrained funds are exempt from garnishment." *Arias*, 875 F.3d at 137-38.

## 2. Kavulich violated section 1692f by continuing to oppose Prage's exemption claim despite overwhelming evidence that all the restrained funds were exempt.

In *Arias*, the Second Circuit held that "a debt collector engages in unfair or unconscionable litigation conduct in violation of section 1692f when, as alleged here, it in bad faith unduly prolongs legal proceedings or requires a consumer to appear at an unnecessary hearing."[3] *Arias*, 875 F.3d at 138. "Although the FDCPA leaves the term 'unfair or

---

[3] As the Second Circuit noted, its holding in *Arias* "does not alter the well-settled rule that the FDCPA is a strict liability statute. We hold only that a plaintiff may allege and later prove bad faith to show that an otherwise legal act is unfair or unconscionable for purposes of section 1692f." 875 F.3d at 138 n.5.

unconscionable means' undefined, we have held that the term refers to practices that are 'shockingly unjust or unfair, or affronting the sense of justice, decency, or reasonableness.'" *Id.* at 135 (quoting *Gallego v. Northland Grp. Inc.*, 814 F.3d 123, 128 (2d Cir. 2016) (quotation marks omitted) (quoting Black's Law Dictionary (10th ed. 2014)).

Kavulich acted in bad faith when it objected to Prage's exemption claim and refused—despite subsequently receiving overwhelming evidence that showed that the restrained funds were exempt (as even its *per diem* attorney agreed, upon review)—to release the restraint "in order to abuse and intimidate [him] into agreeing to make payments from his exempt funds, or in hopes that [he] would default at the hearing." *Arias*, 875 F.3d at 138; ¶¶ 81, 101, 110-11. Kavulich's continued refusal to release the restraint triggered two additional court hearings, ¶¶ 107-08, 124, 128, which the Second Circuit noted "can be expensive, forcing consumers to take unpaid leave from work, incur additional dependent care expenses, and so on, without access to critical…funds." *Arias*, 875 F.3d at 138. Kavulich thus engaged in unfair or unconscionable conduct in violation of section 1692f.

In addition to making the misrepresentations discussed *supra* at Part IV.B.1., Kavulich unlawfully delayed the hearing on its objection to Prage's exemption claim, noticing the hearing for 13 days after service of his papers, instead of the seven days' notice required by state law for a hearing on an objection to an exemption claim. N.Y. C.P.L.R. 5222-a; see *Roberts*, 950 N.Y.S.2d at 869 ("Given the injury that can be caused to judgment debtors when their exempt income is restrained, CPLR 5222-a provides for holding a hearing on short notice."); ¶¶ 81-82.

Also, Kavulich's client, as judgment creditor, bore the burden of proving at the hearing the amount of restrained funds that were not exempt, and yet Kavulich has offered no evidence that it made any effort at all prior to that hearing, or even prior to any of the subsequent hearings,

24

to obtain information regarding the restrained funds. N.Y. C.P.L.R. 5222-a(d) ("The burden of proof shall be upon the judgment creditor to establish the amount of funds that are not exempt"). Instead, Kavulich sought to dissuade Prage from pursuing his exemption claim by misrepresenting that it was Prage who bore the burden of proof, as discussed above, and then made no effort to obtain additional information from Prage, Chase, or anyone else. Kavulich's collection notes, which otherwise show multiple contacts with Chase, show no effort between April 13, 2015, when Kavulich claims to have received a copy of Prage's exemption claim form, and April 29, 2015, the date of the first hearing on Kavulich's objection, to obtain any information concerning the restrained funds. ¶ 134. Nor do the notes show any effort by Kavulich prior to the subsequent hearings, on May 8, 2015 and May 22, 2015, to obtain such information. *Id.* Instead, Kavulich, through its *per diem* attorney, continued to falsely claim at the hearings that commingling exempt funds with non-exempt funds renders exempt funds non-exempt. ¶¶ 104, 118.

Prage, by contrast, exerted tremendous effort to provide more and more evidence to Kavulich that his restrained funds were all exempt unemployment benefits. On April 4, 2015, he faxed his executed Exemption Claim Form along with supporting documents that included his unemployment benefits award letter and a letter stating that all the funds in his restrained Chase savings account were exempt unemployment benefits. ¶ 67. After his April 6, 2015 call to Kavulich to confirm that Kavulich had received his April 4, 2015 fax, he faxed additional documents, including bank statements and receipts showing that the funds in the restrained Chase savings account had all been transferred from his unemployment benefits account. ¶¶ 68, 74.

Kavulich's collection notes also contain no mention of receiving Prage's May 7, 2015 affidavit, much less that anyone at Kavulich had reviewed the affidavit. ¶ 127. Gary Kavulich claimed that if his firm receives, along with or subsequent to an exemption claim, documentation or information that an account he has restrained contains exempt funds, "We look at what they sent us. If they sent us proof that it should not be restrained and it is exempt, we will send a release to the bank." ¶ 126. Kavulich's failure to release the account upon receiving the May 7, 2015 affidavit belies this claim, as discussed below.

Kavulich purports to have objected to Prage's exemption claim because there was "no accounting of the funds" in the account and no "comprehensive proof" of what funds were in the account. ¶¶ 85, 87. In a report dated April 29, 2015 to Kavulich, Jonathan Kingston, the per diem attorney who appeared at the hearings on the objection on behalf of Defendant SJ Cooper Realty, stated that "[Prage] produced [documents] which he states show the restrained funds are all unemployment funds. They seem fishy, as it appears [Prage] withdrew $10K IN CASH from one account only to deposit it another, which you restrained." ¶ 106. Kingston also testified at his deposition, "It's clear [Prage] had unemployment insurance. But the fact of the matter is there was some question as to deposits and the timing of deposits. And cash transfers amongst accounts." ¶ 121.

With his May 7, 2015 affidavit and exhibits thereto, Prage addressed all of Kavulich's pretexts for denying his exemption claim, by providing a thorough accounting of the funds in his restrained account; furnishing comprehensive proof of what kind of funds were in his restrained account; and definitively answering any questions that might have remained "as to deposits and the timing of deposits" or as to "cash transfers amongst accounts." The affidavit methodically laid out:

(1) documentation showing that the New York State Department of Labor (NYS DOL) had determined that Prage was entitled to receive at least $405/week in retroactive unemployment benefits for his benefit year, ¶ 16;

(2) statements showing a series of deposits in March 2015 by NYS DOL totaling $10,665 into a Chase account set up specifically to receive unemployment benefits from NYS DOL, via a NYS DOL Direct Payment Card, ¶¶ 19-21, 26-28; and

(3) receipts showing transfers of $10,000 in funds from his NYS DOL Direct Payment Card account to his savings account, and showing that the balance after the transfers was also $10,000—and thereby establishing that there were no funds in the savings account other than the $10,000 in unemployment benefits transferred from the NYS DOL Direct Payment Card account, ¶¶ 27-34 .

This evidence unequivocally established that all the restrained funds were unemployment benefits. Nevertheless, even after Kavulich received the May 7, 2015 affidavit and exhibits thereto, Kavulich continued to oppose Prage's exemption claim, refusing to release the restraint until after the state court deemed the funds exempt and ordered, on May 22, 2015, that the account be released. ¶¶ 124, 133. Kingston confirmed as much at his deposition ("Exhibit 3" refers to Mr. Prage's May 7, 2015 affidavit and exhibits thereto):

| | |
|---|---|
| Plaintiff's counsel: | So, on May 11th you provided Mr. Kavulich a copy of Exhibit 3, correct? |
| Kingston: | Yes. |
| Plaintiff's counsel: | And then you opposed, on May 22nd, releasing my clients [sic] bank account, correct? |
| Kingston: | Yes. |

Plaintiff's counsel:    And you opposed releasing my client's bank account because Mr. Kavulich, even after receiving Exhibit 3 on May 11th, directed you to continue to oppose the release of the account on May 22nd, correct?

Kingston:    The only circumstances under which I would do that, yes, sir.

¶ 124. After Kingston had reviewed Prage's May 7, 2015 affidavit and exhibits thereto, he testified as follows:

Plaintiff's counsel:    So all the money in my client's Chase savings account, based on the documents in Exhibit 3, all the money in the Chase savings account is exempt, right?

Kingston:    That is what these appear to show, sir.

¶ 120. Kavulich nevertheless maintained the restraint on Prage's account until May 26, 2015, or for at least another 15 days after receiving overwhelming evidence that the restrained funds were exempt.

### 3. Kavulich violated section 1692f by failing to notify the marshal to withdraw the execution against Prage's bank account.

Kavulich failed to direct Marshal Biegel to withdraw the levy against Prage's account following the court's May 22, 2015 order that the restraint be released. ¶ 140. As a result, Prage's account, which still contained only exempt unemployment benefits, was again restrained in late July 2015. ¶¶142-43.

Under state law, the levy that the marshal had served on Chase on April 8, 2015, at Kavulich's direction, ¶¶ 58-59, 140, would have been effective to put a hold on Prage's account for 90 days, or until early August 2015. N.Y. C.P.L.R. 5232. Having received no word from Kavulich regarding the court's May 22, 2015 order, the marshal served the levy on Chase again on July 28, 2015. ¶ 140, 142. As a result, Prage learned that Kavulich had caused another hold,

through Marshal Biegel, on his account. ¶ 143. Prage then sent the marshal a copy of the court's May 22, 2015 order releasing his account. ¶144.

Kavulich knew that the marshal had served a "levy and demand" against Prage's account in April 2015 because it was Kavulich who had directed the marshal to do so. ¶¶ 58-59. Moreover, Kavulich knew that if the court deemed the funds exempt, Kavulich needed to let the marshal know. ¶ 141. However, at his deposition, Gary Kavulich acknowledged that there were no records in either Kavulich's notes or the marshal's notes that Kavulich had notified the marshal of the court's May 22, 2015 order. ¶ 137. Based on this August 3, 2015 email exchange between Kavulich and the marshal's office, to release Prage's account required a separate release of the execution from the marshal, the marshal does not seem to have known about the court's May 22, 2015 order releasing the restraint until Prage sent it to the marshal on or around August 3, 2015:

| Marshal: | See attached paperwork we received from [Prage] giving a court decision from 5/22/15. Please advise on how to proceed since the the account is still being held? |
| Kavulich: | The judgment remains enforceable, but the account needs to be released and the money returned as it was deemed exempt. |
| Marshal: | Ok will send release to bank. |

¶¶ 144-47. The marshal then sent a letter to Chase dated August 3, 2015, stating, "You are hereby authorized and directed to release the Execution heretofore served upon you in the above matter." ¶ 149.

As the FDCPA is a strict liability statute, Kavulich is liable for this unfair act regardless of its intent. *Ellis*, 591 F.3d at 135. But Kavulich's failure to notify the marshal is all the more unfair and unconscionable given that Kavulich knows that the marshal routinely waits for

direction from Kavulich on a Kavulich judgment, and that without such direction the marshal will not cease enforcement on a Kavulich judgment, even upon a court order. ¶¶ 167-221.

### C. Kavulich Violated New York's Deceptive Acts and Practices Law, GBL 349, by Making False and Deceptive Statements to Prage.

N.Y. G.B.L. § 349 ("GBL 349") is a broadly protective consumer protection measure that bars "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service," and provides a cause of action for violations. *Stutman v. Chem. Bank*, 95 N.Y.2d 24, 28 (2000). The statute applies to "virtually all economic activity" and its "application has been correspondingly broad." *Karlin v. IVF America, Inc.*, 93 N.Y.2d 282, 290 (1999). To prevail on a claim under GBL 349, a plaintiff must prove three elements: (1) that the challenged act or practice was consumer-oriented, (2) that it was materially misleading, and (3) that it caused actual damages to the plaintiff. *Stutman*, 95 N.Y.2d at 28. Prage has met all three elements, as discussed below.

### 1. Kavulich's conduct was consumer-oriented.

To demonstrate that the misconduct is consumer-oriented, a plaintiff "need not show that the defendant committed the complained-of acts repeatedly—either to the same plaintiff or to other consumers—but instead must demonstrate that the acts or practices have a broader impact on consumers at large." *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*, 85 N.Y.2d 20, 25 (N.Y. 1995). "Private contract disputes, unique to the parties, [do] not fall within the ambit of the statute." *Id.* The test is whether the actions complained of "*potentially* affect similarly situated consumers." *Id.* at 26-27 (emphasis added). The "critical question" is whether the conduct in question "affects the public interest in New York." *Aghaeepour v. N. Leasing Sys.,* No. 14-CV-5449 (NSR), 2015 U.S. Dist. LEXIS 161018, at *44 (S.D.N.Y. Dec. 1, 2015).

As discussed above, *supra* at Part IV.B.1., Kavulich made at least two false and misleading statements in its objection to Prage's exemption claim: (1) that exempt funds lose their protected status when commingled with non-exempt funds, and (2) that a judgment debtor must furnish "comprehensive proof" regarding both the funds in the subject account and that such funds "meet the statutory requirements" for an exemption. ¶¶ 86-87. Both statements are clearly consumer-oriented, as they could therefore "potentially affect similarly situated consumers." *Oswego Laborers' Local 214 Pension Fund*, 85 N.Y.2d at 26-27; *see also Roberts*, 950 N.Y.S.2d at 869 (noting that judgment creditor's counsel's false statements were "calculated to suppress any response" by the judgment debtor). As in the FDCPA context, such statements are also consumer-oriented under GBL 349 because they "can reasonably be expected to affect how or even whether a consumer responds to a debt collector's objection to a claim that the restrained funds are exempt from garnishment," *Arias*, 875 F.3d at 137-38.

At his deposition, Gary Kavulich estimated that his office receives 15 to 25 exemptions a year, and testified that his office uses a template for his objections. ¶ 90. He acknowledged that the commingling statement is false, and testified that it had been false since the enactment of the EIPA, which was in 2008. ¶ 89. Yet Kavulich had made the false commingling statement—under penalty of perjury no less—as recently as April 2015, when it objected to Prage's exemption claim, without any factual basis to believe that the funds in Prage's account were commingled. ¶¶ 84, 86, 94-95, 134. Assuming *arguendo* that Kavulich had written this statement into its objection template at a time when it was actually true, Kavulich has thus clearly failed *for seven years* to delete this false commingling statement from its objection template, and recklessly continued to make this false claim in the course of its regular business. *See Jordan v. Tucker, Albin and Associates, Inc.*, No. 13-CV-6863 (JMA) (SIL), 2017 U.S. Dist. LEXIS 76702, at *23-

25 (E.D.N.Y. May 19, 2017) (holding that debt collection practices that are part of an entity's

business practices are consumer-oriented and could have a broad impact on consumers at large);

*Midland Funding, LLC v. Giraldo*, 961 N.Y.S.2d 743, 752 (First Dist. Nassau Cty. 2013)

(finding conduct involving the "routine filing of assigned debt lawsuits by plaintiff despite a lack

of crucial, legally admissible information or sufficient inquiry into whether the claims are

meritorious," consumer-oriented conduct under GBL 349) (internal quotations omitted). The

"comprehensive proof" statement is also clearly false, as discussed above, *supra* at Part IV.B.2.,

as it unlawfully purports to shift the burden of proof to the judgment debtor, and thereby

undermines one of the primary purposes of the EIPA—to "remed[y] an imbalance to the prior

law which unfairly placed the burden on debtors to show that their funds were exempt, at a time

when they were being deprived access to those funds." *Ehrler*, 113 A.D.3d at 115, 976 N.Y.S.2d

at 521. Even if Kavulich has objected to just a few of the 15-25 exemption claims it received

every year since the enactment of the EIPA, using a template that included one or both of these

false statements, Kavulich's misrepresentations have clearly had a broad impact on the judgment

debtors whose exemption claims Kavulich has objected to, and therefore on consumers at large,

in a way that profoundly affects the public interest.

  Kavulich also made at least two false statements to Prage orally: In addition to the false

"commingling" statement, Kavulich falsely claimed that by transferring his unemployment

benefits from his NYS DOL card to his savings account, his unemployment benefits had lost

their exempt status. Such a misleading statement, especially coming from a law firm, could

potentially deter consumers at large from pursuing their exemption claims, and is therefore

consumer-oriented conduct. It also demonstrates that the misrepresentations in Kavulich's

objection are part of a unitary course of conduct to try to dissuade judgment debtors from pursuing their exemption claims.

### 2.  Kavulich's conduct was materially misleading.

To determine whether an act was materially misleading, courts apply an objective standard that considers whether the act would likely mislead a reasonable consumer acting reasonably under the circumstances. *Rozier v. Fin. Recovery Sys., Inc.*, No. 10-CV-3273 (DLI) (JO), 2011 U.S. Dist. LEXIS 61307, at *8 (E.D.N.Y. June 7, 2011) (quotations omitted); *see also Koch v. Greenberg*, 626 Fed. App'x. 335, 340 (2d Cir. 2015). Like the FDCPA, GBL 349 does not require the plaintiff to show that he relied on the deception. *Fritz v. Resurgent Capital Servs.*, 955 F. Supp. 2d 163, 174 (E.D.N.Y. 2013).

Kavulich's misrepresentations of the law in its objection, as well as the misrepresentation that Kavulich made orally to Prage, are materially misleading under GBL 349: They are deceptive on their face and would likely discourage a reasonable consumer from opposing the objection and from continuing to pursue his exemption claim. This is especially true where Kavulich, a law firm, makes misrepresentations to unrepresented consumers concerning the law. A reasonable consumer could believe that attempting to challenge the objection would be futile and could therefore be more inclined to make payments from exempt funds instead of challenging the objection in court. *See Samms v. Abrams, Fensterman, Fensterman, Eisman, Formato, Ferrara & Wolf, LLP*, 163 F. Supp. 3d 109, 116 (S.D.N.Y. 2016) (finding the defendant's acts materially misleading because a reasonable consumer reading the complaint would likely be misled into thinking there was some basis for the demand for attorney's fees, which in turn could coerce a reasonable consumer into paying the debt); *Martinez v. LVNV Funding LLC*, 14-CV-00677 (RRM) (ST), 2016 U.S. Dist. LEXIS 136613, at *9-10 (E.D.N.Y.

Sept. 30, 2016) (finding the practice of issuing collection notices in an attempt to collect on vacated judgments deceptive on its face and noting that a reasonable consumer reading this type of collection notice would likely be misled into believing that there was a valid judgment, which in turn could coerce a reasonable consumer to pay the judgment).

### 3. Kavulich's conduct caused injury to Prage.

An individual asserting a GBL 349 claim must allege that the materially misleading act caused actual injury, but need not claim that the act caused pecuniary harm; claims of emotional distress are sufficient. *Rozier* at *16 (holding that alleged damages associated with humiliation, anger, anxiety, emotional distress, fear frustration, and embarrassment are sufficient to meet the injury element).

Kavulich's false and misleading statements inflicted substantial garden-variety emotional distress damages on Prage, who felt panicked and powerless when Kavulich objected to his exemption claim and then continued to oppose it for several weeks. ¶ 223-24. Prage did not know that, contrary to Kavulich's misrepresentations, he did not bear the burden of proof at the hearing on the objection to establish that his restrained funds were exempt. ¶¶ 227-28. Forced to return to court again and again, Prage questioned whether he would actually be able to produce enough evidence that the restrained funds were in fact exempt. ¶ 227. Prage could not sleep for weeks and stayed awake many nights wondering what to do, and began eating more than usual in an attempt to seek comfort. ¶ 229. He was devastated that after finally being awarded unemployment benefits after an eight-month appeal process, Kavulich swept in, froze his account, and then insisted that Mr. Prage could not regain access to his funds without furnishing more and more evidence—evidence that was not actually required by law. ¶ 231.

Prage also suffered financial injury as a result of his inability to access his funds, including spending time and paying expenses, such as transportation and copying costs, in attempting to fight the wrongful restraint. *Fritz,* 955 F.Supp.2d at 174 (alleged damages included time spent and costs incurred to defend against meritless collection lawsuit that should not have been filed constitutes injury); ¶ 230.

### 4. Prage is entitled to punitive damages under GBL 349.

"[P]unitive damages may be awarded for a violation of GBL § 349." *Barkley v. Olympia Mortg. Co.*, 557 Fed. App'x. 22, 26 n.1 (2d Cir. 2014), as amended (Jan. 30, 2014), (citing *Wilner v. Allstate Ins. Co.*, 71 A.D.3d 155, 167, 83 N.Y.S.2d 208 (2d Dep't 2010). Accord *JD & K Assoc., LLC v Selective Ins. Grp., Inc.*, 118 A.D.3d 1402, 1403-04, 988 N.Y.S.2d 749 (4th Dep't 2014); *Park Ave. Realty, LLC v Schindler El. Corp.*, 129 A.D.3d 598, 598-99, 12 N.Y.S.3d 47 (1st Dep't 2015). A plaintiff may recover punitive damages where the defendant's violation of GBL 349 "evidences a high degree of moral culpability, or where the conduct is so flagrant as to transcend mere carelessness, or where the conduct constitutes willful or wanton negligence or recklessness." *Wilner*, 71 A.D.3d at 167 (internal quotations omitted). In *Wilner*, the court held the defendant's intentional failure to reach a timely decision on an insurance claim, in violation of GBL 349, could support the imposition of punitive damages because a jury could determine that the defendant's conduct was "so flagrant as to transcend mere carelessness." *Id.* Prage is entitled to punitive damages under GBL 349 as a matter of law for the reasons stated below.

Kavulich's deception was calculated to harass Prage into making payments from exempt funds. Kavulich knew as early as April 6, 2015 that Prage was on unemployment. ¶ 69. Kavulich knew that the "commingling" statement in its objection to Prage's exemption claim was false and had been false since the enactment of the EIPA seven years earlier. ¶ 89. As a law firm whose

principal business is debt collection and regularly collects on judgments, ¶¶ 3-7, Kavulich knew, or should have known, that the "comprehensive proof" statement in its objection was false under the EIPA and unlawfully purported to shift the burden of proof to the judgment debtor. By including these false statements in its objection, Kavulich directed these false statements of law to the state court as well. ¶¶ 81, 89. Kavulich affirmatively directed his *per diem* attorney to continue opposing Prage's exemption claim for weeks beyond the initial hearing, and to continue insisting on payment, even as Prage provided more and more documentation showing that his restrained funds were exempt. ¶¶ 98-133. Even after the state court ordered the restraint to be released, Kavulich failed to direct the marshal to withdraw its execution against Prage's account, even though Kavulich knows that the marshal routinely waits for direction from Kavulich on a Kavulich judgment, and without such direction will not cease enforcement on a Kavulich judgment, even upon a court order. ¶¶ 136-40. This is not an isolated instance: The pattern and practice evidence submitted herein demonstrates that Kavulich routinely fails to instruct the marshal to cease executing on a judgment, even when that judgment has been vacated. ¶¶ 167-221. Kavulich's misconduct transcends mere carelessness and rises to the level of willful or wanton negligence or recklessness. As a result, this Court should hold that Plaintiff is entitled to punitive damages as a matter of law, with the jury to decide the amount, if any, of punitive damages.

### D.  Defendants Kavulich and SJ Cooper Realty are liable for conversion.

### 1.  Defendants committed conversion by continuing to restrain Prage's unemployment benefits despite overwhelming evidence that the restrained funds were exempt.

A person commits the tort of conversion when he "intentionally and without authority, assumes or exercises control over personal property belonging to someone else, interfering with that person's right of possession." *Colavito v. New York Organ Donor Network, Inc.*, 827

N.Y.S.2d 96, 100 (N.Y. 2006). A plaintiff claiming conversion must establish 1) his legal

ownership of a specific, identifiable piece of property, and 2) the defendant's interference with

his property interest in defiance of his rights. *Id*. To constitute conversion, the defendant's

exercise of control must have been intentional, but he need not have known that the control was

without authority. *See Bhattal v. Grand Hyatt-New York*, 563 F. Supp. 277 (S.D.N.Y. 1983)

(hotel employees acting within the scope of employment committed conversion when they

intentionally took control of plaintiffs' bags, though they did not know the bags belonged to

plaintiffs). The restrained funds were the specific, readily identifiable property of Prage: They

were in a Chase savings account in Prage's name and totaled a specific amount ($7,825). ¶ 25.

Defendants interfered with Prage's property interest in those funds in defiance of his rights, by

continuing to restrain his funds after having received, as early as April 6, 2015, overwhelming

evidence that the restrained funds were exempt unemployment benefits. See discussion *supra* at

Part IV.B.3.; ¶ 74. As discussed below, *infra* at Part IV.E., SJ Cooper Realty, the principal, is

vicariously liable for the conversion committed on its behalf by Kavulich, its agent, acting within

the course and scope of his agency.

### 2. Prage is entitled to punitive damages for conversion.

New York courts have repeatedly stated that tort actions, unlike breach of contract

actions, may warrant punitive damages even in the absence of a public harm. *Giblin v. Murphy*,

73 N.Y.2d 769, 770 (N.Y. 1988); John M. Leventhal & Thomas A. Dickerson, *Punitive*

*Damages: Public Wrong or Egregious Conduct? A Survey of New York Law*, 76 Alb. L. Rev.

961, 1005 (2013). For the tort of conversion, and other intentional torts, punitive damages can be

recovered if the conversion was accomplished by malice, recklessness, or willful disregard for

the plaintiff's rights. 14 *N.Y.Prac.*, *New York Law of Torts* § 2:14; 23 *N.Y. Jur. 2d Conversion,*

Etc. § 75; See *Ashare v. Mirkin, Barre, Saltzstein & Gordon, P.C.*, 106 Misc. 2d 866 (Sup. Ct. Suffolk Cty. 1980), *modified*, 81 A.D.2d 650 (2d Dep't 1981), *aff'd*, 54 N.Y.2d 891, 444 N.Y.S.2d 918 (1981); *Warner v. Village of Chatham*, 194 A.D.2d 980, 598 N.Y.S.2d 863 (3d Dep't 1993).

The purpose of punitive damages for conversion is to deter the tortfeasor from future bad conduct and there is no public-harm requirement. *Manekas v. Allied Discount Co.*, 6 Misc.2d 1079, 1080, 166 N.Y.S.2d 366, 369 (Sup. Ct. Kings Cty. 1957). When a conversion is part of a consumer transaction, it is especially important that punitive damages be available. These scams often involve small dollar amounts that are cost-prohibitive to sue to recover, and without punitive damages, no deterrence mechanism would exist. *Schaffner v. Pierce*, 75 Misc.2d 21, 24-25, 347 N.Y.S.2d 411, 415-16 (Dist. Ct. Nassau Cty. 1973). Along the same lines, attorneys are held to a high standard, and when they commit conversion, abuse of their professional status is a factor in support of punitive damages. *Johnson v. Home Savers Consulting Corp.*, No. 04-CV-5427 (NG) (KAM), 2007 U.S. Dist. LEXIS, at *25 (E.D.N.Y. March 23, 2007) (citing *Chase Manhattan Bank, N.A. v. Perla*, 65 A.D.2d 207, 212 (4th Dep't 1978)).

Kavulich and SJ Cooper Realty acted willfully, wantonly, recklessly and with malice when they unduly prolonged the restraint of Prage's exempt funds, "requiring [Prage] to prepare needlessly for a hearing that [Kavulich] knew was frivolous and that was intended primarily to harass [Prage], frustrate his exemption claim, and erect procedural and substantive challenges that [Prage], *pro se*, was ill-equipped to handle." *See Arias*, 875 F.3d at 135, 138 (finding that similar allegations were enough to support plaintiff's claim that defendant debt collection law firm's conduct was "shockingly unjust or unfair"). Defendants' conduct thwarts the very purpose of the EIPA, a remedial statute intended to better protect judgment debtors from having their

38

exempt income seized by unscrupulous debt collectors. The point of punitive damages is to put

an end to this sort of tortious behavior. This is especially important when the tortious conduct is

being done by a law firm directing such conduct towards consumers, including low-income,

unrepresented consumers. Based on the type and severity of this conduct, the Court should grant

Plaintiff's request for punitive damages.

### E. Defendant SJ Cooper Realty, the principal, is vicariously liable for the GBL 349 violation and conversion committed by Kavulich, its agent, acting within the course and scope of its agency.

The "established rule of agency law is that a principal is liable to third parties for the acts

of an agent operating within the scope of the agent's real or apparent authority." *Gomez v.*

*Resurgent Capital Servs*., LP, 129 F. Supp. 3d 147, 157 (S.D.N.Y. 2015) (plaintiff in a collection

lawsuit is vicariously liable for the acts of its attorney) (quoting *Security Pac. Mortg. & Real*

*Estate Servs., Inc. v. Herald Ctr., Ltd*., 891 F.2d 447, 448 (2d Cir. 1989)). Vicarious liability

applies to torts in general, including conversion. *See Clients' Sec. Fund of State v. Grandeau*, 72

N.Y.2d 62, 67 (Ct. App. 1988) (law partners, who are agents of one another, are liable for

conversion committed by any other partner, even if they had no knowledge of it).

"Under New York law, 'from the nature of the attorney-client relationship itself, an attorney

derives authority to manage the conduct of litigation on behalf of a client, including the authority

to make certain procedural and tactical decisions.'" *Hunter v. Palisades Acquistion XVI, LLC*,

No. 16-CV-8779 (ER), 2017 U.S. Dist. LEXIS 189902, at *25 (quoting *Hallock v. State of New*

*York*, 64 N.Y.2d 224, 230 (N.Y. 1984) (concluding that a client was bound by her attorney's

decision to enter into a settlement without her consent because he had the apparent authority to

act on her behalf)). "Lawyers are generally regarded as agents of their clients in pursing litigation

and other legal activities." *Id.* (citing Restatement (Third) of the Law Governing Lawyers § 26 cmt. B (2000)).

The U.S. Supreme Court "has made clear that 'clients must be held accountable for the acts and omissions of their attorneys.'" *Polanco v. NCO Portfolio Mgmt., Inc.*, 132 F. Supp. 3d 567, 584 (S.D.N.Y. 2015) (*Polanco II*), *quoting Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 396-97 (1993) (*quoting Link v. Wabash R. Co.*, 370 U.S. 626, 633-34 (1962)). In *Polanco II*, the plaintiff alleged that the debt collector, through its debt collection law firm, had refused to return restrained funds after the underlying judgment was vacated. 132 F. Supp. 3d at 570-75. The court observed that because the defendant had voluntarily chosen its attorney as its representative in the action, it could not "now avoid the consequences of the acts or omissions of this freely selected agent." *Id.* at 584. "Any other notion would be wholly inconsistent with our system of representative litigation, in which each party is deemed bound by the acts of his lawyer-agent and is considered to have 'notice of all facts'....'" *Id.*, quoting *Link*, 370 U.S. at 633-34 (internal citation omitted).

Here, SJ Cooper Realty retained Kavulich, a debt collection law firm, for the express purpose of collecting on Prage's judgment. ¶ 40. When Kavulich continued to restrain Prage's bank account despite having received overwhelming evidence that all the funds in the account were exempt, Kavulich did so within the scope of its authority to act on behalf of SJ Cooper Realty. *See Okyere I*, 961 F. Supp. 2d at 517 ("the facts alleged in the complaint easily lead to the conclusion that [the debt collection law firm was] acting within their authority from Palisades" when they continued executing on a judgment after it was vacated). SJ Cooper Realty is therefore vicariously liable for the GBL 349 violation and conversion committed by Kavulich.

40

## V.      CONCLUSION

For these reasons, Plaintiff prays for the Court to enter summary judgment as to liability

and as to the entitlement to punitive damages, and to allow the case to proceed to trial solely on

the issue of the amount of actual, statutory, and punitive damages.

DATED: New York, New York
          December 19, 2017

Respectfully submitted,

By: *Susan Shin*

Susan Shin
Eve Weissman
New Economy Project
121 W. 27th St., Suite 804
New York, NY 10033
Phone: (212) 680-5100
Fax: (212) 925-2092
susan@neweconomynyc.org
eve@neweconomynyc.org

By: *Ahmad Keshavarz*
Ahmad Keshavarz
The Law Office of Ahmad Keshavarz
16 Court St., 26th Floor
Brooklyn, NY 11241-1026
Phone: (718) 522-7900
Fax: (877) 496-7809
ahmad@NewYorkConsumerAttorney.com

*Attorneys for Plaintiff*