56

1

2    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
3    CIVIL DIVISION
     ---------------------------------------X
4    JAMES MORALES,

5                               PLAINTIFF,

6
          -against-        Case No.:
7
                          1:16-cv-02134-ALC-JLC
8

9    KAVULICH & ASSOCIATES, P.C., GARY
     KAVULICH, ROSEWALL GARDENS ASSOCIATES, LP,
10   F/K/A ROSEWALL GARDENS ASSOCIATES, and
     ROSEWALL, INC.,
11
                               DEFENDANTS.
12   ---------------------------------------X

13             DATE:  November 17, 2016

14             TIME:  9:30 A.M.

15

16             CONTINUED DEPOSITION of the

17   Defendants, KAVULICH & ASSOCIATES, P.C. and

18   GARY KAVULICH, by a witness GARY

19   KAVULICH, taken by the Plaintiff, pursuant

20   to a Notice of Appearance and to the

21   Federal Rules of Civil Procedure, held at

22   the Law Office of Ahmad Keshavarz, 16 Court

23   Street, Brooklyn, New York 11241, before

24   Elizabeth Forero, a Notary Public of the

25   State of New York.

DIAMOND REPORTING  (877) 624-3287   info@diamondreporting.com
56

---

57

1

2    A P P E A R A N C E S:

3
     LAW OFFICE OF AHMAD KESHAVARZ
4         Attorneys for the Plaintiff
          JAMES MORALES
5         16 Court Street
          Brooklyn, New York 11241
6    BY:  AHMAD KESHAVARZ, ESQ.
               -and-
7          JESSICA MOODY, LAW CLERK

8

9    CAMBA LEGAL SERVICES, INC.
          Co-Counsel for Plaintiff
10        JAMES MORALES
          885 Flatbush Avenue
11        Brooklyn, New York 11226
     BY:  MELISSA KOVEN, ESQ.

12

13   MITCHELL L. PASHKIN, ESQ.
14        Attorneys for the Defendants
          KAVULICH & ASSOCIATES, P.C., GARY
15        KAVULICH, ROSEWALL GARDENS ASSOCIATES,
          LP, F/K/A ROSEWALL GARDENS ASSOCIATES,
16        ROSEWALL, INC.
          775 Park Avenue, Suite 255
17        Huntington, New York 11743
     BY:  MITCHELL L. PASHKIN, ESQ.

18

19

20             *       *       *
21
22
23
24
25
DIAMOND REPORTING  (877) 624-3287   info@diamondreporting.com
57

---

56

1

2             F E D E R A L  S T I P U L A T I O N S

3

4

5             IT IS HEREBY STIPULATED AND AGREED by and

6    between the counsel for the respective

7    parties herein that the sealing, filing and

8    certification of the within deposition be

9    waived; that the original of the deposition

10   may be signed and sworn to by the witness

11   before anyone authorized to administer an

12   oath, with the same effect as if signed

13   before a Judge of the Court; that an

14   unsigned copy of the deposition may be used

15   with the same force and effect as if signed

16   by the witness, 30 days after service of

17   the original & 1 copy of same upon counsel

18   for the witness.

19

20             IT IS FURTHER STIPULATED AND AGREED that

21   all objections except as to form, are

22   reserved to the time of trial.

23

24             *    *    *    *

25

DIAMOND REPORTING  (877) 624-3287   info@diamondreporting.com
58

---

59

1                      G. KAVULICH

2             G A R Y  K A V U L I C H, called as a

3    witness, having been first duly sworn by a

4    Notary Public of the State of New York, was

5    examined and testified as follows:

6    EXAMINATION BY

7    MR. KESHAVARZ:

8             Q.     Please state your name for the

9    record.

10            A.     Gary Kavulich.

11            Q.     Where do you reside?

12            A.     147 Grace Church Street, Rye,

13   New York 10580.

14            Q.     Good morning.  Thank you for

15   coming back.  So let's pick up where we

16   left off before but let's go over

17   logistics.  I know we are running late.

18   What time do you have to leave today?

19            A.     2:30.

20            Q.     I was going through questions,

21   but I know we had an agreement before that

22   we could use the other deposition testimony

23   in this case at least for background

24   purposes; right?

25            MR. PASHKIN:  Yes.

DIAMOND REPORTING  (877) 624-3287   info@diamondreporting.com
59

60

G. KAVULICH

1
2  MR. KESHAVARZ: Would you be
3  agreeable to use it for all purposes
4  because I don't want to go through
5  all questions that may or may not be
6  background. So can we use it for all
7  purposes generally?
8  MR. PASHKIN: Subject to, you
9  know, my right to object to
10  relevance, in other words, is that
11  fair?
12  MR. KESHAVARZ: If you objected
13  to form before.
14  MR. PASHKIN: In other words, I
15  don't, in other words, I can't, you
16  want to use it in general, I don't
17  know exactly how you want to use it.
18  I just want to reserve my rights, in
19  other words, you try to take a
20  deposition and an answer in that
21  question and say for whatever reason,
22  I can't know what you are going to
23  do. I want to reserve my right to
24  object to its use based on relevance.
25  Is that fair?

DIAMOND REPORTING (877) 624-3287 info@diamondreporting.com
60

---

62

G. KAVULICH

1
2  Q.  Are there any other e-mails
3  related to Mr. Morales other than what you
4  produced in this case?
5  A.  Whatever I had, I gave them to
6  Mitch.
7  MR. KESHAVARZ: You gave them
8  all over?
9  MR. PASHKIN: Right.
10  Q.  I am showing, and we will it
11  mark as an exhibit in a second, but tell
12  me, I am showing what has been Bates
13  stamped Morales 51, 52.
14  MR. KESHAVARZ: Off the record.
15  (Whereupon, an off-the-record
16  discussion was had.)
17  Q.  Before I mark this as an
18  exhibit, I am showing documents Bates
19  stamped Morales 51 to 53. Can you identify
20  what these pages are and which ones go
21  together?
22  A.  The first page is information
23  subpoena with restraining notice.
24  Q.  Go through the other pages and
25  tell me what documents go together.

DIAMOND REPORTING (877) 624-3287 info@diamondreporting.com
62

---

61

G. KAVULICH

1
2  MR. KESHAVARZ: Yes, that
3  should help.
4  Q.  Mr. Kavulich, were there any
5  e-mails sent or received regarding Mr.
6  Morales or his account or any attempt to
7  collect on his account?
8  A.  Yes.
9  Q.  Do you know where those e-mails
10  are?
11  A.  Whatever e-mails we have, I
12  gave to Mitch.
13  Q.  I could be mistaken but for the
14  other case we have e-mails. But for this
15  case, I don't believe we have e-mails.
16  MR. PASHKIN: I checked last
17  night; it was in my first
18  Supplemental Response.
19  MR. KESHAVARZ: I have a first
20  Supplemental Response that includes
21  screen shots. That was dated
22  November 8th. That is what I got.
23  Then on November 14th, I got an
24  accounting and then -- I see it.
25  Okay. Thanks.

DIAMOND REPORTING (877) 624-3287 info@diamondreporting.com
61

---

63

G. KAVULICH

1
2  A.  That goes by itself. This is a
3  property execution. The second page is, I
4  guess, it is the actual levy from Marshal
5  Bigel to TD Bank.
6  Q.  The levy is Bates stamped 53?
7  A.  Yes.
8  MR. KESHAVARZ: Let's mark
9  these as separate exhibits
10  Plaintiff's 1, 2, 3.
11  (Whereupon, the aforementioned
12  documents were marked as Plaintiff's
13  Exhibits 1, 2 and 3 for
14  identification as of this date by the
15  Reporter.)
16  Q.  I am showing what has been
17  marked as Exhibits 1, 2, 3. They were
18  Morales 51, 52 and 53. In the process of
19  using the information subpoena and
20  restraint to my client's bank account, tell
21  me what the order is in that process.
22  A.  Fifty-one comes first.
23  Q.  Exhibit 1 comes first?
24  A.  Yes. Then Exhibit 2, and then
25  from the marshal would be Exhibit 3.

DIAMOND REPORTING (877) 624-3287 info@diamondreporting.com
63

64

G. KAVULICH

1  Q.  For Exhibit 3 the amounts
2  listed as due except for poundage are all
3  based on representations you make to the
4  marshal about the amount due; is that
5  correct?
6  **A.  The judgement amount, yes.  The**
7  **interest the marshal calculates.  The**
8  **statutory fees the marshal calculates and**
9  **poundage is calculated by the marshal.**
10  Q.  Let's go through the first
11  step.  Number one, the information subpoena
12  with restraining notice, is that your
13  signature on the bottom of the document?
14  **A.  Yes.**
15  Q.  Did you sign it on or about the
16  date indicated, which is March 18, 2015?
17  **A.  I assume I did.  I don't**
18  **remember signing this particular piece of**
19  **paper.**
20  Q.  These bank restraint
21  information subpoenas I believe you
22  testified in the other case, if I am not
23  mistaken your staff prints out a stack of
24  bank restraints, information subpoenas,

66

G. KAVULICH

1  correct in Plaintiff's 1; is that correct?
2  **A.  Correct.**
3  Q.  What is, in fact, the amount
4  due on the judgment on the date you signed
5  the information subpoena with restraining
6  notice on March 18, 2015?
7  **A.  I don't know.**
8  Q.  We went through some of the
9  terms before and then we used some
10  shorthand.  You sign information subpoenas;
11  correct?
12  **A.  Correct.**
13  Q.  Information subpoenas are not
14  necessarily with the bank restraint;
15  correct?
16  **A.  Correct.**
17  Q.  Are they typically with a bank
18  restraint?
19  **A.  They are two separate animals.**
20  Q.  So you have one document called
21  the information subpoena that goes to a
22  bank, usually to say how much money is in
23  the account?
24  **A.  The information subpoena with a**

65

G. KAVULICH

1  income executions and so forth and you go
2  through the stack and sign them one at a
3  time?
4  **A.  Correct.**
5  Q.  You said before about the
6  number that you signed per day, but we will
7  use whatever that transcript section is.
8  So are all the statements in Exhibit 1 true
9  and correct?
10  **A.  No.**
11  Q.  What statements are not
12  correct?
13  **A.  That there was a judgement**
14  **against James Morales.**
15  Q.  Anything else?
16  **A.  I believe the remaining amounts**
17  **of the judgment is incorrect.**
18  Q.  Anything else?
19  **A.  The index number is missing L &**
20  **T.**
21  Q.  Anything else?
22  **A.  No.**
23  Q.  What you just testified to are
24  the only things that are not true and

67

G. KAVULICH

1  **restraining notice is what goes to the**
2  **bank.**
3  Q.  Do you ever send information
4  subpoenas without a restraining notice?
5  **A.  Yes.  To a bank?**
6  Q.  Yes.
7  **A.  You didn't say that.**
8  Q.  Generally, do you just send
9  information subpoenas to collect judgments?
10  **A.  To any entity?**
11  Q.  Yes.
12  **A.  Yes.**
13  Q.  Do you send information
14  subpoenas to banks, just the information
15  subpoena?
16  **A.  Only if we believe someone is**
17  **employed with the bank.**
18  Q.  You send out an income
19  execution; correct?
20  **A.  Yes.**
21  Q.  To collect judgements?
22  **A.  Yes.**
23  Q.  Are those the three major
24  mechanisms you use to collect on

68

G. KAVULICH

1 judgements?
2          A.    Information subpoenas,
3 information subpoenas with restraining
4 notices and income executions, yes.
5          Q.    If I am going to use the term
6 judgment enforcement devices, would you
7 understand that to mean all three of those?
8          A.    Yes.
9          Q.    If you are ever unclear, let me
10 know.
11         A.    Okay.
12         Q.    When I say "you," you are
13 testifying on your own behalf and on behalf
14 of your law firm; correct?
15         A.    Yes.
16         Q.    So when I say you, will you
17 understand that to mean both you and the
18 law firm?
19         A.    I intellectually understand
20 that.  But I ask you to be specific as to
21 who you mean in doing things.
22         Q.    When I say you, if you are ever
23 unclear about what you mean, would you ask
24 me to clarify?

70

G. KAVULICH

1 garnished from Miss Potter, were not
2 credited to the amount you were seeking to
3 collect from Mr. Morales?
4          A.    No, that is not right.
5          Q.    In what way is that not right?
6          A.    Once it was indicated that the
7 judgment, one of the judgement enforcement
8 devices, was sent, then the marshal should
9 have been told that, no, this is not the
10 correct amount.
11         Q.    In what way, is it not the
12 correct amount?
13         A.    Because this judgment
14 enforcement device did not account for the
15 monies collected from Miss Potter.
16         Q.    Why not?
17         A.    Because it was an oversight on
18 the person who did this.
19         Q.    Who is the person that did
20 this?
21         A.    I signed it and Collin printed
22 it.
23         Q.    Your firm is not trying to deny
24 responsibility?

69

G. KAVULICH

1          A.    Yes.
2          Q.    If I ask a question and you
3 don't ask me to clarify, is it reasonable
4 for me to assume you understood the
5 question?
6          A.    Yes.
7          Q.    We were talking about Exhibit 1
8 the information subpoena and bank
9 restraint.  You indicated that the total
10 amount claimed to be due was incorrect; is
11 that right?
12         A.    Yes.
13         Q.    How do you know that?
14         A.    Because it came up in, because
15 of this.
16         Q.    In what way what do you mean?
17         A.    Because there is a second
18 debtor in this case.
19         Q.    Clara Potter?
20         A.    Yes, against whom the judgement
21 is only against.  And we had garnished, I
22 don't know how much, but we had garnished
23 some monies from her.
24         Q.    Are you saying the monies you

71

G. KAVULICH

1          A.    No, not at all.
2          Q.    You are not personally trying
3 to deny responsibility?
4          A.    No, not at all.
5          Q.    Now, is the, you talked about
6 before Collin is the person in your office
7 who is responsible for deciding when to
8 issue a post-judgement enforcement;
9 correct?
10         A.    The computer brings it up, but
11 he is the main person who then goes forward
12 on a particular case or not.  Although
13 recently now, I am as involved as well.
14         Q.    After this lawsuit was filed?
15         A.    No, after Collin moved to Laos.
16         Q.    About when was that?
17         A.    The end of May or the beginning
18 of June of 2016.
19         Q.    And as I remember from before
20 your computer program has a number of
21 things, but one of the things is judgments
22 to be collected upon and on a regular basis
23 it goes through those lists and it pops up
24 a judgment for review to determine whether

G. KAVULICH

1  additional post-judgment enforcement
2  mechanisms should be used; is that right?
3  **A.  Yes.**
4  **Q.**  And Collin makes the judgement
5  about whether to issue the post-judgment
6  enforcement mechanism?
7  **A.  He and I.**
8  **Q.**  Before he left, it was
9  primarily he that made the decision about
10  which post judgment enforcement mechanism
11  to issue; correct?
12  **A.  Correct.**
13  **Q.**  He made the decision about who
14  that particular post-judgment enforcement
15  mechanism should be directed towards;
16  correct?
17  **A.  Yes.**
18  **Q.**  Such as which bank, which
19  employer?
20  **A.  Yes.**
21  **Q.**  He would decide which of the
22  persons listed on the account here, Clara
23  Potter and James Morales here, he would
24  made the decision about which one of those

---

G. KAVULICH

1  **between post-judgment or civil court.  They**
2  **would give us a list.  We would pick up the**
3  **file.  We would read the documents and**
4  **proceed accordingly whether it was a**
5  **post-judgment housing court judgement in**
6  **these cases or a pure civil action.**
7  **Q.**  About how many accounts did
8  this plaintiff, Rosewall Garden Associates
9  forward to you for collection?
10  MR. PASHKIN:  Objection to
11  relevancy.
12  **A.  Maybe a dozen, not many.**
13  **Q.**  During this time you had about
14  five thousand judgment accounts to collect?
15  MR. PASHKIN:  Objection.
16  **A.  At what time?**
17  **Q.**  You have about five thousand
18  judgments you are collecting on?
19  **A.  About five thousand.**
20  **Q.**  That's the judgements that come
21  up when the computer sends a cue to remind
22  Collin to do income executions?
23  **A.  To search for assets.**
24  **Q.**  That comes up a few times a

---

G. KAVULICH

1  two to issue the post judgment enforcement
2  mechanism about?
3  **A.  No, he would not distinguish**
4  **between these two because the computer**
5  **already had all the persons on the**
6  **judgment.  So he would have just pursued**
7  **both.**
8  **Q.**  At what point in time did your
9  computer have both Mr. Morales and Miss
10  Potter listed as both judgment debtors for
11  the account?
12  **A.  When the case was entered.**
13  **Q.**  What do you mean?
14  **A.  When we initially got the case.**
15  **Q.**  You got the case from whom?
16  **A.  From our client.**
17  **Q.**  You got the case from your
18  client to file a civil action to collect
19  rent or to engage in post-judgment
20  collection activities against both Morales
21  and Potter?
22  **A.  Our client does not, at that**
23  **time we don't represent them anymore by the**
24  **way, at the time they didn't distinguish**

---

G. KAVULICH

1  year it pops up for each judgement?
2  **A.  No.**
3  **Q.**  How often?
4  **A.  Generally, once a year.**
5  **Q.**  When Rosewall forwarded the
6  account for Miss Potter and Mr. Morales,
7  did it tell you that it was a judgment
8  account?
9  **A.  There were --**
10  **Q.**  Or did it tell you to file a
11  rent suit?
12  **A.  Again, it does not tell us.**
13  **Basically, we get a list.  We go to the**
14  **file, pull out all the documents for that**
15  **particular case, and then at the time it**
16  **would be given to someone in my office who**
17  **would then enter it.  We were not given any**
18  **direction by the incline as to, again,**
19  **proceed on a judgment or do a civil case.**
20  **Q.**  You make that determination
21  independently?
22  **A.  Correct.**
23  **Q.**  Initially, you filed a civil
24  suit to collect rent against Miss Potter

76

G. KAVULICH

1  and Mr. Morales; correct?
2
3      **A.  No, not to my recollection, no.**
4      **Q.**  You didn't file a civil
5  collection suit?
6      **A.  No.**
7      **Q.**  Did you file a case in civil
8  court to collect a debt from Mr. Morales
9  and Miss Potter?
10      **A.  That is not my recollection,**
11  **no.**
12      **Q.**  We will go through the
13  documents in a minute.  Let's go back to
14  the amount on Exhibit 1.  When Collin
15  directs these post-judgment enforcement
16  mechanisms to be issued -- let's just go
17  through the numbers you testified before.
18  Let's see if it is clear.  About how many,
19  just information subpoenas, do you sign
20  during this time period in a day or a week
21  or a month, about how many?
22      **A.  I would say approximately**
23  **between, information subpoenas only,**
24  **between 80 a week.  It could be anywhere**
25  **between 70 and 90, but figure about 80**

77

G. KAVULICH

1  average.
2      **Q.**  On average about how many
3  information subpoenas would the bank
4  restraint, would you sign per week?
5      **A.  Probably about the same.**
6      **Q.**  About 80 per week?
7      **A.  Approximately, yes.**
8      **Q.**  How many income executions
9  would you sign?
10      **A.  That varies month to month.**
11      **Q.**  What is the typical range?
12      **A.  Fifty a month or 60 a month.**
13      **Q.**  So around 15 a week?
14      **A.  Yes.**
15      **Q.**  Then you signed all of the
16  pleadings that go out from your office;
17  correct?
18      **A.  Ninety-nine percent.**
19      **Q.**  You file collection lawsuits;
20  correct?
21      **A.  Correct.**
22      **Q.**  But how many a week on average?
23      **A.  It varies.  About 20.**
24      **Q.**  Is that about an approximate
25

78

G. KAVULICH

1  average?
2      **A.  Over the court of a year.**
3      **Q.**  About 20 a week on average over
4  the course of a year?
5      **A.  Yes.**
6      **Q.**  You sign motions in some of
7  these cases?
8      **A.  Correct.**
9      **Q.**  Roughly speaking, about how
10  many?
11      **A.  Ten to 15.**
12      **Q.**  What other documents do you
13  typically sign on average in a week at your
14  firm?
15      **A.  Demand notices, verifications.**
16      **Q.**  What else?
17      **A.  Notices of trial, notices of**
18  **issue, notices of entry.**
19      **Q.**  Anything else?
20      **A.  I am sure but none that come to**
21  **mind.**
22      **Q.**  Roughly on average about how
23  many would you say demand letters would you
24  say?
25

79

G. KAVULICH

1      **A.  Demand notices?**
2      **Q.**  What is a demand notice?
3      **A.  Really?  You are asking me this**
4  **question?  Before we start a lawsuit, we**
5  **have to serve a demand notice.**
6      **Q.**  We are taking a deposition.
7  This could be used at trial or summary
8  judgment.  So I have to give questions that
9  I could present to a jury if need be.  So
10  you have to send a demand notice or your
11  office sends a demand notice prior to
12  filing a lawsuit?
13      **A.  I do, yes.**
14      **Q.**  Do you also do that prior to
15  issuing post-judgment enforcement
16  mechanisms?
17      **A.  No.**
18      **Q.**  What notice do you sent for
19  post-judgment?
20      **A.  A 5222.**
21      **Q.**  So let's take them one at a
22  time.  A demand notice, if you were to sign
23  about 20 complaints, you would sign about,
24  roughly speaking, around 20 demand notices
25

G. KAVULICH

1  or five a week?

2     **Q.**  On average, would you say 15 a
3  week would be an reasonable approximation?

4     **A.**  **Fifteen to 20.**

5     **Q.**  Notices of entry a week?

6     **A.**  **Yes.**

7     **Q.**  Any other documents other than
8  those you regularly sign a week?

9     **A.**  **There may be but those are the**
10 **ones that come to mind.**

11    **Q.**  But most of the time at your
12 office, you are not signing a stack of
13 documents, you are doing other things or
14 you tell me?

15    **A.**  **Most of the time, meaning more**
16 **than 50 percent, yes, I am doing other**
17 **things.**

18    **Q.**  In a typical week, what do you
19 do on a typical day?

20    **A.**  **I open cases, search for new**
21 **addresses, intra-office meetings, go to**
22 **clients, go to court, although I try to**
23 **keep that to a minimum, review lists,**
24 **trouble-shot problems as they come up,**
25 **respond or engage in various**

---

G. KAVULICH

1  or five a week?

2     **A.**  **Usually or a few more because**
3  **some come back no good or with a bad**
4  **service address.**

5     **Q.**  About 30 or 40 a week?

6     **A.**  **Thirty.**

7     **Q.**  So a 5222 notice, what do you
8  mean by 5222?

9     **A.**  **It is a notice that goes to the**
10 **judgment debtor before we send out the**
11 **judgment enforcement devices.**

12    **Q.**  Do you send those out once a
13 year?

14    **A.**  **No, only when we do the work.**

15    **Q.**  So if you sign roughly 80
16 information subpoenas a week, 80
17 information subpoenas with bank restraints
18 a week, and 15 wage garnishments a week,
19 would you sign about 175, 5222 notices a
20 week or would you sign a little more than
21 that?

22    **A.**  **No, it would be whatever we do.**
23 **If it is 80 bank restraints, then there are**
24 **80 of those.**

---

G. KAVULICH

1     **Q.**  Adding up those numbers, this
2  is roughly, your office sends out about 175
3  5222 notices a week?

4     **A.**  **If that's what matches the**
5  **numbers, yes.**

6     **Q.**  You said verifications.  What
7  do you mean by verifications?

8     **A.**  **If we receive a dispute from a**
9  **debtor we send a verification of the debt.**

10    **Q.**  Do you send that both to oral
11 and written disputes?

12    **A.**  **Yes.**

13    **Q.**  Approximately how many of those
14 do you send a week?

15    **A.**  **One maybe.**

16    **Q.**  You said notices of trial,
17 approximately how many notices of trial
18 would you send out and sign in a week?

19    **A.**  **Two.**

20    **Q.**  You said notices of entry,
21 about how many notices of entry do you sign
22 in a week?

23    **A.**  **Fifteen or 20.  It is more than**
24 **a couple.**

---

G. KAVULICH

1  **communications, e-mail, meet with clients,**
2  **debtors, courts.**

3     **Q.**  Any other major activities that
4  you do?

5     **A.**  **That pretty much covers it.**

6     **Q.**  Do you know approximately on
7  average what percentage of your time you
8  spend going to court?

9     **A.**  **Now, 10 percent a year.**

10    **Q.**  Now, you go about 10 percent of
11 your time a week, on average, you go to
12 court; correct?

13    **A.**  **Yes.**

14    **Q.**  And a year ago you were going
15 approximately how many times per week,
16 would you go to court?

17    **A.**  **About a year ago about 25**
18 **percent.  Two years before that it was 40**
19 **percent.  It has been decreasing since the**
20 **last five years.**

21    **Q.**  Why is that?

22    **A.**  **Because court is not an**
23 **efficient use of my time or anyone else's.**

24    **Q.**  So going back to 2015, you said

G. KAVULICH

1  you spent about 25 percent of your time in
2  court?
3      A.   About 25.
4      Q.   Now, opening cases, what do you
5  mean by opening cases?
6      A.   Client sends in a case or we go
7  and pick up a case.  I review the file.  I
8  enter the necessary information into our
9  system and calendar it ahead accordingly.
10     Q.   What percentage of your week do
11 you spend doing that?
12     A.   Fifteen percent maybe.
13     Q.   Is that true in 2015?
14     A.   Yes.
15     Q.   You said you search for new
16 addresses; correct?
17     A.   Yes.
18     Q.   Approximately what percentage
19 of your time do you spend doing that?
20     A.   That's included in opening
21 cases.
22     Q.   You do intra office meetings,
23 generally what does that entail?
24     A.   I would speak to the staff

G. KAVULICH

1  doing that?
2      A.   When?
3      Q.   Now.
4      A.   Ten percent.
5      Q.   What that true in 2015?
6      A.   Yes.
7      Q.   In 2008, was that roughly true?
8      A.   It was a lot more.  I can't
9  quantify it, but it was a lot more.
10     Q.   You said you review lists, what
11 do you mean by that?
12     A.   Review the ticklers.
13     Q.   That is the computer pop-up
14 that happens on a regular basis, for
15 example, to collect on judgements?
16     A.   That is one example, yes.
17     Q.   What are other examples?
18     A.   If a summons and complaint is
19 due to be issued.
20     Q.   When is that tickler sent out?
21     A.   Forty days after we issue the
22 demand notice.
23     Q.   What other major lists do you
24 review?

G. KAVULICH

1  members about what they are doing and
2  address the issues relevant to their job
3  tasks.
4      Q.   Approximately what percentage
5  of your week do you spend doing that?
6      A.   Probably 10 or 15 percent.
7      Q.   Was that true in 2015?
8      A.   Maybe 10 percent.  We were a
9  little bit busier.
10     Q.   You will find out later in the
11 deposition about why I am asking this
12 question but around 2008, about what
13 percentage of your time was used on
14 intra-office meetings?
15     A.   Probably the same.  I don't
16 know.  It is eight years ago.
17     Q.   I am trying to get a rough
18 estimate.  You said going to court was
19 greater before back in 2008.  About what
20 percentage of your time were you spending
21 then?
22     A.   Fifty percent.
23     Q.   Going to client meetings, about
24 what percentage of your time did you spend

G. KAVULICH

1      A.   If a notice of trial is due.
2  There are not that many.  There are not
3  that many job tasks.  I should not say job
4  tasks.  There are not that many categories.
5  Review a file to see if or to look for a
6  new address.  If a summons is due, if a
7  judgment is due, if we you execute on a
8  judgment, if a motion is due, and then a
9  notice of issue or a notice of trial.
10     Q.   So approximately what
11 percentage of your week is spend doing that
12 now?
13     A.   Ten or 15 percent.
14     Q.   Was that true in 2015?
15     A.   Most likely, yes.
16     Q.   Is that true in 2008?
17     A.   Yes, probably.
18     Q.   Troubleshoot problems,
19 approximately how much time do you spend a
20 week doing that?
21     A.   Twenty-five percent.
22     Q.   Is that true in 2015
23 approximately?
24     A.   Probably.

G. KAVULICH

1
2  **Q.**   Approximately speaking, would
3  that be true in 2008?
4  **A.   You know, I can't tell you.**
5  **Q.**   You said responding to
6  communications e-mails and so forth from
7  consumers and clients, approximately what
8  percentage of your time per week do you
9  spend doing that?
10  **A.   Ten or 15.  Maybe it is a**
11  **little bit more.**
12  **Q.**   Was that true in 2015, roughly
13  speaking?
14  **A.   Most likely, yes.**
15  **Q.**   And roughly speaking, is that
16  true in 2008?
17  **A.   2008 is a blur.  I had just**
18  **opened up my own office in 2007.  Shortly**
19  **thereafter I was sued by my old firm, even**
20  **though I didn't do anything wrong.  I was**
21  **going through a divorce.  It was a crazy**
22  **time.**
23  **Q.**   So you were just getting
24  everything set up back in 2007?
25  **A.   Yes.**

G. KAVULICH

1  other words, client A, if they had started
2  a case with Gutman Mintz, they stayed with
3  Gutman Mintz.  Any new cases that client A
4  would place, they would place it with me.
5  No monies changed hands.  That is how it
6  was resolved.
7
8  **Q.**   About how many accounts or
9  cases came with you then from Gutman Mintz?
10       MR. PASHKIN:  Objection to
11       relevancy.
12  **A.   Came from Guttman?**
13  **Q.**   Yes.
14  **A.   I don't know if any.  I a**
15  **handful.**
16  **Q.**   But some of the clients came
17  over with you?
18  **A.   Yes.**
19  **Q.**   Those clients, about how many
20  cases did you do with them after they came
21  to you?
22       MR. PASHKIN:  Objection to
23       relevancy.
24  **Q.**   Were they the major source of
25  your cases?

G. KAVULICH

1
2  **Q.**   We don't need to go into
3  details.  I think you testified before your
4  old firm was Gutman & Mintz?
5  **A.   Yes.**
6  **Q.**   They were trying to send a shot
7  across the bow so other attorneys would not
8  leave?
9  **A.   As well as punishing me.**
10  **Q.**   And so you wouldn't take away
11  clients?
12       MR. PASHKIN:  Objection to
13       relevancy.
14  **A.   I am sure that was part of it.**
15  **Q.**   Any other reasons?
16       MR. PASHKIN:  Objection to
17       relevance.
18  **A.   No.**
19  **Q.**   What happened was that suit?
20  **A.   The clients that decided to**
21  **come with me, came with me.  The bigger**
22  **issue for me at the time was whether those**
23  **client's cases that had already been placed**
24  **with Gutman Mintz, whether or not they came**
25  **with me or not and they did not.  So, in**

G. KAVULICH

1       MR. PASHKIN:  Objection.
2
3  **A.   No.**
4  **Q.**   Of your week you did doing
5  various tasks signing all of the documents
6  that we talked about, post-judgment
7  enforcement mechanisms demand letters, 5222
8  notices, the information subpoenas, wage
9  garnishments, and all the other things we
10  talked about, so would those, they give
11  those to you in a stack and you go through
12  them one at a time, you start signing them?
13  **A.   Say that again.  My office is**
14  **down.  That is taking a little bit of my**
15  **attention away.**
16  **Q.**   All those documents you signed,
17  they give them in a stack to you and you
18  just sign them one at a time?
19  **A.   Yes.**
20  **Q.**   Roughly speaking, you spend
21  about an hour a week signing all those
22  things or how long?
23  **A.   I don't know how much time it**
24  **is.  I don't time it.**
25  **Q.**   Generally speaking do you

G. KAVULICH

1 review any of the information of the
2 documents you sign or pretty much just sign
3 what is in front of you generally?
4 **A.    Generally speaking, I sign what**
5 **is in front of me.**
6         MR. KESHAVARZ:  Let's take a
7 break now.
8         (Whereupon, a short recess was
9 taken.)
10        **Q.**    Going back to Exhibit 1, the
11 information subpoena and bank restraint.
12 The amounts that are claimed that are due
13 are spit out by your computer; is that
14 right?
15       **A.    Correct.**
16       **Q.**    I want to ask you about, where
17 it says on the bottom of the first
18 paragraph, I take that back, if you look at
19 Exhibit 2, the execution with notice to
20 garnishee, what is an execution to
21 garnishee?
22       **A.    That is what we sent to the**
23 **marshal.**
24       **Q.**    The marshal forwards that to

G. KAVULICH

1       **A.    Correct.**
2       **Q.**    Exhibit 2, if you look at it
3 that was created by your office; correct?
4       **A.    Yes.**
5       **Q.**    If you look underneath the
6 addresses, where it says whose last known
7 address is, and it has the address, do you
8 see that?
9       **A.    Yes.**
10      **Q.**    And beneath that it says, in
11 the amount of, that is the amount due on
12 the judgment?
13      **A.    Not according to this.**
14      **Q.**    In what way?
15      **A.    It says zero is due.**
16      **Q.**    It says in that sentence, read
17 that sentence.
18      **A.    In the amount of $4,352.74**
19 **including costs of which zero dollars**
20 **interest thereon from March 13, 2008**
21 **remains due and unpaid.  So it says zero is**
22 **due on it.**
23      **Q.**    It says zero is due or zero
24 interest is due?

G. KAVULICH

1 the judgement debtor; correct?
2       **A.    To judgment debtor and I**
3 **believe the garnishee.**
4       **Q.**    Because the marshal is required
5 to do that under the CPLR; correct?
6       **A.    Correct.**
7       **Q.**    When you sign Exhibit 2 you
8 intend that the marshal forward Exhibit 2
9 to Mr. Morales; correct?
10      **A.    Yes.**
11      **Q.**    Exhibit 1, does that get
12 forwarded to the consumer?
13      **A.    Yes, I believe it does, yes.**
14      **Q.**    Does it get forwarded by the
15 marshal to the consumer?
16      **A.    By the bank.**
17      **Q.**    Because the bank is required to
18 send a copy of the information subpoena
19 with restraint notice to the consumer?
20      **A.    Yes.**
21      **Q.**    So when you signed Exhibit 1,
22 you knew and intended that Exhibit 1 would
23 be forwarded to the consumer by the bank;
24 correct?

G. KAVULICH

1       **A.    It says zero, if you read the**
2 **whole sentence remains due and unpaid and**
3 **the last number is zero in that line.**
4       **Q.**    Well, let's move up because it
5 says in the amount of, that is continuing a
6 few lines up, where it says who are all of
7 the parties named in said action judgment,
8 was entered on March 13, 2008.  Then skip
9 down to in the amount of, is that supposed
10 to be all part of the same sentence?
11      **A.    Yes.**
12      **Q.**    In essence what this is saying
13 is there was a judgment entered on March
14 13, 2008, in the amount of $4,352.74?
15      **A.    Correct.**
16      **Q.**    Including costs; correct?
17      **A.    Correct.**
18      **Q.**    Well, when you read the
19 sentence --
20      **A.    It is a computer error.**
21 **Something got screwed up.**
22      **Q.**    Exhibit 2 is a form generated
23 by your office; correct?
24      **A.    Correct.**

96

G. KAVULICH

1    **Q.**   You set up the template for it?

2    **A.**   **Correct.**

3    **Q.**   Computer just fills in all of

4 the numbers and the names; correct?

5    **A.**   **Fills in the variable fields**

6 **names of the parties, et cetera, yes.**

7    **Q.**   Index number, so forth?

8    **A.**   **Correct.**

9    **Q.**   But the template of the text,

10 other than the specifics of the consumer,

11 that text is established by your office;

12 correct?

13    **A.**   **Yes.**

14    **Q.**   Are you saying there is some

15 error in how the text is set up for Exhibit

16 2?

17    **A.**   **It is definitely inartfully**

18 **written.**

19    **Q.**   In what way?

20    **A.**   **It should say something of the**

21 **sort in amount of four thousand, a**

22 **judgement amount including costs and**

23 **interest of which blank dollars, and fill**

24 **in the blank, remains due and unpaid.**

---

G. KAVULICH

1    **Q.**   So if you are saying Exhibit 2

2 has an error in the text, the format of the

3 text, and that is true for 2014 to present;

4 correct?

5    **A.**   **I don't know that for sure. I**

6 **know on this one it is an error.**

7    **Q.**   Did you change your template

8 for the execution?

9    **A.**   **No.**

10    **Q.**   So the error in the text here,

11 would be an error in the text for

12 everything for 2014 forward?

13    **A.**   **That is a reasonable assumption**

14 **but an assumption.**

15    **Q.**   Just to be clear, because we

16 talked about data fields, what specifically

17 in the template of the text, not the

18 variables of Mr. Morales, is incorrect or

19 inartful?

20    **A.**   **I just told you.**

21    **Q.**   That it should say the

22 judgement was entered on a certain date and

23 the next line should be in the amount of;

24 correct?

---

97

G. KAVULICH

1    **Q.**   Looking at the execution with

2 notice to garnishee, how much, in reading

3 this document, what do you believe this

4 document says as to how much is due?

5    **A.**   **Zero.**

6    **Q.**   If the amount of zero was due,

7 why did you sign and send it for execution?

8    **A.**   **I made a mistake.**

9    **Q.**   Why?

10    **A.**   **I don't know why. I don't**

11 **remember from May or April of 2015.**

12    **Q.**   Is the template that is Exhibit

13 2 the same template you use today?

14    **A.**   **I believe so.**

15    **Q.**   This is a template you have

16 used for many years?

17    **A.**   **Since 2014.**

18    **Q.**   So if you believe there is

19 something wrong with the text of the form

20 that has been in error for all the

21 executions with notice to garnishee from

22 2014 to present; correct?

23    **A.**   **I didn't hear a question in**

24 **there.**

---

99

G. KAVULICH

1    **A.**   **Yes.**

2    **Q.**   So, in that sentence it says

3 zero dollars interest thereon, so are you

4 saying zero dollars interest, does that

5 mean how much interest is occurring?

6    **A.**   **What is the question? I am**

7 **saying what?**

8    **Q.**   Let me rephrase the question.

9    **A.**   **I told you already what I said,**

10 **what I believe this says. I also told you**

11 **what I believe that it should say. I don't**

12 **know what more or less I could add to that.**

13    **Q.**   Let me be more specific right

14 now. When it says of which zero dollars

15 interest thereon from a certain date, where

16 it says zero dollars interest, that means

17 there is zero dollars interest accruing;

18 correct?

19    **A.**   **The way it is written, yes.**

20    **Q.**   So the way it is written, it is

21 saying there is an amount due of $4,300 but

22 there is no interest accruing on it?

23    **A.**   **No, and I answered that**

24 **question already.**

**100**

G. KAVULICH

1
2 **Q.** Where it says in the amount of
3 $4,300, what about that is unclear?
4 **A. I told you already.**
5 MR. PASHKIN: Asked and
6 answered. We keep going around in
7 circles. You are asking him to
8 interpret a document. He has given
9 you his interpretation. The document
10 says what it says.
11 **Q.** I am trying to narrow down a
12 specific phrase one at a time.
13 **A. I have already done that.**
14 **Q.** I am not sure you have. Let's
15 do it and get it out of the way?
16 **A. Let's move on to something**
17 **else. I have acknowledged this is wrong.**
18 **I have acknowledged it was inartful. I**
19 **told you what it should be. And I told you**
20 **what it says.**
21 **Q.** Let's break down a specific
22 phrase, where it says there was a judgment
23 entered on the date in the amount of
24 $4,300?
25 **A. You asked that already, and I**

DIAMOND REPORTING (877) 624-3287 info@diamondreporting.com
100

**101**

G. KAVULICH

1
2 **acknowledged that.**
3 **Q.** When it says in the amount of
4 $4,300, this is stating the judgement was
5 $4,300; is that correct?
6 **A. Correct.**
7 **Q.** Then it says zero dollars in
8 interest; correct?
9 **A. It says zero dollars interest**
10 **thereon from March 13, 2008.**
11 **Q.** Then it says remains due;
12 correct?
13 **A. And unpaid, correct.**
14 **Q.** So why does that not mean there
15 is an amount of $4,300 due, no interest and
16 that amount remains due and unpaid?
17 **A. That is not the way I read it.**
18 **I don't know how many ways you want me to**
19 **say it. I read it and I am acknowledging**
20 **it was a mistake. So I don't know really**
21 **what, I mean we can move on to to more**
22 **productive things. Forty-three hundred and**
23 **change is the judgement amount, of which**
24 **zero remains due and unpaid. The interest**
25 **thereon from March 13, 2008 is a clause**

DIAMOND REPORTING (877) 624-3287 info@diamondreporting.com
101

**102**

G. KAVULICH

1
2 **that belongs before that zero, but that's**
3 **the way I read it, and you may disagree**
4 **with me, but that's the way I read it.**
5 **Q.** The clause "interest thereon"
6 should be moved to where?
7 **A. After including costs, with**
8 **interest thereon.**
9 **Q.** What about the phrase of which,
10 does that get deleted?
11 **A. That would be after. Interest**
12 **thereon from the date, the entry date is a**
13 **clause which should be after the word**
14 **"costs." That after which should follow of**
15 **which X amount of dollars remains due and**
16 **unpaid. This clause simply has to go after**
17 **costs the way it is presently constructed.**
18 **Q.** Are you saying that the
19 template that has these phrases, that
20 template should be rearranged?
21 **A. I am saying, yes. I said that**
22 **already.**
23 **Q.** You clarified it. Thank you.
24 Since this FDCPA action has been filed,
25 have you changed the template that is in

DIAMOND REPORTING (877) 624-3287 info@diamondreporting.com
102

**103**

G. KAVULICH

1
2 Exhibit 2?
3 **A. No, but I will today or**
4 **tomorrow when I get back. That being said,**
5 **I don't know about the other ones, this**
6 **could be, this is a form but forms get**
7 **screwed up sometimes too.**
8 **Q.** But the data inputs I am more
9 interested in. So you are saying on the
10 date of the signature here April 27, 2015
11 there was zero dollars remaining on the
12 judgement; correct?
13 **A. That is the way I read this.**
14 **Q.** But putting aside how you read
15 it, let me ask you a factual question, is
16 it the position of your firm and yourself
17 as of April 27, 2015, the judgment was
18 entirely satisfied, is that what you are
19 saying?
20 **A. No. I am saying there wasn't a**
21 **judgement against Mr. Morales.**
22 **Q.** You're saying it was a judgment
23 against Clara Potter, not Mr. Morales?
24 **A. In addition to there not being**
25 **a judgment against Mr. Morales. There was**

DIAMOND REPORTING (877) 624-3287 info@diamondreporting.com
103

104

G. KAVULICH

1  a judgement against Clara Potter.
2  
3      Q.    Was the judgment against Clara
4  Potter due in the amount of $4,352.74 when
5  you signed this document on or about April
6  27, 2015?
7      A.    It was some number less than
8  that because there were payments from an
9  income execution, the exact amount of which
10 I don't know.
11     Q.    Was the number zero?
12     A.    No.
13     Q.    How do you know that?
14     A.    From my recollection.
15         MR. KESHAVARZ:  Mark this as
16 Plaintiff's 4.
17         (Whereupon, the aforementioned
18         document was marked as Plaintiff's
19         Exhibit 4 for identification as of
20         this date by the Reporter.)
21     Q.    I am showing you what has been
22 marked as Plaintiff's 4 and Bates stamped
23 Kavulich parenthesis Morales, 1 through 3
24 from your attorney's office.  Can you
25 identify what Exhibit 4?

---

105

G. KAVULICH

1  
2      A.    This is our snapshot.
3      Q.    It is the collection notes on
4  the punitive judgement account: correct?
5      A.    Say that again.
6      Q.    Let me rephrase that.  Is it
7  your position you and your firm that Mr.
8  Morales owes any amount to Rosewall?
9      A.    Mr. Morales owes any money to
10 Rosewall.  He did but he does not now
11 because of the statute of limitations.  He
12 owed money.  It wasn't in a judgment form.
13 But he owed money.  Because it was in a
14 judgment form, we did not sue him civilly,
15 to my recollection.  And because it was
16 determined subsequently to the expiration
17 of statute of limitations, he didn't owe
18 the money.  It is not because there was not
19 an original debt.
20     Q.    What is your position about the
21 date the statute of limitations ran as to
22 the punitive debt by Mr. Morales to
23 Rosewall?
24     A.    From my recollection, it was,
25 from my recollection in this case, to both

---

106

G. KAVULICH

1  the statute of limitations on contracts in
2  New York State and Mr. Morales' statement
3  he signed the lease, it would be six years
4  from when the debt started accruing.
5      Q.    When was that date for Morales?
6      A.    I don't remember.  Obviously,
7  some time before May of 2008.
8      Q.    The statute of limitations
9  began.
10     A.    The statute of limitations
11 began running sometime before May of 2008.
12     Q.    Does Exhibit 1 indicate,
13 provide information to you to determine
14 when the statute of limitations expired for
15 the alleged debt from Mr. Morales to
16 Rosewall?
17     A.    Exhibit 1 is not informative as
18 to that.
19     Q.    Exhibit 4?
20     A.    It gives me a range, yes.
21     Q.    What is that range?
22     A.    Sometime after October of 2007.
23     Q.    Sometime after October of 2007,
24 six years the statute of limitations began

---

107

G. KAVULICH

1  to start?
2      A.    Correct, began to run, yes.
3      Q.    Do you or your firm have a
4  document in your possession that would
5  indicate to your firm the date that the
6  statute of limitation would begin and would
7  expire?
8      A.    More exactly, yes.
9      Q.    What document would have that?
10     A.    The lease and the breakdown.
11     Q.    The breakdown of what?
12     A.    Of the arrears.
13     Q.    That breakdown of the arrears
14 is provided to your office by Rosewall;
15 correct?
16     A.    Yes.
17     Q.    Now, there are some prior
18 depositions you were not here for by
19 Rosewall's corporate representative.  Is it
20 your understanding that all of the
21 communications on behalf of Rosewall go
22 through a property management company?
23     A.    I can't account for all
24 corporate communications.

G. KAVULICH

**Q.** All your communications with Rosewall go through a property management company?

**A.** As far as us, yes.

**Q.** To your knowledge, you don't know anyone at Rosewall Gardens?

**A.** Correct.

**Q.** When you collect on debts that are not a judgment, when you do that, you send out collection letters; correct?

**A.** Yes.

**Q.** What other ways do you do that?

MR. PASHKIN:  Objection to relevance.

**A.** We send a letter.  If we, in fact, have a good address for service, we commence a lawsuit.

**Q.** Now looking at Exhibit 1 going from the bottom, when was the accounts for Miss Potter and Mr. Morales given to you by Rosewall?

**A.** I have to see Exhibit 4.  In or around March of 2008.

**Q.** You believe that because the

G. KAVULICH

third page of your document production says that?

**A.** Yes.

**Q.** You are looking at the bottom line?

**A.** Yes.

**Q.** An entry of March 13, 2008?

**A.** Yes.

**Q.** Where it says prior judgement for $300, that is something your staff puts in your computer system based on the documents provided to your office by Rosewall?

**A.** Yes.

**Q.** In the prior deposition, I think you testified when you worked at Guttman & Mintz you primarily did landlord-tenant lawsuits, correct?

**A.** When I worked for Gutman Mintz I wore a number of different hats.

**Q.** Was there a primary litigation purpose?

**A.** The firm's primary practice was landlord-tenant.

G. KAVULICH

**Q.** That was primarily what you did there?

**A.** And collections, yes.

**Q.** How do you distinguish collections from landlord-tenant?

**A.** In my world collections are post tenancy.  Landlord-tenant would be while the person is actually a tenant.

**Q.** When you file landlord-tenant action, you are trying to evict the tenants from the property; correct?

**A.** No.  We are trying to collect rent money.

**Q.** You file a landlord-tenant action to collect rent money?

**A.** That is the hope.

**Q.** Are you also trying to get judgement of possession of the property?

**A.** In the absence of payment, yes.

**Q.** What is a judgment of possession?

**A.** It is a judgement which allow the property owner to, along with other things, regain possession of the space.

G. KAVULICH

**Q.** When you say regain possession, do you mean evict tenant that is there or what do you mean by that?

**A.** That is one of the measures that a landlord could take, yes, based on that judgement of possession.

**Q.** Is that the primary purpose of getting a judgement of possession?

**A.** The primary purpose is a step in the procedure.

**Q.** In order to force a tenant out of a property, you have to get a judgement of possession?

**A.** Among other things but, you, that is the primary step.

**Q.** So it is common to file a landlord-tenant action against more than one individual; correct?

**A.** That is my secondhand experience.  I never filed a landlord-tenant action.

**Q.** When you said you did landlord-tenant work, what did you mean?

**A.** I would go to court and write

112

G. KAVULICH

1  stipulations.
2      **Q.**   So Gutman Mintz, the firm you
3  worked for at the time, would file
4  landlord-tenant lawsuits; correct?
5      **A.**   Yes.
6      **Q.**   You were one of the attorneys
7  at Gutman Mintz; correct?
8      **A.**   Yes.
9      **Q.**   You would go to court because
10 of the lawsuits, landlord-tenant lawsuits
11 your firm filed?
12     **A.**   Yes.
13     **Q.**   So you were involved in the
14 landlord-tenant lawsuits that Gutman Mintz
15 filed?
16     **A.   Yes, to the extent of, all I**
17 **did, I would not even know how to file a**
18 **notice of petition, all I did was go to**
19 **court and write a stipulation or argue a**
20 **motion.  I never did trials.**
21     **Q.**   By stipulation, what do you
22 mean?
23     **A.   Payment agreements between the**
24 **parties.**

113

G. KAVULICH

1      **Q.**   If there is a landlord-tenant
2  suit against multiple tenants or multiple
3  defendants, is it true you can only get a
4  money judgement if that tenant appears on
5  the court date; is that true?
6      **A.   Nowadays that's true.**
7      **Q.**   Is that true as of 2008?
8      **A.   I can't give you an exact**
9  **delineation of the time.  But I know years**
10 **ago that that was not the case.  Now it is**
11 **where if you have two tenants, two**
12 **lease-holders, you are absolutely correct,**
13 **both tenants have to appear in court.  But**
14 **going back, I don't remember exactly what**
15 **years but even after this lawsuit, I**
16 **remember there being cases where it would**
17 **turn out later, I would get a housing court**
18 **judgement from a client or we pull it from**
19 **the file or whatever, and both names would**
20 **be on it but after engaging in litigation**
21 **and court appearance and find out only one**
22 **of those tenants showed up, yes, the clerk**
23 **entered a judgement again both, a money**
24 **judgment against both of them.**

114

G. KAVULICH

1      **Q.**   Back in 2008, when this account
2  was given to you by Rosewall, your firm did
3  not charge to see if there was a money
4  judgment entered against all of the
5  defendants; is that true?
6      **A.   No, my recollection is that the**
7  **woman who entered, the person who entered**
8  **the case believed there was a judgement**
9  **against both.**
10     **Q.**   Well, let me ask you this if
11 you know, back in March of 2008 when you
12 got the account for collections from
13 Rosewall, was it your office's procedure to
14 check to see if there was a money judgement
15 against all of the defendants in the
16 landlord-tenant action?
17     **A.   Yes.**
18     **Q.**   In 2008, you knew, you and your
19 firm knew that you would only get a money
20 judgment against consumer in a
21 landlord-tenant action if that consumer
22 actually appeared in court; correct?
23     **A.   No.  First of all, I knew that.**
24 **The woman who entered the cases knew that.**

115

G. KAVULICH

1  **That is one of the reasons we hired her,**
2  **she had experience on the landlord-tenant**
3  **side.  But back then in 2008, it surely**
4  **wasn't my understanding that both parties**
5  **had to appear in order for there to be a**
6  **judgment, a money judgment in a**
7  **landlord-tenant action, because that wasn't**
8  **my experience.  That has unfolded and been**
9  **a court practice later.  That being said, a**
10 **case can be given to us by a client with**
11 **two people on the lease and one person may**
12 **leave or somehow remove him or herself from**
13 **the landlord-tenant relationship.  So we**
14 **still review the file to make sure that**
15 **both people are actual debtors.**
16     **Q.**   When you said the person who
17 enters the information into your computer
18 system, do your records indicate who that
19 was for the Rosewall file regarding Miss
20 Potter or Mr. Morales that you got in March
21 of 2008?
22     **A.   My records don't necessarily**
23 **show that definitively.  But I know who it**
24 **was.  I forget her last name.  Mercedes.**

116

G. KAVULICH

1  We hired her about January or February of
2  that year.
3      Q.   January or February of 2008?
4      A.   Yes.
5      Q.   Is this from the prior
6  deposition, they are sisters that worked
7  there?
8      A.   No.
9      Q.   That a different person?
10     A.   Those are different people.
11     Q.   You said Mercedes started
12  working for your firm in January or
13  February of 2008?
14     A.   Yes.
15     Q.   When did she cease working for
16  your firm?
17     A.   March or April or May of 2011.
18     Q.   What were her primary
19  responsibilities when she worked for you?
20     A.   Her primary, first and foremost
21  responsibility was entering the cases.
22     Q.   What do you mean by entering
23  the cases?
24     A.   I would get the file from the

117

G. KAVULICH

1  client or some other way in the mail or
2  however it would come to me.  Then I would
3  give it to her to enter the name of the
4  parties and how much was owed.
5      Q.   So she would be the person who
6  would determine whether it was a debt for
7  rent that you had to file a civil suit for,
8  as opposed to judgment enforcement?
9      A.   Generally, yes.
10     Q.   She would make that decision?
11     A.   Yes.
12     Q.   You would not tell her which
13  one it is?
14     A.   No, especially me at this time.
15     Q.   Why do you say that?
16     A.   Because I was only open less
17  than a year and I was trying to build a
18  business and I was wearing many more hats
19  than I do now.
20     Q.   Would it be fair to say when
21  you first opened your practice in 2008,
22  your office was just starting up and was in
23  a jumble?
24     A.   No.  I am saying up until

118

G. KAVULICH

1  about, until I hired her, I used to enter
2  the cases.  And I just decided we were very
3  busy and people's responsibilities were
4  stretched.
5      Q.   What qualifications did
6  Mercedes have when she began to work for
7  you?
8      A.   She was the legal point person
9  for a large housing company.
10     Q.   Which one?
11     A.   Sepco Development in the Bronx.
12     Q.   Is that a property management
13  company?
14     A.   Yes.
15     Q.   Do you know how long she worked
16  there before you hired her?
17     A.   I don't know exactly, but for a
18  long time.
19     Q.   Do you know about how old she
20  was when she started working for you?  Was
21  she out of high school, in her 20s or 40s?
22     A.   I know she had at the time a
23  high school age daughter.
24     Q.   Do you know if she graduated

119

G. KAVULICH

1  from high school?
2      A.   Do I know whether she graduated
3  from high school?  No.
4      Q.   What training did Mercedes have
5  to determine whether a case should be
6  entered for collection and rent as opposed
7  to enforcement of the judgement?
8      A.   Years.
9      Q.   What experience?
10     A.   Years, this housing company, I
11  don't know then it might have been
12  twenty-five hundred, but somewhere between
13  twenty-five hundred and three thousand
14  apartments were under their management.  It
15  is Father Gigante in the Bronx.  He worked
16  there for many years, and she was their
17  liaison with their landlord-tenant counsel.
18  She would put cases into legal follow-up
19  and deal with all the legal aspects of the
20  case.
21     Q.   Is she an attorney?
22     A.   No.
23     Q.   Did she have any formal
24  training or legal training?

120

G. KAVULICH

1  G. KAVULICH
2      A.   I don't know.
3      Q.   Did she have any legal
4  training?
5      A.   I don't know.  What do you mean
6  by legal training?
7      Q.   I don't know.  Was she doing
8  the activities of an attorney?
9      A.   No, she would not make court
10  appearance or sign papers.
11      Q.   She would make decisions about
12  what an attorney would make decisions on
13  about whether or not to file a collection
14  lawsuit or expedite judgment?
15      A.   She would determine whether a
16  judgement exists or not, yes.
17      Q.   But you didn't direct her to
18  determine whether there was a possessory
19  order or a money judgement in a
20  landlord-tenant action; is that correct?
21      A.   Possessory orders were
22  generally, actually I can't right now, I
23  will reserve the possibility were relevant
24  to what we did or what we do because all
25  our cases were after folks moved out or

DIAMOND REPORTING (877) 624-3287  info@diamondreporting.com
120

121

1  G. KAVULICH
2  were evicted.
3      Q.   Let me make sure I understand.
4  A landlord-tenant action would be filed and
5  one reason would be to collect rent;
6  correct?
7      A.   Yes.
8      Q.   And another reason would be to
9  get a possessory judgement so that you
10  could begin the process of evicting that
11  tenant from the property; correct?
12      A.   Yes, but to make clear, my firm
13  nor I do this work, nor did we do this work
14  in 2008.
15      Q.   You didn't do landlord-tenant
16  work?
17      A.   Correct.
18      Q.   At Gutman Mintz you appeared at
19  hearing on landlord-tenant cases filed by
20  Gutman Mintz; correct?
21      A.   Yes.
22      Q.   You are saying you don't know
23  so --
24      A.   My simple point is possessory
25  judgments don't come into collections,

DIAMOND REPORTING (877) 624-3287  info@diamondreporting.com
121

122

1  G. KAVULICH
2  aren't really relevant to collection
3  actions to the extent that the collection
4  actions that we engage in and engaged in
5  2008 were all post possession cases,
6  meaning that the tenants/debtors/defendants
7  were no longer residents in those
8  apartments.
9      Q.   And that could only happen if
10  you have a possessory judgement?
11      A.   Unless they left voluntarily,
12  you cannot evict someone without a
13  possessory judgment, yes.
14      Q.   You are saying all the cases
15  you got at that point the tenant had
16  already moved out?
17      A.   Either moved out or was
18  evicted, yes.
19      Q.   So when you got an account that
20  was after landlord-tenant action was
21  completed, you would not take any steps to
22  determine whether there was only a
23  possessory judgement or if there was also a
24  money judgement; is that true?
25      A.   The inquiry, again, I will

DIAMOND REPORTING (877) 624-3287  info@diamondreporting.com
122

123

1  G. KAVULICH
2  reserve for a metaphysical possibility, but
3  I cannot imagine where a possessory
4  judgment would be relevant.  We would look
5  to see if there was a money judgement, but
6  not a possessory judgement.
7      Q.   But it is not uncommon; correct
8  me if I am wrong, it is not uncommon for a
9  multiple defendant landlord-tenant action
10  to have a money judgment against one of the
11  tenants and not a money against the other
12  tenant, because the other tenant didn't
13  show up in court?
14      A.   Now that is common.
15      Q.   In 2008 was that common?
16      A.   To my knowledge, no, because
17  they, whatever or whenever the exact
18  delineation was, I don't know whether they
19  changed the law or maybe now they started
20  paying attention, I am speaking about the
21  clerks in the court, now they started
22  paying attention to it.  Because back then
23  you could have a money judgment against two
24  tenants although only one appeared, a money
25  judgement.  Now that, I haven't seen that

DIAMOND REPORTING (877) 624-3287  info@diamondreporting.com
123

## 124

G. KAVULICH

1                  G. KAVULICH
2  in a few years.
3       **Q.**    Let me ask you this:  When you
4  got the account for Miss Potter and Mr.
5  Morales since it was after a
6  landlord-tenant action, did your firm
7  assume that there was a judgement against
8  both of the debtors?
9       **A.**    No, we would not assume, no.
10       **Q.**    You would check to see if there
11  was an actual judgment against each of
12  them?
13       **A.**    Correct.
14       **Q.**    Would you request, obtain a
15  copy of the physical judgement against each
16  of the debtors, would you request that from
17  your client when you got the account?
18       **A.**    **This particular client it would**
19  **be in there or there would be a notation in**
20  **there that there was.**
21       **Q.**    My question is more general.
22  Do you insist on seeing a copy of the money
23  judgement against each of the defendants
24  when you get a case post landlord-tenant?
25       **A.**    **Yes, we want to see it, sure.**

DIAMOND REPORTING (877) 624-3287  info@diamondreporting.com
124

## 126

G. KAVULICH

1                  G. KAVULICH
2       **Q.**    But based on your own office's
3  records in this case, is there any evidence
4  that your office had possession of the
5  judgements in the landlord-tenant case
6  against Miss Potter or Mr. Morales, either
7  possessory judgement or money judgement?
8       **A.**    **I just told you usually we**
9  **require, if the client does not provide it**
10  **to us, we look for it in court.  What I**
11  **believe, I just answered this, but what I**
12  **believe happened is she misread what we**
13  **had.  Do I know for sure?  No.**
14       **Q.**    You would generally have
15  someone from your office check the court's
16  website or would you have your staff go to
17  the physical courthouse and check the
18  computers there?
19       **A.**    **E-courts is useless.  E-courts**
20  **isn't applicable when it is a housing court**
21  **index number.  Once the case is over you**
22  **can't find them.  So we use to send a guy**
23  **down to various housing courts and look in**
24  **their housing court system computer.**
25       **Q.**    But your staff generally would

DIAMOND REPORTING (877) 624-3287  info@diamondreporting.com
126

## 125

G. KAVULICH

1                  G. KAVULICH
2       **Q.**    Did you insist on getting a
3  physical copy of that money judgment prior
4  to you attempting to collect on the debt?
5       **A.**    **I assuming, first of all, I**
6  **don't remember 2008.  I am assuming**
7  **Mercedes would have reached out or looked**
8  **at whatever was there, if she thought there**
9  **was one there.**
10       **Q.**    My question is broader:  Did
11  your office require the client to provide
12  you a copy of a money judgement for
13  accounts that were given to you after a
14  landlord-tenant action?
15       **A.**    **No, because sometimes we would**
16  **go look.  If the information wasn't in the**
17  **file, we would send someone to housing**
18  **court and check in the housing court**
19  **computer.**
20       **Q.**    Would the housing court, do you
21  know if that happened in this case?
22       **A.**    **I don't think so.  I believe**
23  **what happened, I am not sure, but I believe**
24  **what happened was Mercedes just misread the**
25  **documents.**

DIAMOND REPORTING (877) 624-3287  info@diamondreporting.com
125

## 127

G. KAVULICH

1                  G. KAVULICH
2  not pull the actual file, they would look
3  at what the computer screen said?
4       **A.**    **When the files were available**
5  **they would get copies, sure.**
6       **Q.**    When was the landlord-tenant
7  action completed as to Miss Potter and Mr.
8  Morales?
9       **A.**    **In 2008, I believe.**
10       **Q.**    Why do you think that?
11       **A.**    **Because that's when they**
12  **vacated.**
13       **Q.**    That's when the vacated the
14  premises?
15       **A.**    **Yes.**
16       **Q.**    How do you know that?
17       **A.**    **By my notes, the system notes.**
18       **Q.**    Do you know when your office
19  obtained, if ever, a copy of the money
20  judgment against Miss Potter?
21       **A.**    **No.**
22       **Q.**    Is there anything in your
23  records that would indicate when that was
24  received?
25       **A.**    **When that was received?**

DIAMOND REPORTING (877) 624-3287  info@diamondreporting.com
127

128

G. KAVULICH

1
2    Q.    The money judgment against Miss
3    Potter?
4    A.    Apparently when we opened the
5    case, when the case was opened.
6    Q.    What makes you say that?
7    A.    Because it says prior judgment.
8    Q.    Where does it say that?
9    A.    Bottom of page three.
10   Q.    On March 13, 2008; correct?
11   A.    Correct.
12   Q.    You don't know from that entry
13   whether you had possession of the money
14   judgement against Miss Potter, do you know?
15   A.    No, I do not know.
16   Q.    So there is no evidence in your
17   own records that indicate when, if ever,
18   you had a copy of the money judgment
19   against Miss Potter; correct?
20   A.    No, in the records there may be
21   but I don't have them all in front of me.
22   Q.    Well, I can show you the
23   documents.  Is there anything in your
24   documents production that show if your
25   office ever received the money judgment

130

G. KAVULICH

1
2    it, but I subsequently found out that the
3    guy that used to scan our stuff used to
4    intentionally scan, after I fired him, used
5    to intentionally scan one person's
6    documents into another person's file.  He
7    is since dead.  But I can't say nobody
8    would take it out and intentionally destroy
9    it.  But that being said, who knows what
10   file it is in or if it is in a file or
11   maybe it just fell out, sixty pages or a
12   hundred pages we took and we copied from
13   the client file and it got lost.  But my
14   notes, my contemporaneous notes at the time
15   I picked up the file indicates that we did
16   have it by handwriting saying FJ attached.
17   FJ in my lingo means money judgment.  I
18   have no need to know about a possessor
19   judgement for our purposes.
20   Q.    A final judgement attached to
21   what?
22   A.    To the rest of the documents.
23   Q.    There is that notation but you
24   don't have possession of the document?
25   A.    It is not included in this pile

129

G. KAVULICH

1
2    against Miss Potter?
3    A.    Yes, it looks like when I
4    picked up the case there was one because it
5    says "FJ attached."
6    Q.    FJ means?
7    A.    Final judgment.
8    Q.    Final judgment could be a
9    possessory judgement?
10   A.    Not in my lingo.  I don't see
11   the judgement.  I see the stipulation from
12   the court, but I didn't see the judgement.
13   Q.    So you are saying your office
14   never had possession of a money judgment
15   against Miss Potter?
16   A.    No, now I am definitely not
17   saying that.  Now, I am saying we did.
18   Q.    Correct me if I am wrong.  Do
19   you have a copy of the money judgment
20   against Miss Potter in your document
21   production?
22   A.    In here, no, but we did at some
23   point.  At least when we opened the case.
24   Q.    Would it have been destroyed?
25   A.    I can't say what happened to

131

G. KAVULICH

1
2    of papers; correct.
3    Q.    Any documents regarding the
4    account the judgement Miss Potter, Mr.
5    Morales you would have provided in your
6    possession, you would have provided to your
7    attorney?
8    A.    Yes.
9    Q.    And your attorney would have
10   provided them to my office in this case?
11   A.    Yes, I believe that, yes.
12   Q.    To your knowledge, there isn't
13   any documents being withheld?
14   A.    No, if I had it, I would show
15   it to you.
16   Q.    If you had a monetary judgement
17   against Miss Potter in your custody and
18   control, it would be in your document
19   production in this case?
20   A.    Correct.
21   MR. KESHAVARZ:  Please mark
22   this as Plaintiff's 5 for
23   identification.
24   (Whereupon, the aforementioned
25   document was marked as Plaintiff's

132

G. KAVULICH

1    Exhibit 5 for identification as of
2    this date by the Reporter.)
3         Q.    I am showing you what has been
4    marked as Plaintiff's 5.  Can you identify
5    what that document is?
6         A.    It is a summons, complaint.
7         Q.    Did your office file a summons
8    and complaint against Miss Potter and Mr.
9    Morales on or about July 1, 2008?
10        A.    It appears so.
11        Q.    It is a summons and complaint
12   to collect on rent to be owed by them?
13        A.    Correct.  Now it is kind of
14   screwy, right?  See, because we
15   discontinued this -- I didn't remember
16   this.  After looking at this -- I don't
17   remember, I don't remember actually which
18   one, I saw it said something about a
19   discontinuance or something.  We should
20   have kept this case going.  We should have
21   kept this case going against James Morales
22   because he owed the money.  But we
23   discontinued it because of the judgment.
24   We discontinued it because somebody said

133

G. KAVULICH

1    there was a judgment against both people.
2    We screwed ourselves and our client because
3    your client got away with owing the money.
4         Q.    You collected the full amount
5    of the money from Miss Potter?
6         A.    I don't think we collected the
7    full amount.  I guess we did ultimately.
8         Q.    You are looking at Plaintiff's
9    2; correct?
10        A.    Yes.
11        Q.    You are looking at?
12        A.    I am looking at Plaintiff's 4.
13        Q.    What about Plaintiff's 4
14   demonstrates to you that the full debt to
15   Rosewall, by Miss Potter and/or Mr. Morales
16   apparently was entirely satisfied?
17        A.    I don't know if it is entirely
18   satisfied because I see the judgement is
19   for $4,352.74.  So the amount collected
20   $4,505.47.
21        Q.    So you collected more than the
22   amount of the judgement?
23        A.    I don't know that all of the
24   interest that would have accrued on this

134

G. KAVULICH

1    was not paid in full.  I think it is not
2    paid in full.
3         Q.    How much is left?
4         A.    I don't know; you have to ask
5    the marshal.
6         Q.    You collect on a debt and you
7    don't know how much is owed on that debt?
8         A.    No, you are mischaracterizing
9    what I said.  I said, like you mentioned
10   before, I don't remember what we were
11   referring to, but don't trust your math,
12   was what you said.  I am not good at math
13   either.  So I am not going to tell you they
14   owe $5,226.22 as of yesterday.  I am saying
15   that a non-math expert, fairly intelligent
16   guy, not the brightest guy in the bunch,
17   but fairly intelligent, can look at a
18   judgment from 2007 that's been paid off
19   slowly, that there is a good likelihood
20   there is still interest owed, that is what
21   I am saying.
22        Q.    Let me ask you a specific
23   question.  You have in front of you all of
24   your documents in your possession custody

135

G. KAVULICH

1    and control against Morales, Miss Potter,
2    the accounts of the judgement, you have
3    that in front of you right now; correct?
4         A.    Correct.
5         Q.    Is there anything in your
6    records that indicates to you how much, if
7    anything, is owed on the judgement?
8         A.    There is still interest owed.
9    Can I tell you exactly how much?  No, I
10   can't.  Once we do a property execution or
11   an income execution we rely on the marshal
12   to determine because poundage is also
13   involved once an account goes to a marshal,
14   and I rely on what their calculations are.
15        Q.    I am not talking about
16   poundage.  I am talking about the interest.
17        A.    But poundage affects the
18   interest, poundage affects the debt; right.
19        Q.    When you get an account to
20   collect on a judgement, do you ever put on
21   a document that is sent to a consumer what
22   the current balance is on the judgement?
23        A.    No.  When we get the case, we
24   say the judgement plus interest from when

136

G. KAVULICH

1  it was due.
2      **A.  Well, hold on.**
3      Q.   Let me look at it on my screen
4  while you look at it on the document.  Let
5  me catch up with you, please.  So look at
6  Exhibit 1, the information subpoena and
7  restraining notice issued by your office
8  and signed on March 18, 2015.  What does
9  this document say the balance due on the
10  judgment is?
11      **A.   It says how much, it says**
12  **$4,352.74 together with interest thereon**
13  **from the date of entry of the judgement,**
14  **remains due and unpaid.**
15      Q.   This is, in your view says that
16  there's --
17      **A.   That this was still $4,352.74.**
18      Q.   Left on the judgement?
19      **A.   Correct.**
20      Q.   That was not true.
21      **A.   Correct.**
22      Q.   Your office did not know what
23  the current balance was actually due on
24  March 18, 2015 when you signed this
25  document?

DIAMOND REPORTING (877) 624-3287  info@diamondreporting.com
138

---

136

G. KAVULICH

1      Q.   You noted before that there is
2  a tickler that comes up on all five
3  thousand judgments your office has to
4  determine what steps to take about
5  executing on that judgment; correct?
6      **A.   No, it just tells us that it is**
7  **time to execute on the judgement.**
8      Q.   So this pops up, and this
9  non-attorney in Laos, Collin, now in Laos,
10  looks at the screen and determines whether
11  to issue a post-judgment enforcement
12  mechanism; correct?
13      **A.   Yes.**
14      Q.   He determines that without
15  noting what the balance is due on that
16  account; correct?
17      **A.   No, that is not true.**
18      Q.   So this judgment account
19  against Miss Potter pops up on your
20  computer screen, is there any way to
21  determine how much is due on the judgement,
22  if any?
23      **A.   If you sat down, did the**

DIAMOND REPORTING (877) 624-3287  info@diamondreporting.com
136

---

137

G. KAVULICH

1  calculations but additionally we also know
2  **whether or not there is money due or not by**
3  **how the marshal returns the file to us.  If**
4  **we were doing an income execution, for**
5  **instance, the marshal gets the money from**
6  **the employer, right or from the debtor, I**
7  **guess, for the first stage and they will**
8  **tell us whether or not it is satisfied.**
9  **And sometimes it will come back that the**
10  **person became separated from their**
11  **employment and they could not pursue the**
12  **garnishment anymore and they will say it is**
13  **partially satisfied.**
14      Q.   Let me direct your attention to
15  Exhibit 1, this is the information subpoena
16  and a restraining notice, this document, if
17  you can read from where it says at the
18  bottom of the first paragraph where it says
19  "in total?"
20      **A.   Before "in total?"**
21      Q.   From there to the end?
22      **A.   Unlike the property execution,**
23  **I think that verbiage is more correct.**
24      Q.   Well, different.

DIAMOND REPORTING (877) 624-3287  info@diamondreporting.com
137

---

139

G. KAVULICH

1      **A.   They neglected to ask the**
2  **marshal, yes.**
3      Q.   They neglected to ask the
4  marshal how much was due on the judgement?
5      **A.   Correct because they had been**
6  **collecting on the income execution on Miss**
7  **Potter.**
8      Q.   Well, sometimes your office
9  uses more than one marshal to collect on a
10  judgement; correct?
11      **A.   If we did, it was a mistake.**
12  **Because we are supposed to, and I can't**
13  **point to, I can't think of any.  But if we**
14  **are using one marshal, if you have two**
15  **debtors, you want to use the same marshal.**
16      Q.   Why?
17      **A.   So you can keep track of things**
18  **like this.**
19      Q.   Does your office --
20      **A.   We would never purposely send a**
21  **judgement, an execution, sorry, to a**
22  **marshal, using this instance, purposely**
23  **send an execution on James Morales to**
24  **marshal A and send an execution on Miss**

DIAMOND REPORTING (877) 624-3287  info@diamondreporting.com
139

---

140

G. KAVULICH

1  Potter to marshal B, it does not make any
2  sense.
3      Q.  Why would you not do that?
4      A.  Because they can keep track of
5  the numbers.
6      Q.  If you were to send the account
7  from Miss Potter to one marshal to collect
8  and you sent the account to a different
9  marshal to collect, the amounts each
10 marshal thought were due on the judgment or
11 the punitive judgment would be
12 inconsistent; is that you are saying?
13     A.  I am saying there is a greater
14 chance of that happening.  No, I am not
15 saying, again, the amount of the judgment
16 goes down.  Use this, for example, the
17 amount of the judgment on Potter, the
18 amount of monies received from Potter pays
19 down the judgement.  If there was a
20 judgment against Mr. Morales and say we
21 were garnishing him, it would be easier to
22 keep track of that to have it with the same
23 person.
24     Q.  Putting aside whether there was

141

G. KAVULICH

1  one or two judgment debtors or punitive
2  judgment debtors on an index number,
3  generally does your office use more than
4  one marshal?
5      A.  We use two marshals.
6      Q.  Which two?
7      A.  Steven Bigel and Ronald Moses.
8      Q.  Would there be a particular
9  reason why you would send a punitive
10 judgment account to one marshal as opposed
11 to the other?
12     A.  No.
13     Q.  If it is an old judgement.
14     A.  No, I mean, even if it an old
15 judgment, when I first left Gutman & Mintz,
16 Ronald Moses was the marshal there.  And
17 because of how that all happened when I
18 left, I didn't know if I could trust him.
19 And I think I was paranoid about that.  Not
20 paranoid clinically, but concerned about
21 that.  So I tried using, I don't know
22 another marshal in Queens, Beinstock.  And
23 I just didn't like the way they treated my
24 staff.  Then we started using marshal

142

G. KAVULICH

1  Bigel.  Then I was afraid of having all my
2  eggs in one basket.  Not they did anything
3  bad, they were very nice people.  But by
4  that time, I guess, my non-clinical
5  paranoia had worn off and Ronnie was
6  reaching out to me, he wanted work.  I had
7  a relationship with him.  So he gets a
8  small, he does not get at much as marshal
9  Bigel.
10     Q.  When you say Ronnie?
11     A.  Ronald Moses.
12     Q.  When did you start using
13 marshal Bigel?
14     A.  2009 maybe or 2010.  I don't
15 remember exactly.
16     Q.  For a period of time you would
17 use only marshal Bigel?
18     A.  Well, other than the cases that
19 we had already placed with marshal
20 Bienstock.
21     Q.  For what period of time did you
22 use only marshal Bienstock?
23     A.  Well, from like 2007, the end
24 of 2007 until probably 2009.  We probably

143

G. KAVULICH

1  started using Bigel in 2009, I would think.
2      Q.  So if there are any accounts on
3  this punitive judgment, this index number
4  that would be with marshal Bienstock?
5      A.  Depending on when we executed
6  on it.
7      Q.  A couple of minutes ago you
8  said, if I understand correctly, marshal
9  Moses, worked for Gutman & Mintz, what did
10 you mean by that?
11     A.  He did their work.  He did
12 their income executions and property
13 executions as of when I left.
14     Q.  As of the date when you left in
15 about 2007, Gutman Mintz used marshal Moses
16 for all of their post-judgment collection
17 activities?
18     A.  Yes, most of it, yes.  If it
19 was upstate someone else.
20     Q.  Upstate they would use someone
21 else?
22     A.  Yes.
23     Q.  But most of their work was in
24 New York City?

144

G. KAVULICH

1    **A.    Yes.**
2        **Q.    So you were afraid maybe
3    initially that maybe marshal Moses would
4    what?**
5        **A.    Give them information.  You
6    know, the wounds were raw.  They sued me.
7    I didn't have a lot of money.  Times were
8    tight.  I had worked there for a long time.
9    I mean on a business level, I sort of
10   understood what they did, but personally I
11   was friends with a few of them and I had
12   been there with them through hard times to
13   get treated like that.**
14       **Q.    Is there anything in your
15   system at your office that would make sure
16   that a judgment account, even with multiple
17   debtors, would stay with one marshal the
18   entire time for collections?**
19       **A.    Would the system, like, in
20   other words, when we get a dispute letter,
21   we click off the thing, we went over this
22   last time, it will prevent the summons from
23   going.  Is that what you mean?**
24       **Q.    Plaintiff's 1 is that the index**

146

G. KAVULICH

1    **the property execution, we started
2    collecting in 2009.**
3        **Q.    Let me go back to Exhibit 1
4    again for a second, the information
5    subpoena with bank restraint.  So the basic
6    template that's Exhibit 1, most of that
7    test is because the statute requires this
8    language; right?**
9        **A.    Yes.**
10       **Q.    Is the template for Exhibit 1
11   the same template that you have used since
12   you opened your office?**
13       **A.    Well, with some changes.**
14       **Q.    Some changes in what way?**
15       **A.    I know when we first opened,
16   that there wasn't this language about
17   restraining the exempt monies, don't
18   restrain if there are exempt monies.**
19       **Q.    You are looking at the bottom
20   of the page?**
21       **A.    Yes.  Also on the bottom of the
22   page response only required if judgment
23   debtors have ever had a relationship with
24   your institution.**

145

G. KAVULICH

1    **in the landlord-tenant action or the index
2    in the civil court action?**
3        **A.    The housing court.**
4        **Q.    So the index, the money
5    judgment entered against Miss Potter was in
6    the landlord index?**
7        **A.    Yes.**
8        **Q.    So there was one judgement
9    index number for both Potter and Morales?**
10       **A.    There was one housing court
11   case against, brought against them, yes.
12   There was a housing court case brought
13   again both persons under one index number,
14   yes.**
15       **Q.    So in this case, you used one
16   marshal to collect against Miss Potter and
17   a different marshal to try to collect
18   against Mr. Morales; is that true?**
19       **A.    No.  It doesn't say on here.**
20       **Q.    In that Exhibit 4?**
21       **A.    Yes.  I am assuming it was
22   Bigel.**
23       **Q.    Why do you assume that?**
24       **A.    Because we used them again for**

147

G. KAVULICH

1        **Q.    That is also on the bottom of
2    Exhibit 1?**
3        **A.    Yes.**
4        **Q.    Other than those two changes?**
5        **A.    I don't recall, but I don't
6    think it has been changed much.**
7        **Q.    So the question is clear.  To
8    your recollection, you don't think there
9    are any changes in Exhibit 1, in the
10   template that's Exhibit 1 from the time
11   you opened your office until now; is that a
12   fair statement?**
13       **A.    I don't think so.**
14       **Q.    You don't think is it a fair
15   statement?**
16       **A.    I don't think we made any
17   changes.**
18       **Q.    You are saying, and correct me
19   if I am wrong, you rely on the marshal to
20   tell your office the balance due on a
21   judgement; correct?**
22       **A.    When there an is execution
23   involved, yes.**
24       **Q.    By an execution, you mean a**

148

G. KAVULICH

1 bank restraint or a wage garnishment?

2     **A. Or a property execution.**

3     Q. So every time you would use an

4 information subpoena with a bank restraint

5 like Exhibit 1, you would only put the

6 amount of the judgement as the amount

7 claimed to be due; correct?

8     **A. Less the payments, the system**

9 **is supposed to pick that up.**

10     Q. Let me ask you this: Let's

11 look at Exhibit 1. Let me ask you a

12 specific sentence. It says a judgement

13 which was entered on March 13, 2008, and it

14 goes on to identify the parties. It says

15 that judgement of March 2013 in the total

16 amount of an amount of money, am I reading

17 that correctly?

18     **A. Yes.**

19     Q. Of which that same amount of

20 money which is $4,352.74, that is the

21 amount that remains due and unpaid?

22     **A. It should be yes, and, it**

23 **didn't here; correct.**

24     Q. It is the amount due and unpaid

149

G. KAVULICH

1 as of the date of your signature March 18,

2 2015?

3     **A. Correct.**

4     Q. When you issue the bank

5 restraint, you fill that out and you send

6 it to the marshal; correct?

7     **A. The property execution, yes.**

8     Q. And the information restraint,

9 who do you sent that to?

10     **A. To the bank.**

11     Q. Exhibit 1 goes to the bank?

12     **A. Yes.**

13     Q. And Exhibit 1 gets forwarded

14 from the bank to the consumer?

15     **A. Correct.**

16     Q. As of the date, there the

17 restraint is sent your communication with

18 the consumer says that the amount that is

19 due and unpaid, is actually the amount of

20 the judgment itself?

21     **A. Yes.**

22     Q. So the bank restraints that you

23 have the bank send to the consumer, that

24 doesn't credit any payments; is that

150

G. KAVULICH

1 correct?

2     **A. It didn't correct.**

3     Q. The form use you for the

4 restraining notice from 2007 until the

5 present time when it says that an amount is

6 due and unpaid it only uses the judgement

7 amount; correct?

8     **A. It did in 2015, yes.**

9     Q. And it did from 2007 until the

10 present; correct?

11     **A. No, now it is in the process of**

12 **being changed.**

13     Q. After this lawsuit?

14     **A. It started around the same time**

15 **but not because of this.**

16     Q. So from 2007 until the about

17 the time of this FDPCA lawsuit when you

18 sent out a bank restraint knowing that the

19 bank would send that to the consumer, when

20 it says in the amount that remains due and

21 unpaid, that amount is always the amount of

22 the judgement itself; correct?

23     **A. Say that again.**

24     Q. Before you changed your policy,

151

G. KAVULICH

1 I am talking about the period before you

2 started changing your policy after this

3 lawsuit, from when you opened your office

4 in 2007 up until the, around the time the

5 FDPCA lawsuit was filed, when you filled in

6 the restraining notice amount and it says

7 the amount that remains due and unpaid, you

8 would always fill in the amount of the

9 judgment; correct?

10     **A. Yes, the computer did. We**

11 **didn't fill it in.**

12     Q. The computer filled it in?

13     **A. It is not like somebody sat**

14 **there and typed in the numbers.**

15     Q. Because the numbers, for all

16 these documents, the bank restraints and so

17 forth, they are all automatically spit out

18 by the computer?

19     **A. Yes.**

20     Q. So for the restraints, when it

21 is, I just want to be clear, I apologize if

22 you answered this, I am not sure this is

23 the question, for 2007 until the day of the

24 suit, when the restraining notice was sent

152

G. KAVULICH

1  out when they say the balance remains due
2  and unpaid, you would only use the judgment
3  amount to fill it in?
4     **A.    It is a little bit before the**
5  **suit but, yes.**
6     **Q.**   So the amount due and unpaid
7  when you sent out the restraining notice,
8  your office does not, in fact, know if
9  there anything that is due and unpaid for
10  judgment; is that true?
11    **A.    No, because if there are no**
12  **monies due, the file would be closed.**
13    **Q.**   Except here?
14    **A.    No, that is not true.  There**
15  **was still money owed by Miss Potter.  They**
16  **were mistakenly believed by human error to**
17  **be owned Mr. Morales.**
18    **Q.**   Let me rephrase the question.
19  When the computer spits out the amounts
20  remaining, that remains due and unpaid, it
21  would give the amount of the judgement and
22  it would not credit any payments that were
23  made on the judgement?
24    **A.    Correct.**

DIAMOND REPORTING (877) 624-3287  info@diamondreporting.com
152

---

153

G. KAVULICH

1     **Q.**   Why not?
2     **A.    Oversight.**
3     **Q.**   Because when you issued the
4  bank restraints your office, in fact, does
5  not know the amount that is due on the
6  judgment on the date that you use issue the
7  bank restraint; is that true?
8     **A.    Depending on the circumstances,**
9  **it could be true.**
10    **Q.**   Generally that's true; correct?
11    **A.    Again, depending on the**
12  **circumstances, it could be true.  Sometimes**
13  **it is not.  If there were never any monies**
14  **corrected, then it would be the judgment**
15  **amount plus the interest.**
16    **Q.**   So if any amount was actually
17  collected on the judgement, those payments
18  would not be reflected in the amount
19  claimed to be due for the restraining
20  notices, such as Exhibit 1 you sent to the
21  consumer; correct?
22    **A.    Correct.**
23    **Q.**   Why did you not set up your
24  system so that the current balance due

DIAMOND REPORTING (877) 624-3287  info@diamondreporting.com
153

---

154

G. KAVULICH

1  would be reflected where it says an amount
2  remains due and unpaid?
3     **A.    We had asked our IT people, but**
4  **they said it was really difficult and it**
5  **would have been more expensive.**
6     **Q.**   How much more expensive?
7     **A.    I don't remember, but there**
8  **wasn't much money left.  So it didn't**
9  **matter as far as budgeting for IT.**
10    **Q.**   What was your budget for IT?
11    **A.    What we could afford.**
12    **Q.**   Roughly speaking.
13    **A.    Look, I am a small operation.**
14  **I don't have work charts and things like**
15  **that.  It was, can we print the summons.**
16  **Can we do this and that.**
17    **Q.**   I am trying to figure out why
18  it would be difficult to calculate that?
19    **A.    I agree with you.  That was my**
20  **question.  I don't know.  I got "because of**
21  **this and that."  I had the same question,**
22  **but then again I am not a computer person.**
23  **I am not a math person.  We don't collect**
24  **more than what is owed so.**

DIAMOND REPORTING (877) 624-3287  info@diamondreporting.com
154

---

155

G. KAVULICH

1     **Q.**   But you ask for more than what
2  is owed if there is a payment, you ask for
3  more than that what is owed?
4     **A.    This document says, for**
5  **instance, when we talk to people and we are**
6  **looking at a computer screen and we see**
7  **payments, we don't ask for more than that.**
8     **Q.**   So a consumer calls and you
9  have been garnishing an amount on their
10  wages, and taking from their bank account,
11  and they are saying I feel like I have been
12  paying forever, how much do I owe?
13    **A.    It happened to me yesterday.**
14    **Q.**   You say what?
15    **A.    I say that I need to check with**
16  **the marshal.  I will call you back.**
17  **Because usually they don't call out of the**
18  **blue.  They call because there is some**
19  **other reason involved.  Yesterday the lady**
20  **was being garnished by us twice.  I guess,**
21  **she was getting paid biweekly, and it was**
22  **too much for her.  So she started off with**
23  **what you just brought us and then the next**
24  **thing was, can I just pay once, you know,**

DIAMOND REPORTING (877) 624-3287  info@diamondreporting.com
155

156

G. KAVULICH

1  can they garnish once.
2      **Q.**   So when the information, so if
3  when you sent the bank restraint to the
4  bank and it forwards it to the consumer,
5  the form letters that the bank sends or do
6  you know says contact the judgment
7  creditor's attorney to figure out what was
8  going on, that is one of the things it says
9  in the form letter?
10     **A.**   **You know, I don't know if it**
11 **was Monday or Tuesday was the first time I**
12 **had ever seen what they actually, I know**
13 **that they convey this information, how they**
14 **convey it, I never knew.  But, again, you**
15 **know, I don't even remember, it sort of**
16 **looked like this but it wasn't --**
17     **Q.**   Exhibit 2?
18     **A.**   **Yes, it wasn't an execution.**
19 **But the layout, the layout of the page, but**
20 **that was the first time I have ever seen**
21 **what they send to the judgment debtor.  So**
22 **I don't know exactly.**
23     **Q.**   So what you did see was the
24 cover letter to the judgment debtor that

157

G. KAVULICH

1  says in one part, if you have any questions
2  contact the attorney for the judgment
3  debtor; is that true or something along
4  those lines?
5      **A.**   **It probably did.**
6      **Q.**   And that looked like a form
7  letter that the bank would send out?
8      **A.**   **I would think so.  I don't**
9  **know.**
10     **Q.**   Let's go back to Exhibit 2.
11 The information that is Exhibit 2, the
12 execution with notice to garnishee; that is
13 a document that is generated from your
14 office; correct?
15     **A.**   Yes.
16     **Q.**   It is a document that is signed
17 by you?
18     **A.**   Yes.
19     **Q.**   This is the same template you
20 have used from 2007 until the present; is
21 that correct?
22     **A.**   Yes, probably with some minor
23 **tweaks.**
24     **Q.**   No substantive tweaking, just

158

G. KAVULICH

1  minor tweaking; is that right?
2      **A.**   **I would not think so.**
3      **Q.**   You would not think there were
4  substantive changes?
5      **A.**   **I don't think so.**
6      **Q.**   So then how do you put in,
7  there is a date remains unpaid in the
8  amount of $4,352.74, that's an amount that
9  is greater than the judgement for this
10 index number; correct?
11     **A.**   **Yes, $4,352.74, that's right.**
12     **Q.**   Where it says with zero dollar
13 interest, we talked about that, I am not
14 trying to restate all that, with zero
15 dollars interest thereon, where does that
16 number come from, that gets put before the
17 word interest?
18     **A.**   **That is supposed to be the**
19 **balance.**
20     **Q.**   But correct me if I am wrong,
21 your office does not know, when it
22 generates an execution with notice to
23 garnishee, what the balance on the
24 judgement account is?

159

G. KAVULICH

1      **A.**   **In certain circumstances that**
2  **is true.  Look, how many cases have we**
3  **collected on?  A miniscule number**
4  **percentage-wise.**
5      **Q.**   That you actually collect money
6  on?
7      **A.**   **Right.**
8      **Q.**   As opposed to sending them
9  executions and so forth?
10     **A.**   **I am saying in general in the**
11 **debt collection business, it is a small**
12 **percentage of accounts that you collect on.**
13     **Q.**   What is a small percentage?
14     **A.**   **We collect on a small**
15 **percentage of cases, a very small**
16 **percentage.  So most of them you are**
17 **actually right, right.**
18     **Q.**   Most of them I am actually
19 right what?
20     **A.**   **Most of them you are right with**
21 **what the balance is.**
22     **Q.**   Because most of them you don't
23 actually collect anything?
24     **A.**   **Yes.**

160

G. KAVULICH

1   MR. KESHAVARZ:  Let take a
2   break.
3   (Whereupon, a short recess was
4   taken.)
5   Q.   So we started talking before,
6   and I am not trying to rehash an argument,
7   but where it says zero interest thereon is
8   due, you believe that is the total balance
9   and not just the interest accruing over
10  from date of the judgment?
11  A.   Correct.
12  Q.   Where does that zero dollar
13  come from, where from your computer system?
14  A.   It should not say zero.
15  Q.   What should it say?
16  A.   It shouldn't say zero.
17  Q.   What should it say?
18  A.   It should account for the
19  payments that have been made against that
20  judgement.
21  Q.   But correct me if I am wrong
22  Exhibit 2 is generated by your office;
23  correct?
24  A.   Yes.

162

G. KAVULICH

1   A.   Well, it totals the payments
2   you have to do subtraction.
3   Q.   So your software shows the
4   amount of the judgements and it shows the
5   amount of the payments?
6   A.   Correct.
7   Q.   Your software doesn't show the
8   amount due.  You would have to manually
9   find that out?  You would have to manually
10  subtract that; correct?
11  A.   Well, we actually, if somebody
12  calls, we will just subtract the amount, if
13  somebody calls us, I am thrilled they are
14  calling us so we don't even account for the
15  interest.  Like just using this, for
16  example, we say you owe $4,352.74.
17  Q.   And where would you get that
18  number to tell the consumer that?
19  A.   From here, looking at the
20  screen, Exhibit 4.
21  Q.   But the screen, tell me from
22  looking at Exhibit 4 what the balance on
23  the judgment account is separate from the
24  interest, if you know?

161

G. KAVULICH

1   Q.   And it has a specific date?
2   A.   Yes.
3   Q.   Are you saying that where it
4   says zero, it should reflect the current
5   balance on the date you signed the
6   execution that credits all payments on that
7   judge?
8   A.   Yes, and then say plus
9   interest, yes.
10  Q.   But this is what I am trying to
11  get at, to get clarity on, your office does
12  not know what the balance on the judgment
13  account is, correct?
14  A.   We know how much was paid.  We
15  don't know what the interest, what the
16  interest added to that would be, yes.
17  Q.   So putting aside the interest
18  for a second.  Does your system tell you
19  what the balance is due on the judgment,
20  putting aside interest payments?
21  A.   You have to do the math.  We
22  have to manually do the math.
23  Q.   You have to add up all the
24  payments?

163

G. KAVULICH

1   A.   Well, on this we collected a
2   hundred and fifty-three dollars and change
3   more than the judgment so this would be a
4   little bit different.
5   Q.   If the consumer called, Miss
6   Potter or Mr. Morales called you, you would
7   tell them more has been paid than the face
8   value of the judgement, but you don't know
9   how much?
10  A.   Right, we will check with the
11  marshal and call you back or e-mail you if
12  you want.
13  Q.   Does your system differentiate
14  between payments that are paid by the
15  judgment debtor Miss Potter and the
16  punitive judgment debtor Mr. Morales?  Does
17  your system tell you we got this much from
18  this person and this much from this person?
19  A.   Yes, it will show, I am
20  referring to Exhibit 4, this says Potter.
21  This would be Potter.  It does say Potter.
22  It will have income execution with the
23  judgment debtor's name like it does here.
24  Maybe with the old system we didn't but the

G. KAVULICH

1  new system does.
2      Q.    You are looking at the bottom
3  of page one; correct?
4      A.    Correct.
5      Q.    You are looking at the list of
6  payments that are made; correct?
7      A.    Correct, and also one of the
8  two judgment execution devices and to who
9  that would be, or against whom that would
10 be.  The way our system now does it, just
11 make believe we got payments from him;
12 right, it would continue up here and we
13 would know they came from him.
14     Q.    So this first line here in the
15 middle of the page, Exhibit 4, does it say
16 total amount collected?
17     A.    No, that follows to the left.
18 This says two things.  This has the amount
19 collected, which should come after the
20 entry of the property execution or income
21 execution or stipulation device.  So say
22 there was nothing here.  There was a blank
23 slate for now.  It would show income
24 execution John Doe and the amount of the

---

G. KAVULICH

1  system?
2      A.    It would be too much of a
3  bookkeeping headache for us to keep track
4  and to follow a particular file and then
5  really leave it to the marshal to do it.
6  So we would use the same marshal if we had
7  two income executions.
8      Q.    We talked about the numbers
9  that are put into the documents that you
10 issue to the marshal or to the bank to
11 execute on money, execute to get money on a
12 judgement.  If the system is set up and you
13 get payments from one marshal and you send
14 it to another marshal to execute, the
15 system is not set up to account for the
16 balance due from the first marshal; right?
17     A.    That is why we generally don't
18 do that.  What I see here is, what I think,
19 although it is not indicated, because our
20 old system didn't say which marshal like
21 this one does, it probably went to
22 Bienstock.  And since I don't use Bienstock
23 anymore, that is why it was sent to some
24 other marshal.  This was the one off.

---

G. KAVULICH

1  judgment.  Then it will show the payments
2  from John Doe.  And if there were two
3  people on the judgement, it would show Jane
4  Doe going up.
5      Q.    Let's assume for a moment, we
6  can go through the document later, let's
7  assume for the moment you, in fact, used
8  two marshals to attempt to collect on this
9  index number.  If you got a payment from
10 one marshal, say for Miss Potter, and you
11 got payments from another marshal, say for
12 Mr. Morales, who keeps track of the total
13 amount due on the judgment?
14     A.    If that happened, we would
15 send, I can't imagine an instance where we
16 would have two income executions -- it is
17 rare that happens -- we would advise the
18 marshal two in your example how much we had
19 collected from the other debtor, the
20 co-judgment debtor.  But I can't think one
21 where we have two income execution where we
22 would use different marshals, because that
23 is where it becomes problematic.
24     Q.    Because you wouldn't, know your

---

G. KAVULICH

1      Q.    You don't know that.  How would
2  you know that?  You would have to go back
3  through the system and check manually each
4  of the accounts where there was more than
5  one alleged judgment debtor?
6      A.    If it happened, it would be a
7  departure from policy, yes.
8      Q.    And the policy is to try to
9  send it to one marshal?
10     A.    To the same marshal, yes.
11     Q.    That's what you mean by policy?
12     A.    Yes.
13     Q.    When does the marshal tell you,
14 if at any point, what the actual balance is
15 on a judgment?
16     A.    I don't think they
17 affirmatively tell us until the judgment is
18 satisfied.  But, in other words, every,
19 they send like when we got the payments
20 from Miss Potter on June 5, 2010 it didn't
21 say fifty-five dollars remaining balance, I
22 don't think.  But I would have to review
23 the remittent sheets.
24     Q.    When the marshal tells you the

168

G. KAVULICH

1  balance on a certain date, you don't
2  reflect that balance anywhere in your
3  records, right?
4  **A.    I don't think the marshal gives**
5  **us the balance as we go along.  It will**
6  **say, I am making this up, two hundred**
7  **dollar payment, a hundred applied to**
8  **principal and a hundred applied to**
9  **interest.**
10  **Q.**   If the marshal is able to keep
11  track of the balance due, why is your
12  office not able to do that?
13  **A.    That's what I said to my IT**
14  **people.**
15  **Q.**   Is the interest running from
16  the principal amount of the judgement, from
17  the date of the judgement, or does the
18  interest run on the balance due as the
19  payments are made?
20  **A.    Does the interest run from?**
21  **Q.**   Let's say, for example, you
22  have a thousand dollar judgment a year ago,
23  and there is a 9 percent interest, so you
24  already owe a thousand and ninety dollars.

169

G. KAVULICH

1  So if you have a judgement for a thousand
2  dollars, and a month later you pay nine
3  hundred dollars, at the end of the year, do
4  you owe ninety dollars of interest or do
5  you have to recalculate the amount of
6  interest, you know?
7  **A.    Well, interest runs during the**
8  **whole, I mean, it does not stop running.**
9  **Q.**   But is the interest set up to
10  run, say in my second example where you
11  make a payment a month clear, and you
12  reduce the balance, in a year is the
13  interest running on the entire amount of
14  the judgement even though there are
15  payments made in that one-year period or do
16  you know?
17  **A.    If there's a payment and there**
18  **is a judgement for a thousand dollars, a**
19  **month later --**
20  **Q.**   Someone pays nine hundred
21  dollars.
22  **A.    I assume it would be a thousand**
23  **plus interest for that month less that**
24  **payment.**

170

G. KAVULICH

1  **Q.**   Then they run 9 percent
2  interest on the hundred dollars?
3  **A.    Yes, let's say on a hundred and**
4  **three dollars or whatever it was.  I don't**
5  **know.**
6  **Q.**   So the interest would be run on
7  the decreasing balance; is that correct?
8  **A.    Yes, it wouldn't be on the**
9  **monies that are not owed.**
10  **Q.**   Because the thing that confuses
11  me and has always confused me, when I look
12  at the bank restraint notices and the
13  execution notices, it says interest from
14  the date of the judgement, but it does not
15  say the interest on what.  Is it interest
16  on the judgment itself or is it interest on
17  the decreasing balance?
18  **A.    I would imagine it is less so,**
19  **in other words, if you have a five thousand**
20  **dollars judgment, you have four hundred**
21  **dollars left, I imagine the interest is on**
22  **four hundred.**
23  **Q.**   Do you happen to know if that
24  is how the marshal calculates interest?

171

G. KAVULICH

1  **A.    Am I metaphysically sure, no,**
2  **but I know they are supervised by the**
3  **department of investigation and the City**
4  **and they are pretty tough, from what I**
5  **understand.**
6  **Q.**   You don't give the payment
7  history to the marshal, you just give the
8  total amount paid; right?
9  **A.    Usually, yes, we will call**
10  **them.  What I started doing is, just which**
11  **I just learned how to do, is copying it,**
12  **cutting it and pasting it.**
13  **Q.**   You just started doing that
14  recently?
15  **A.    Yes.**
16  **Q.**   Up to that point when you
17  informed the marshal how much was due, the
18  marshal would take the balance that you
19  claimed was due and they would run interest
20  on the full amount of the judgement until
21  the date of the execution; is that right?
22  **A.    Say that again.**
23  **Q.**   You tell the marshal about the
24  balance due?

172

```
1              G. KAVULICH
2         A.   Of five thousand dollars.
3         Q.   Until recently you didn't tell
4    him the payment history?
5         A.   Correct, I didn't give the
6    dates of the payments.  But I would tell
7    him how much they would be.
8         Q.   So the marshal was calculating
9    interest on the full amount of the
10   judgement all the way through the date of
11   the execution?
12        A.   I don't know.  You would have
13   to ask the marshal.
14        Q.   Let's move on to the
15   landlord-tenant suits.  Going back to
16   Exhibit 5, the collection lawsuit against
17   Miss Potter and Mr. Morales, you were suing
18   Miss Potter for the same debt that Rosewall
19   had a money judgment against her for;
20   right?
21        A.   Yes.
22        Q.   It was not for rent due after
23   that judgment; right?
24        A.   No, but it included both.
25        Q.   It included rent due after the
```

174

```
1              G. KAVULICH
2    action or were you also suing her for rent
3    after the entry of the money judgment?
4         A.   Both.
5         Q.   What amount was for the debt
6    for rent after the landlord-tenant, after
7    the money judgment against Potter in the
8    landlord-tenant action?
9         A.   I believe, April and May of
10   2008.
11        Q.   Why do you say that?
12        A.   Because the judgment was for
13   monies, according to my recollection, was
14   for monies due through March and this
15   summons seeks monies for through and
16   including March but also additional to
17   that, April and May of 2008.
18        Q.   If you go down to the third
19   action, it says "plaintiff seeks to recover
20   damages from the defendant in the sum of
21   five hundred dollars representing
22   reasonable attorney's fees together with
23   costs and disbursements of this action and
24   for such other further relief as the court
25   may deem just."  Let me ask you this:  Do
```

173

```
1              G. KAVULICH
2    judgement?
3         A.   According to my rudimentary
4    Spanish, it looks like we scanned the
5    English version of the summons and the
6    Spanish version of the complaint.
7         Q.   You don't have the full summons
8    and complaint for a lawsuit you filed
9    against Miss Potter and Mr. Morales?
10        A.   Now we do.  Now it scans
11   automatically.  It may well very be in
12   there.  Here it is.
13        Q.   What is the Bates stamp?
14        A.   That's 34.
15        Q.   It is Bates stamped Kavulich
16   parenthesis Morales 34?
17        A.   Yes.
18             MR. KESHAVARZ:  So we are
19        amending Plaintiff's 5 to add this
20        subsequent two pages.  So Exhibit 5
21        is now Kavulich 31 through Kavulich
22        34.
23        Q.   My question is as to Miss
24   Potter, were you suing her in Exhibit 5 for
25   the money judgment in landlord-tenant
```

175

```
1              G. KAVULICH
2    you make this five hundred dollar attorney
3    fees demand for every lawsuit you file to
4    collect rent?
5         A.   Mostly, yes.
6         Q.   When you make a demand for
7    attorney fees for five hundred dollars, you
8    don't know if the lease agreement allows
9    for the recovery of attorney's fees, do
10   you?
11        A.   That is why I say mostly.
12   There are cases where there aren't lease
13   agreements.  And we sue for, rent is now
14   called, what otherwise is called rent, is
15   called use and occupancy.  In those cases
16   we don't use ask for attorney fees because
17   there is no contractural rate.  But just
18   about every lease I have seen, does allow
19   for it.  So the answer it, yes, mostly we
20   do ask for attorney's fees which ultimately
21   are waived because it is on default.  I
22   don't remember one case where we collected
23   legal fees, but the answer is, yes, there
24   has to be a lease for us to sue.
25        Q.   When you file these
```

176

G. KAVULICH

1  landlord-tenant suits you don't look to see
2  based on a contract, you don't look to see
3  if that specific lease has a provision
4  about the recovery of attorney's fees, do
5  you?
6      **A.   Yes.  Sure.**
7      Q.   Every time you file a landlord,
8  a suit for collection of rent, you also
9  look at that specific lease at issue to
10 determine whether there are rights to
11 attorney's fees, are you saying that?
12     **A.   No, I am saying not at the time**
13 **when we do the summons.  That time is**
14 **actually determined in anticipatorily when**
15 **the case is entered because, for example,**
16 **the notes will say, no late or legal fees,**
17 **no lease, must be use and occupancy.**
18     Q.   That is put in by Mercedes when
19 she puts it into the system?
20     **A.   Was.  Now it is by me for the**
21 **last five years.**
22     Q.   You are saying Mercedes is to
23 interpret a lease agreement to determine
24 whether there is a right to attorney's fees

178

G. KAVULICH

1  correct?
2      **A.   She is the one who did.**
3      Q.   While she worked there?
4      **A.   Yes.**
5      Q.   While she worked there, that
6  was her responsibility and you didn't look
7  at the leases, you just relied on what
8  Mercedes put in the notes?
9      **A.   Yes.**
10     Q.   Based on what the lease said?
11     **A.   Yes.**
12         MR. KESHAVARZ:  Please mark
13     this as Plaintiff's 6 for
14     identification.
15         (Whereupon, the aforementioned
16     document was marked as Plaintiff's
17     Exhibit 6 for identification as of
18     this date by the Reporter.)
19     Q.   I am showing you what has been
20 marked as Plaintiff's 6, Bates stamped
21 Kavulich 4 through Kavulich 9 and is this
22 the lease upon which you are basing the
23 collection lawsuit that is Exhibit 5?
24     **A.   I believe so, yes.**

177

G. KAVULICH

1  in the lease agreement and put that into
2  the computer notes; right?
3      **A.   She is not supposed to**
4  **interpret the lease agreement.  She is**
5  **supposed to look at it and see and it says**
6  **late and legal fees, usually.  If I may,**
7  **most of my clients have rent-stabilized**
8  **apartments, use the standard form apartment**
9  **lease.**
10     Q.   I will ask you to take a look
11 at this in a second.  Let me ask, let me
12 just finish up this line of questioning.
13 Mercedes would be the one responsible when
14 she opens up the account on your computer
15 system to review the lease and determine if
16 there is a right to attorney's fees; is
17 that right?
18     **A.   Yes.**
19     Q.   You don't just assume there is
20 a right to attorney's fees if it is a
21 written contract?
22     **A.   No.**
23     Q.   She is the one who look at
24 those leases to make that determination;

179

G. KAVULICH

1      Q.   When you said the standard
2  lease form, what did you mean?
3      **A.   As it says on the first page**
4  **there is a standard form of apartment lease**
5  **that is issued by the Real Estate Board of**
6  **New York that most landlords use for rent**
7  **stabilized leases.**
8      Q.   I want to point your attention
9  to Bates stamped Kavulich 6 and tell me if
10 you can read paragraph 18C3.
11     **A.   Yeah.**
12     Q.   So 18C says whether the
13 apartment is re-rented or not, you must pay
14 the owner as damages; right?
15     **A.   You must pay to the owner as**
16 **damages, yes.**
17     Q.   So sub C3 is owner's expenses
18 for attorney's fees; correct?
19     **A.   Yes.**
20     Q.   This is the language you use as
21 a basis for demanding five hundred dollars
22 in attorney's fees in almost all of the
23 rent cases that you file based on a written
24 contract; correct?

G. KAVULICH

1     **A.**   I believe there is another
2 section. I haven't looked at one of these
3 from 2006 in a long time.
4     **Q.**   Take your time.
5     **A.**   **Well, also on page 4 of the**
6 **lease, Bates stamped page 7 at the top, sub**
7 **5, "any legal fees or disbursements for**
8 **illegal actions or proceedings brought by**
9 **owner against you because of a lease**
10 **default by you or defending lawsuits**
11 **brought against owner because of your**
12 **actions." I guess those are the only two.**
13     **Q.**   But the thing you just read is
14 not one of the remedies?
15     **A.**   **You are correct, it is not a**
16 **remedy. It says fees and expenses as the**
17 **owner's rate, you must reimburse owner for**
18 **any of the following fees and expenses**
19 **incurred by owner. That is Bates stamped**
20 **page 6 at the bottom paragraph 20,**
21 **sub-paragraph A and of that subparagraph 5,**
22 **is what I read just a minute ago.**
23     **Q.**   When you file civil suits to
24 collect rent, the landlord does not
25

---

G. KAVULICH

1 debt collected; correct?
2     **A.**   **Other than the suit fees, yes.**
3     **Q.**   So your client doesn't actually
4 incur the attorney's fees; right? He does
5 not actually pay any attorney's fees, it is
6 not incurred; is that right?
7     **A.**   **Depending on the case, maybe**
8 **not, but otherwise, yes, of course, he**
9 **incurs fees. He's losing, he's not only**
10 **just, he's losing money from the monies**
11 **that are owed him that go to us that is a**
12 **legal fee.**
13     **Q.**   But that is a fee that would be
14 paid if monies is collected?
15     **A.**   **Correct.**
16     **Q.**   It is not an obligation that
17 the landlord incurs by hiring you to file a
18 collection lawsuit.
19     **A.**   **Not at that time.**
20     **Q.**   So at the date you file the
21 collection lawsuit, the landlord has not
22 incurred any attorney's fees at that point;
23 correct?
24     **A.**   **Correct.**
25

---

G. KAVULICH

1 actually pay you to file a suit, you just
2 get a percentage of what is collected;
3 right?
4     **A.**   **No, that's not true.**
5     **Q.**   In what way is that not true?
6     **A.**   **Some landlords play the suit**
7 **fees.**
8     **Q.**   Which are the filing fees?
9     **A.**   **Yes, and process serving.**
10     **Q.**   Other than that when you get
11 hired to file suit to collect rent, you
12 don't get paid anything by the landlord
13 other than the costs of court for some of
14 the landlords; right?
15     **A.**   **Right.**
16     **Q.**   Is that most of the landlord's?
17     **A.**   **Half and half.**
18     **Q.**   Do you bill your clients for
19 attorney's fees, not expenses but bill your
20 clients for attorney's fees for?
21     **A.**   **A contingency fee is considered**
22 **our legal fee.**
23     **Q.**   The only thing you charge your
24 client is the amount of a percentage of the
25

---

G. KAVULICH

1     **Q.**   How did you come to the number
2 five hundred dollars?
3     **A.**   **It is what they had on my old**
4 **firm's summons.**
5     **Q.**   That was Gutman & Mintz?
6     **A.**   **Yes.**
7     **Q.**   To your knowledge, does Gutman
8 Mintz still use that?
9     **A.**   **I don't know.**
10     **Q.**   So when you filed the civil
11 lawsuit, Exhibit 5, you knew that there was
12 no judgement against James Morales;
13 correct?
14     **A.**   **No.**
15     **Q.**   Why would you file a lawsuit to
16 obtain a judgement against a consumer if
17 you already had a judgment for most of the
18 debt you were seeking to collect?
19     **A.**   **There was a momentary lapse of**
20 **consciousness here. Because when the case**
21 **was opened, it seemed as though there was a**
22 **judgement, and I am reading from the notes.**
23 **I am recollecting myself from Exhibit 4,**
24 **there was a judgement, and then somehow it**
25

184

G. KAVULICH

1  went as if there wasn't a judgement, and
2  then somebody realized there was a
3  judgement.  So we instructed the process
4  server not to serve the summons.  And we
5  filed a, which we may or may not have been
6  done, I don't know off the top of my head,
7  but then we filed a notice of
8  discontinuance.
9      Q.    You don't recall this, this
10  basis of?
11      A.    Off the notes.  I don't recall
12  this independently.
13      Q.    Your testimony is based solely
14  on the documents in front of you?
15      A.    Yes.
16      Q.    Not based on your independent
17  recollection?
18      A.    Yes.
19      Q.    So after the complaint was
20  withdrawn, then it says strike S & C we
21  have FJ; correct?
22      A.    Yes.
23      Q.    So someone looked at your file
24  to see if there was a judgement?
25

185

G. KAVULICH

1
2      A.    I did.
3      Q.    But looking at your file, there
4  was, in fact, no money judgement against
5  Mr. Morales; is that correct?
6      A.    In retrospect it is true.
7      Q.    Because a computer system in
8  court would not reflect a money judgment
9  entered against Mr. Morales in the
10  landlord-tenant action because, in fact,
11  there was no such judgement.
12      A.    If there is not a judgment it
13  is very unlikely a court computer would
14  should that; correct.
15      Q.    Would show a money judgement.
16  If there is no money judgement, the
17  computer system at the courthouse --
18      A.    Is not going to show there is
19  one; correct.
20      Q.    Who made that determination
21  there was a final judgment?
22      A.    After the issuance of the
23  summons, me.
24      Q.    How do you know that?
25      A.    We just said that.

186

G. KAVULICH

1      Q.    Because of the handwritten
2  notes?
3      A.    No, because, I don't remember
4  exactly but it states it here in the notes
5  as Exhibit 1.
6      Q.    I am trying to figure out who
7  on July 23, 2008, realized there was a
8  final judgement?  How do you know it was
9  you as opposed to someone else on your
10  staff?
11      A.    Because it is indicated, I
12  updated the note.
13      Q.    Where is that indicated?
14      A.    To the right.
15      Q.    Let me jump back for a second.
16  When you talked before about one of your
17  staff, you said they intentionally, and
18  correct me if I am wrong, put documents in
19  the wrong consumer's file?
20      A.    That is what I am told.  I
21  don't know if it is factually true.  Told
22  is that what I was told.
23      Q.    As a factual matter, documents
24  for one consumer would not be in that
25

187

G. KAVULICH

1  consumer's file sometimes?
2      A.    Do documents get scanned into
3  the wrong files sometimes, yes, even by the
4  guy I have now.
5      Q.    What I am trying to get at is
6  this:  There aren't any other documents in
7  your system other than what you have
8  produced in this case?
9      A.    In this case, yes.
10      Q.    Regardless of where it is
11  filed?
12      A.    Right I don't have another file
13  somewhere else.
14      MR. KESHAVARZ:  Mark this
15  please as Plaintiff's 7 for
16  identification.
17      (Whereupon, the aforementioned
18  document was marked as Plaintiff's
19  Exhibit 7 for identification as of
20  this date by the Reporter.)
21      Q.    I am showing you what has been
22  marked as Plaintiff's 7.  These are two
23  documents that were produced by your
24  attorney in this case Kavulich 36 and

188

G. KAVULICH

1  Kavulich 37. Are these affidavits of
2  service in the collections lawsuit filed in
3  civil court?
4
5      A.   35 and 36, yes.
6      Q.   So according to these documents
7  the summons and complaint was actually
8  served on Mr. Morales and Miss Potter;
9  correct?
10     A.   Yes.
11     Q.   The process server filed that
12 return of service and provided a copy to
13 your office; is that correct?
14     A.   Yes.
15     Q.   But you don't know if the
16 summons and complaint was actually served
17 on Miss Potter or Mr. Morales. All you
18 know is what the affidavit of service
19 claims?
20     A.   I know that the affidavit of
21 served states they were both served of
22 suitable age and discretion, but was I
23 there, no.
24     Q.   Do you know this process
25 server? Have you used this process server

190

G. KAVULICH

1  Does that appear to be a Notice Of
2  Discontinuance you filed in the civil court
3  action against Ms. Potter and Mr. Morales?
4      A.   Yes.
5      Q.   Even though Mr. Morales and
6  Miss Potter were served in a civil court
7  lawsuit, your office did not notify either
8  Miss Potter or Mr. Morales that the suit
9  had been discontinued; is that correct?
10     A.   No, that is false.
11     Q.   In what way is that false?
12     A.   We mailed these certified out
13 to the defendants.
14     Q.   You are referencing Exhibit 8?
15     A.   Yes, we mailed notices of
16 discontinuance to the respective parties,
17 the defendants.
18     Q.   But Exhibit 8 does not include
19 a certificate of service?
20     A.   No.
21     Q.   There is nothing in your
22 collection notes that indicate that a copy
23 of the Notice of Discontinuance was, in
24 fact, mailed to Mr. Morales or Miss Potter;

189

G. KAVULICH

1  before?
2      A.   We don't use this company
3  anymore. Do I know him? No.
4      Q.   Which company was that?
5      A.   It was a gentleman by the name
6  of Lawrence Marsh.
7      Q.   Is there something on this
8  document that tells you that?
9      A.   No, I just know.
10     Q.   He notarized the signature of
11 the process server; correct?
12     A.   It look like Sheryl Marsh to
13 me.
14     Q.   Mr. Evans or Mrs. Evans was the
15 process server that worked for Mr. Marsh?
16     A.   Yes.
17          MR. KESHAVARZ: Mark this
18 please as Plaintiff's 8 for
19 identification.
20          (Whereupon, the aforementioned
21 document was marked as Plaintiff's
22 Exhibit 8 for identification as of
23 this date by the Reporter.)
24     Q.   I am showing you Plaintiff's 8.

191

G. KAVULICH

1  correct?
2      A.   No.
3      Q.   No, there isn't any?
4      A.   No, there isn't any.
5      Q.   Sitting here today you don't
6  know if, in fact, Miss Potter or Mr.
7  Morales was, in fact, mailed a copy of the
8  Notice of Discontinuance; is that correct?
9      A.   Metaphysically, no. I don't
10 know, metaphysically know it was not sent,
11 but I know it was our procedure.
12          MR. KESHAVARZ: Let's take a
13 quick break.
14          (Whereupon, a short recess was
15 taken.)
16     Q.   So do you believe any liability
17 in this case is due to the action or in
18 action of Gutman Mintz?
19     A.   No.
20     Q.   Have you ever attempted to
21 collect on a judgement that has been
22 vacated or non-existent other than this
23 case?
24     A.   First of all, never

192

G. KAVULICH

1 **intentionally and not that any come to**
2 **mind.  I mean Mr. Morales.**
3     **Q.**   Can you think about it and let
4 us know when we come back.
5     MR. KESHAVARZ:  We have an
6 agreement that since Mr. Kavulich has
7 to leave at 2:30 today, we have an
8 agreement the deposition will
9 continue at my office at 10:30 on
10 December 1st, is that our agreement?
11     MR. PASHKIN:  Yes.
12     **Q.**   The account that comes to you
13 from Rosewall, you said that come through a
14 property management company?
15     **A.**   **Yes.**
16     **Q.**   Who did you say that was?
17     **A.**   **Metropolitan Properties.**
18     **Q.**   When I say communications with
19 Rosewall, those are all communications that
20 go through this property management
21 company?
22     **A.**   **They are with the Met**
23 **Properties management company.**
24     **Q.**   Any communications about this

193

G. KAVULICH

1
2 case, about the debt and so forth those are
3 only communications through the property
4 management company on behalf of Rosewall;
5 correct?
6     **A.**   **Correct.**
7     **Q.**   Well, let's start from the
8 beginning.  What information have you
9 provided when started opening this case for
10 Mr. Morales.
11     **A.**   **We had, it is unrelated to this**
12 **because I don't represent them anymore, I**
13 **would go to their office physically and I**
14 **would go through the files and take out**
15 **the, you know, the necessary documents and**
16 **copy them and bring them back to my office.**
17     **Q.**   Is that for all accounts that
18 go through that property management
19 company?
20     **A.**   **For that particular management**
21 **company, yes.**
22     **Q.**   About how many accounts would
23 do that?
24     **A.**   **Maybe ten.**
25     **Q.**   And the total number of cases

194

G. KAVULICH

1 you did for Rosewall are how many?
2     **A.**   **A dozen.**
3     **Q.**   Was there a particular reason
4 you no longer are filing cases on behalf of
5 Rosewall?
6     **A.**   **Or through Metropolitan, yes,**
7 **but it is unrelated to this.  We had a**
8 **personality thing.  He hooked me up with a**
9 **good client, I sent him a thank you.  I got**
10 **him a gift certificate to a restaurant out**
11 **on Long Island.  I didn't know restaurants**
12 **on Long Island so I had to do research and**
13 **find out what was a good one, and he never**
14 **thanked me and we had words.**
15     **Q.**   Do you know if that is the same
16 individual --
17     **A.**   **No, it was not the guy that**
18 **came here.**
19     **Q.**   I think from his testimony, he
20 was the only point of contact for Rosewall
21 cases.  He was not --
22     **A.**   **I am saying another part of**
23 **Metropolitan.  One of the guys, the guy he**
24 **works with recommended me to someone else.**

195

G. KAVULICH

1 **It had nothing to do with that.**
2     **Q.**   Nothing to do with collection
3 on behalf of Rosewall?
4     **A.**   **Correct.**
5     **Q.**   As this case progressed, and I
6 guess generally for the Rosewall cases, do
7 you communicate back and forth with
8 Rosewall through their property management
9 company or how does that work?
10     **A.**   **Now, you mean, or back then?**
11     **Q.**   Back when you had cases with
12 Rosewall and other communications with the
13 property management company?
14     **A.**   **It was not that many.  They**
15 **would call us.  If you are looking for how**
16 **it worked, he would say give me a call,**
17 **Gary, I have some cases for you to pick up.**
18 **I would go there he would have a list.**
19 **Somebody would show me where the files are.**
20 **I would sit down at a table and take out**
21 **documents and copy them and that was it.**
22     **Q.**   Were they both judgment
23 accounts and filing suits to collect rents?
24     **A.**   **When I sat down at the table**

196

G. KAVULICH

1  before I opened the file, I would not know.
2  There are people who vacated those
3  properties owing monies.
4      **Q.**    So when you looked through the
5  file, you would copy, make a photocopy of
6  the judgment, if there was a judgement?
7      **A.**    If they had it in their file,
8  yes.
9      **Q.**    Do they normally have a copy of
10  the court file from the prior
11  landlord-tenant attorney?
12      **A.**    Sometimes they would, and
13  sometimes they would not.
14      **Q.**    Would they normally have a copy
15  of the judgement if there was a judgment
16  entered?
17      **A.**    Sometimes there were and
18  sometimes there wasn't.
19      **Q.**    Before got an account to
20  collect on a judgement, you would check the
21  file to see if there was, in fact, a
22  judgement?
23      **A.**    We would check there and then
24  if there was any sort of indication there,

198

G. KAVULICH

1  the only client I did that for,
2  regrettably, if I had personally handled,
3  picked up the case, then, no, she would
4  not.  But those were not most of the cases.
5  In other words, I didn't go and pick up
6  most of the cases and go through the
7  clients files.  I might go and pick up
8  files that they put together or receive
9  files in the mail, or grab them off the
10  fax.  But if I received a case in the mail,
11  then I would just give it to Mercedes.  But
12  in this particular case, I physically went
13  there and I physically went through the
14  client's file and I physically wrote the
15  note.
16      **Q.**    You say that because that is
17  how you, that is the process for the
18  Rosewall accounts?
19      **A.**    For the Metropolitan
20  Properties, yes, and also reviewing the
21  documents.
22      **Q.**    So whether there was a
23  determination whether there was a judgement
24  or not for Mr. Morales and Miss Potter,

197

G. KAVULICH

1  maybe then we would go to court.
2      **Q.**    So you made the determination,
3  did you make the determination when you got
4  the account about going through their file
5  whether there was a judgment or not, a
6  money judgement?
7      **A.**    I would say, yes, because
8  apparently we came up with one here, but
9  pursuant to my review of the documents
10  earlier and my contemporaneous notes at the
11  time, that's what I did come up with.  I
12  don't recall now.
13      **Q.**    Correct me if I am wrong, was
14  it Mercedes' decision to note whether the
15  account was a judgment account or a
16  collections lawsuit account?
17      **A.**    Generally, yes, but on the
18  cases where I would go and pick up, in
19  other words, as I mentioned before,
20  sometimes, well, then, I don't know if we
21  had any e-mailed cases, they would come in
22  the mail or we would go and pick them up,
23  they would fax them.  God forbid.  If I was
24  involved in, like I mentioned, this isn't

199

G. KAVULICH

1  that would not have been based on a review
2  of the housing court computer; right?
3      **A.**    That note was written while I
4  was sitting in the client's office.
5      **Q.**    What note?
6      **A.**    That I referenced earlier FJ.
7      **Q.**    So you saw a money judgement
8  against Miss Potter, is that what you are
9  saying you or don't know?
10      **A.**    Again, I am not the brightest
11  bulb in the bunch, but I would know
12  generally if there were two.  I screwed up
13  and wrote FJ, which would have meant it was
14  against both people.  Because these
15  situations come up or have come up and do
16  come up now, for instance, we will open up
17  two cases, like as well we should have done
18  here, open up a case for, with hindsight
19  opened up one case against Miss Potter
20  solely as to the judgement, and opened up
21  one case, another case as to Mr. Morales
22  for the non-judgement debt.
23      **Q.**    So for Mr. Morales you would
24  file a civil court case and for Miss Potter

200

G. KAVULICH

1  you would just go through execution?
2      **A.   Correct.**
3      **Q.   There was a stipulation --**
4      **A.   From housing court.**
5      **Q.   A stipulation of settlement**
6  from housing court?
7      **A.   Yes.**
8      **Q.   Was that a basis for you**
9  thinking there was a judgment in this case?
10     **A.   I don't remember but I think**
11 **that is probably what it must have been.  I**
12 **just read the stip.**
13     **Q.   So based on your review right**
14 now, you think maybe that is why?
15     **A.   I think that is why?**
16     **Q.   You thought it was a judgement?**
17     **A.   There was a judgement, but why**
18 **I thought it was a judgement against Mr.**
19 **Morales as well, yes.**
20     **Q.   But don't specifically**
21 remember, you are assuming that's the
22 reason, based on looking at the
23 stipulation?
24     **A.   Yes.**

201

G. KAVULICH

1      **Q.   Because when you filed the, my**
2  client claimed the money in the account was
3  exempt?
4      **A.   No, I don't think he did.**
5      **Q.   He didn't file an exemption**
6  claim form?
7      **A.   In this case, no.  I think that**
8  **is Prage.**
9          MR. PASHKIN:  This seems like a
10 good stopping point.  So I will see
11 you on December 1st at 10:30.
12     **Q.   It said in the e-mails with the**
13 marshal, that this is another one and this
14 is like the other case, about the fact
15 there was no judgement, do you know what
16 that was about?
17     **A.   Who said that?**
18     **Q.   It was in e-mail with the**
19 marshal?  Do you know what the other case
20 they were referring to was?
21     **A.   I don't know.**
22         MR. KESHAVARZ:  I can check the
23 e-mail and we can pick that up the
24 next time.  See you shortly.

202

G. KAVULICH

1      (Whereupon, at 2:30 P.M., the
2  Examination of this witness was
3  adjourned.)

4          °      °      °      °

203

G. KAVULICH

D E C L A R A T I O N

    I hereby certify that having been
first duly sworn to testify to the truth, I
gave the above testimony.

    I FURTHER CERTIFY that the foregoing
transcript is a true and correct transcript
of the testimony given by me at the time
and place specified hereinbefore.

_____
        GARY KAVULICH

Subscribed and sworn to before me

this _____ day of _____ 20___.

_____
        NOTARY PUBLIC

204

1          G. KAVULICH
2      E X H I B I T S
3
4    PLAINTIFF'S EXHIBITS:
5
6    EXHIBIT   EXHIBIT              PAGE
7    NUMBER    DESCRIPTION
8    1 - 3    Documents to restrain
9            Bank account        63
10       4    Snapshot Bates stamped
11           1 through 3 docs       104
12       5    Summons & Complaint    131
13       6    Lease               178
14       7    Affidavits           187
15       8    Notice of Discontinuance 189
16
17        (Exhibits retained by Counsel.)
18
19        I N D E X
20   EXAMINATION BY                PAGE
21   MR. KESHAVARZ                 59
22
23     INFORMATION AND/OR DOCUMENTS REQUESTED
24   INFORMATION AND/OR DOCUMENTS        PAGE
25   (NONE)

205

1          G. KAVULICH
2      C E R T I F I C A T E
3
4    STATE OF NEW YORK     )
                          : SS.:
5    COUNTY OF KINGS        )
6
7        I, ELIZABETH FORERO, a Notary Public
8    for and within the State of New York, do
9    hereby certify:
10        That the witness whose examination is
11   hereinbefore set forth was duly sworn and
12   that such examination is a true record of
13   the testimony given by that witness.
14        I further certify that I am not
15   related to any of the parties to this
16   action by blood or by marriage and that I
17   am in no way interested in the outcome of
18   this matter.
19        IN WITNESS WHEREOF, I have hereunto
20   set my hand this 6th day of December 2016.
21

22                        _Elizabeth_
23   _____
            ELIZABETH FORERO
24
25

**$**

**$300** [1] - 109:11
**$4,300** [6] - 99:22, 100:3, 100:24, 101:4, 101:5, 101:15
**$4,352.74** [10] - 94:19, 95:15, 104:4, 133:20, 138:12, 138:17, 148:21, 158:9, 158:12, 162:17
**$4,505.47** [1] - 133:21
**$5,226.22** [1] - 134:15

**1**

**1** [10] - 58:17, 63:10, 63:13, 63:17, 66:2, 104:23, 132:10, 144:25, 204:8, 204:11
**10** [4] - 83:10, 83:11, 85:7, 85:9
**104** [1] - 204:11
**10580** [1] - 59:13
**10:30** [2] - 192:10, 201:12
**11226** [1] - 57:11
**11241** [2] - 56:23, 57:5
**11743** [1] - 57:17
**13** [8] - 94:21, 95:9, 95:15, 101:10, 101:25, 109:8, 128:10, 148:14
**131** [1] - 204:12
**147** [1] - 59:12
**14th** [1] - 61:23
**15** [7] - 77:14, 78:12, 80:19, 82:2, 85:7, 87:14, 88:10
**16** [2] - 56:22, 57:5
**17** [1] - 56:13
**175** [2] - 80:20, 81:3
**178** [1] - 204:13
**18** [5] - 64:17, 66:7, 138:8, 138:24, 149:2
**187** [1] - 204:14
**189** [1] - 204:15
**18C** [1] - 179:13
**18C3** [1] - 179:11
**1:16-cv-02134-ALC-JLC** [1] - 56:7
**1st** [2] - 192:11, 201:12

**2**

**2** [4] - 63:10, 63:13, 63:17, 133:10
**20** [7] - 77:24, 78:4, 79:24, 79:25, 81:24, 82:4, 180:21
**2006** [1] - 180:4
**2007** [14] - 88:18, 88:24, 106:23, 106:24, 134:19,

142:24, 142:25, 143:16, 150:5, 150:10, 150:17, 151:5, 151:24, 157:21
**2008** [36] - 85:13, 85:20, 86:8, 87:17, 88:3, 88:16, 88:17, 94:21, 95:9, 95:15, 101:10, 101:25, 106:8, 106:12, 108:24, 109:8, 113:8, 114:2, 114:12, 114:19, 115:4, 115:22, 116:4, 116:14, 117:22, 121:14, 122:5, 123:15, 125:6, 127:9, 128:10, 132:10, 148:14, 174:10, 174:17, 186:8
**2009** [4] - 142:15, 142:25, 143:2, 146:3
**2010** [2] - 142:15, 167:21
**2011** [1] - 116:18
**2013** [1] - 148:16
**2014** [4] - 97:18, 97:23, 98:4, 98:13
**2015** [17] - 64:17, 66:7, 83:25, 84:14, 85:8, 86:6, 87:15, 87:23, 88:12, 97:12, 103:10, 103:17, 104:6, 138:8, 138:24, 149:3, 150:9
**2016** [3] - 56:13, 71:19, 205:20
**20___** [1] - 203:19
**20s** [1] - 118:22
**23** [1] - 186:8
**25** [3] - 83:18, 84:2, 84:4
**255** [1] - 57:16
**27** [3] - 103:10, 103:17, 104:6
**2:30** [3] - 59:19, 192:8, 202:2

**3**

**3** [6] - 63:10, 63:13, 63:17, 104:23, 204:8, 204:11
**30** [2] - 58:16, 80:6
**31** [1] - 173:21
**34** [3] - 173:14, 173:16, 173:22
**35** [1] - 188:5
**36** [2] - 187:25, 188:5
**37** [1] - 188:2

**4**

**4** [7] - 104:16, 104:22, 133:13, 133:14, 178:22, 180:6, 204:10
**40** [2] - 80:6, 83:19
**40s** [1] - 118:22

**5**

**5** [7] - 131:22, 132:5, 167:21, 173:19, 180:8, 180:22, 204:12
**50** [1] - 82:16
**51** [3] - 62:13, 62:19, 63:18
**52** [2] - 62:13, 63:18
**5222** [6] - 79:21, 80:8, 80:9, 80:20, 81:4, 91:7
**53** [3] - 62:19, 63:6, 63:18
**59** [1] - 204:21

**6**

**6** [5] - 178:14, 178:21, 179:10, 180:21, 204:13
**60** [1] - 77:13
**63** [1] - 204:9
**6th** [1] - 205:20

**7**

**7** [4] - 180:7, 187:16, 187:23, 204:14
**70** [1] - 76:25
**775** [1] - 57:16

**8**

**8** [3] - 189:19, 189:25, 204:15
**80** [7] - 76:24, 76:25, 77:7, 80:16, 80:17, 80:24, 80:25
**885** [1] - 57:10
**8th** [1] - 61:22

**9**

**9** [3] - 168:24, 170:2, 178:22
**90** [1] - 76:25
**9:30** [1] - 56:14

**A**

**A.M** [1] - 56:14
**able** [2] - 168:11, 168:13
**above** [1] - 203:6
**absence** [1] - 110:20
**absolutely** [1] - 113:13
**according** [4] - 94:14, 173:3, 174:13, 188:6
**accordingly** [2] - 74:5, 84:10
**account** [41] - 61:6, 61:7, 63:20, 66:24, 70:15, 72:23, 73:12, 75:7, 75:9, 105:4, 107:24, 114:2,

114:13, 122:19, 124:4, 124:17, 131:4, 135:14, 135:20, 136:18, 136:20, 140:7, 140:9, 141:11, 144:17, 155:11, 158:25, 160:19, 161:14, 162:15, 162:24, 166:16, 177:15, 192:13, 196:20, 197:5, 197:16, 197:17, 201:3, 204:9
**accounting** [1] - 61:24
**accounts** [13] - 74:8, 74:15, 90:8, 108:20, 125:13, 135:3, 143:3, 159:13, 167:5, 193:17, 193:22, 195:24, 198:19
**accrued** [1] - 133:25
**accruing** [4] - 99:18, 99:23, 106:5, 160:10
**acknowledged** [3] - 100:17, 100:18, 101:2
**acknowledging** [1] - 101:19
**across** [1] - 89:7
**action** [29] - 73:19, 74:7, 95:8, 102:24, 110:11, 110:16, 111:18, 111:22, 114:17, 114:22, 115:8, 120:20, 121:4, 122:20, 123:9, 124:6, 125:14, 127:7, 145:2, 145:3, 174:2, 174:8, 174:19, 174:23, 185:10, 190:4, 191:18, 191:19, 205:16
**actions** [4] - 122:3, 122:4, 180:9, 180:13
**activities** [4] - 73:21, 83:4, 120:8, 143:18
**actual** [5] - 63:4, 115:16, 124:11, 127:2, 167:15
**add** [3] - 99:13, 161:24, 173:19
**added** [1] - 161:17
**adding** [1] - 81:2
**addition** [1] - 103:24
**additional** [2] - 72:2, 174:16
**additionally** [1] - 137:2
**address** [6] - 80:5, 85:3, 87:7, 94:8, 108:17
**addresses** [3] - 82:21, 84:17, 94:7
**adjourned** [1] - 202:4
**administer** [1] - 58:11
**advise** [1] - 165:18
**affects** [2] - 135:18, 135:19
**affidavit** [1] - 188:18, 188:20
**Affidavits** [1] - 204:14

**affidavits** [1] - 188:2
**affirmatively** [1] - 167:18
**afford** - 154:12
**aforementioned** [6] -
63:11, 104:17, 131:24,
178:16, 187:18, 189:21
**afraid** [2] - 142:2, 144:3
**after** [30] - 58:16, 71:15,
71:16, 86:22, 90:20,
102:7, 102:11, 102:13,
102:14, 102:16, 106:23,
106:24, 113:16, 113:21,
120:25, 122:20, 124:5,
125:13, 130:4, 132:17,
150:14, 151:3, 164:20,
172:22, 172:25, 174:3,
174:6, 184:20, 185:22
**again** [16] - 75:13, 75:19,
91:13, 105:5, 113:24,
122:25, 140:16, 145:14,
145:25, 146:5, 150:24,
153:12, 154:23, 156:15,
171:23, 199:11
**against** [62] - 56:6,
65:15, 69:21, 69:22,
73:21, 75:25, 103:21,
103:23, 103:25, 104:2,
104:3, 111:18, 113:3,
113:25, 114:5, 114:10,
114:16, 114:21, 123:10,
123:11, 123:23, 124:7,
124:11, 124:15, 124:23,
126:6, 127:20, 128:2,
128:14, 128:19, 129:2,
129:15, 129:20, 131:17,
132:9, 132:22, 133:2,
135:2, 136:21, 140:21,
145:6, 145:12, 145:17,
145:19, 160:20, 164:10,
172:16, 172:19, 173:9,
174:7, 180:10, 180:12,
183:13, 183:17, 185:4,
185:9, 190:4, 199:9,
199:15, 199:20, 200:19
**age** [2] - 118:24, 188:22
**ago** [7] - 83:15, 83:18,
85:17, 113:11, 143:8,
168:23, 180:23
**agree** [1] - 154:20
**agreeable** [1] - 60:3
**AGREED** [2] - 58:5,
58:20
**agreement** [8] - 59:21,
175:8, 176:24, 177:2,
177:5, 192:7, 192:9,
192:11
**agreements** [2] - 112:24,
175:13
**ahead** [1] - 84:10
**Ahmad** [1] - 56:22

**AHMAD** [2] - 57:3, 57:6
**alleged** [2] - 106:16,
167:6
**allow** [2] - 110:23,
175:18
**allows** [1] - 175:8
**almost** [1] - 179:23
**along** [3] - 110:24, 157:4,
168:6
**always** [3] - 150:22,
151:9, 170:12
**amending** [1] - 173:19
**among** [1] - 111:15
**amount** [80] - 64:5, 64:7,
66:4, 69:11, 70:3, 70:11,
70:13, 76:14, 94:12,
94:19, 95:6, 95:10, 95:15,
96:22, 96:23, 97:7, 98:24,
99:22, 100:2, 100:23,
101:3, 101:15, 101:16,
101:23, 102:15, 104:4,
104:9, 105:8, 133:5,
133:8, 133:20, 133:23,
140:16, 140:18, 140:19,
148:7, 148:17, 148:20,
148:22, 148:25, 149:19,
149:20, 150:6, 150:8,
150:21, 150:22, 151:7,
151:8, 151:9, 152:4,
152:7, 152:22, 153:6,
153:16, 153:17, 153:19,
154:2, 155:10, 158:9,
162:5, 162:6, 162:9,
162:13, 164:17, 164:19,
164:25, 165:14, 168:17,
169:6, 169:14, 171:9,
171:21, 172:9, 174:5,
181:25
**amounts** [5] - 64:2,
65:17, 92:13, 140:10,
152:20
**AND** [2] - 58:5, 58:20
**and/or** [1] - 133:16
**AND/OR** [2] - 204:23,
204:24
**animals** [1] - 66:20
**another** [10] - 121:8,
130:6, 141:23, 165:12,
166:15, 180:2, 187:13,
194:23, 199:22, 201:14
**answer** [2] - 60:20,
175:19, 175:23
**answered** [4] - 99:24,
100:6, 126:11, 151:23
**anticipatorily** [1] -
176:15
**anymore** [5] - 73:24,
137:13, 166:24, 189:4,
193:12
**anyone** [3] - 58:11,

83:24, 108:7
**anything** [14] - 65:16,
65:19, 65:22, 78:20,
88:20, 127:22, 128:23,
135:6, 135:8, 142:3,
144:15, 152:10, 159:24,
181:13
**anywhere** [2] - 76:24,
168:3
**apartment** [3] - 177:9,
179:5, 179:14
**apartments** [3] - 119:15,
122:8, 177:9
**apologize** [1] - 151:22
**apparently** [3] - 128:4,
133:17, 197:9
**appear** [3] - 113:14,
115:6, 190:2
**Appearance** [1] - 56:20
**appearance** [2] - 113:22,
120:10
**appeared** [3] - 114:23,
121:18, 123:24
**appears** [2] - 113:5,
132:11
**applicable** [1] - 126:20
**applied** [2] - 168:8, 168:9
**approximate** [1] - 77:25
**approximately** [13] -
76:22, 77:8, 81:14, 81:18,
83:7, 83:16, 84:19, 85:5,
87:11, 87:20, 87:24, 88:2,
88:7
**approximation** [1] - 82:3
**April** [7] - 97:12, 103:10,
103:17, 104:5, 116:18,
174:9, 174:17
**are there** [1] - 62:2
**aren't** [3] - 122:2, 175:12,
187:7
**argue** [1] - 112:20
**argument** [1] - 160:7
**around** [7] - 77:14,
79:25, 85:13, 100:6,
108:24, 150:15, 151:5
**arrears** [2] - 107:13,
107:14
**aside** [4] - 103:14,
140:25, 161:18, 161:21
**ask** [23] - 68:21, 68:24,
69:3, 69:4, 92:17, 103:15,
114:11, 124:3, 134:5,
134:23, 139:2, 139:4,
148:11, 148:12, 155:2,
155:3, 155:8, 172:13,
174:25, 175:16, 175:20,
177:11, 177:12
**asked** [3] - 100:5,
100:25, 154:4
**asking** [3] - 79:4, 85:12,

100:7
**aspects** [1] - 119:20
**assets** [1] - 74:24
**ASSOCIATES** [7] - 56:9,
56:9, 56:10, 56:17, 57:14,
57:15, 57:15
**Associates** [1] - 74:9
**assume** [9] - 64:18, 69:5,
124:7, 124:9, 145:24,
165:6, 165:8, 169:23,
177:20
**assuming** [4] - 125:5,
125:6, 145:22, 200:22
**assumption** [2] - 98:14,
98:15
**attached** [3] - 129:5,
130:16, 130:20
**attempt** [2] - 61:6, 165:9
**attempted** [1] - 191:21
**attempting** [1] - 125:4
**attention** [5] - 91:15,
123:20, 123:22, 137:15,
179:9
**attorney** [13] - 119:22,
120:8, 120:12, 131:7,
131:9, 136:11, 156:8,
157:3, 175:2, 175:7,
175:16, 187:25, 196:12
**attorney's** [16] - 104:24,
174:22, 175:9, 175:20,
176:5, 176:12, 176:25,
177:17, 177:21, 179:19,
179:23, 181:20, 181:21,
182:5, 182:6, 182:23
**attorneys** [2] - 89:7,
112:7
**Attorneys** [2] - 57:4,
57:14
**authorized** [1] - 58:11
**automatically** [2] -
151:18, 173:11
**available** [1] - 127:4
**Avenue** [2] - 57:10,
57:16
**average** [10] - 77:2, 77:3,
77:23, 78:2, 78:4, 78:14,
78:23, 82:2, 83:8, 83:12
**away** [3] - 89:10, 91:15,
133:4

**B**

**back** [27] - 59:15, 76:13,
80:4, 83:25, 85:20, 88:24,
92:11, 92:19, 103:4,
113:15, 114:2, 114:12,
115:4, 123:22, 137:10,
146:4, 155:17, 157:11,
163:12, 167:3, 172:15,
186:16, 192:5, 193:16,

195:8, 195:11, 195:12
**background** [2] - 59:23, 60:6
**bad** [2] - 80:4, 142:4
**balance** [28] - 135:23, 136:17, 138:9, 138:23, 147:21, 152:2, 153:25, 158:20, 158:24, 159:22, 160:9, 161:6, 161:13, 161:20, 162:23, 166:17, 167:15, 167:22, 168:2, 168:3, 168:6, 168:12, 168:19, 169:13, 170:8, 170:18, 171:19, 171:25
**Bank** [1] - 63:5
**bank** [40] - 63:20, 64:21, 64:25, 66:15, 66:18, 66:23, 67:3, 67:6, 67:18, 69:9, 72:19, 77:4, 80:18, 80:24, 92:12, 93:17, 93:18, 93:24, 146:6, 148:2, 148:5, 149:5, 149:11, 149:12, 149:15, 149:23, 149:24, 150:19, 150:20, 151:17, 153:5, 153:8, 155:11, 156:4, 156:5, 156:6, 157:8, 166:11, 170:13, 204:9
**banks** [1] - 67:15
**based** [13] - 60:24, 64:4, 109:12, 111:6, 126:2, 176:3, 178:11, 179:24, 184:14, 184:17, 199:2, 200:14, 200:23
**basic** [1] - 146:6
**basically** [1] - 75:14
**basing** [1] - 178:23
**basis** [5] - 71:23, 86:15, 179:22, 184:11, 200:9
**basket** [1] - 142:3
**Bates** [1] - 62:12, 62:18, 63:6, 104:22, 173:13, 173:15, 178:21, 179:10, 180:7, 180:20, 204:10
**becomes** [1] - 165:24
**before** [36] - 56:23, 58:11, 58:13, 59:16, 59:21, 60:13, 62:17, 65:6, 66:10, 71:7, 71:20, 72:9, 76:17, 79:5, 80:11, 83:19, 85:20, 89:3, 102:2, 106:8, 106:12, 118:17, 134:11, 136:3, 137:21, 150:25, 151:2, 152:5, 158:17, 160:6, 186:17, 189:2, 196:2, 196:20, 197:20, 203:18
**began** [5] - 106:10, 106:12, 106:25, 107:3, 118:7

**begin** [2] - 107:7, 121:10
**beginning** [2] - 71:18, 193:8
**behalf** [6] - 68:14, 107:22, 193:4, 194:5, 195:4
**Beinstock** [1] - 141:23
**believe** [24] - 61:15, 64:22, 65:17, 67:17, 93:4, 93:14, 97:4, 97:15, 97:19, 99:11, 99:12, 108:25, 125:22, 125:23, 126:11, 126:12, 127:9, 131:11, 160:9, 164:12, 174:9, 178:25, 180:2, 191:17
**believed** [2] - 114:9, 152:17
**belongs** [1] - 102:2
**beneath** [1] - 94:11
**between** [9] - 58:6, 73:5, 74:2, 76:23, 76:24, 76:25, 112:24, 119:13, 163:15
**Bienstock** [5] - 142:21, 142:23, 143:5, 166:23
**Bigel** [8] - 63:5, 141:8, 142:2, 142:10, 142:14, 142:18, 143:2, 145:23
**bigger** [1] - 89:21
**bill** [2] - 181:19, 181:20
**bit** [5] - 85:10, 88:11, 91:14, 152:5, 163:5
**biweekly** [1] - 155:22
**blank** [3] - 96:24, 96:25, 164:23
**blood** [1] - 205:16
**blue** [1] - 155:19
**blur** [1] - 88:17
**Board** [1] - 179:6
**bookkeeping** [1] - 166:4
**both** [23] - 68:18, 73:8, 73:10, 73:11, 73:21, 81:11, 105:25, 113:14, 113:20, 113:24, 113:25, 114:10, 115:5, 115:16, 124:8, 133:2, 145:10, 145:14, 172:24, 174:4, 188:21, 195:23, 199:15
**bottom** [11] - 64:14, 92:18, 108:20, 109:5, 128:9, 137:19, 146:20, 146:22, 147:2, 164:3, 180:21
**bow** [1] - 89:7
**break** [4] - 92:8, 100:21, 160:3, 191:14
**breakdown** [3] - 107:11, 107:12, 107:14
**brightest** [1] - 134:17, 199:11
**bring** [1] - 193:16

**brings** [1] - 71:11
**broader** [1] - 125:10
**Bronx** [2] - 118:12, 119:16
**Brooklyn** [3] - 56:23, 57:5, 57:11
**brought** [5] - 145:12, 145:13, 155:24, 180:9, 180:12
**budget** [1] - 154:11
**budgeting** [1] - 154:10
**build** [1] - 117:18
**bulb** [1] - 199:12
**bunch** [2] - 134:17, 199:12
**busier** [1] - 85:10
**business** [3] - 117:19, 144:10, 159:12
**busy** [1] - 118:4
**BY** [5] - 57:6, 57:11, 57:17, 59:6, 204:20

## C

**C3** [1] - 179:18
**calculate** [1] - 154:19
**calculated** [1] - 64:10
**calculates** [3] - 64:8, 64:9, 170:25
**calculating** [1] - 172:8
**calculations** [2] - 135:15, 137:2
**calendar** [1] - 84:10
**call** [7] - 155:17, 155:18, 155:19, 163:12, 171:10, 195:16, 195:17
**called** [7] - 59:2, 66:21, 163:6, 163:7, 175:14, 175:15
**calling** [1] - 162:15
**calls** [3] - 155:9, 162:13, 162:14
**CAMBA** [1] - 57:9
**came** [10] - 69:15, 89:21, 89:24, 90:9, 90:12, 90:16, 90:20, 164:14, 194:19, 197:9
**can you** [4] - 62:19, 104:24, 132:5, 192:4
**can't** [15] - 60:15, 60:22, 86:9, 88:4, 107:24, 113:9, 120:22, 126:22, 129:25, 130:7, 135:11, 139:13, 139:14, 165:16, 165:21
**cannot** [2] - 122:12, 123:3
**Case** [1] - 56:6
**case** [64] - 59:23, 61:14, 61:15, 62:4, 64:23, 69:19, 71:13, 73:13, 73:15,

73:16, 73:18, 75:16, 75:20, 76:7, 84:7, 84:8, 90:3, 105:25, 113:11, 114:9, 115:11, 119:6, 119:21, 124:24, 125:21, 126:3, 126:5, 126:21, 128:5, 129:4, 129:23, 131:10, 131:19, 132:21, 132:22, 135:24, 145:12, 145:13, 145:16, 175:22, 176:16, 182:8, 183:21, 187:9, 187:10, 187:25, 191:18, 191:24, 193:2, 193:9, 195:6, 198:4, 198:11, 198:13, 199:19, 199:20, 199:22, 199:25, 200:10, 201:8, 201:15, 201:20
**cases** [38] - 74:7, 78:8, 82:20, 84:5, 84:6, 84:22, 89:23, 90:4, 90:9, 90:20, 90:25, 113:17, 114:25, 116:22, 116:24, 118:3, 119:19, 120:25, 121:19, 122:5, 122:14, 142:19, 159:3, 159:16, 175:12, 175:15, 179:24, 193:25, 194:5, 194:22, 195:7, 195:12, 195:18, 197:19, 197:22, 198:5, 198:7, 199:18
**catch** [1] - 138:5
**categories** [1] - 87:5
**cease** [1] - 116:16
**certain** [4] - 98:23, 99:16, 159:2, 168:2
**certificate** [2] - 190:20, 194:11
**certification** [1] - 58:8
**certified** [1] - 190:13
**certify** [3] - 203:4, 205:9, 205:14
**CERTIFY** [1] - 203:8
**cetera** [1] - 96:7
**chance** [1] - 140:15
**change** [3] - 98:8, 101:23, 163:3
**changed** [6] - 90:6, 102:25, 123:19, 147:7, 150:13, 150:25
**changes** [6] - 146:14, 146:15, 147:5, 147:10, 147:18, 158:5
**changing** [1] - 151:3
**charge** [2] - 114:4, 181:24
**charts** [1] - 154:15
**check** [11] - 114:15, 124:10, 125:18, 126:15, 126:17, 155:16, 163:11,

167:4, 196:21, 196:24, 201:23
**checked** [1] - 61:16
**Church** [1] - 59:12
**circles** [1] - 100:7
**circumstances** [3] - 153:9, 153:13, 159:2
**City** [2] - 143:25, 171:4
**civil** [15] - 73:19, 74:2, 74:7, 75:20, 75:24, 76:4, 76:7, 117:8, 145:3, 180:24, 183:11, 188:4, 190:3, 190:7, 199:25
**CIVIL** [1] - 56:3
**Civil** [1] - 56:21
**civilly** [1] - 105:14
**claim** [1] - 201:7
**claimed** [6] - 69:11, 92:13, 148:8, 153:20, 171:20, 201:3
**claims** [1] - 188:19
**Clara** [5] - 69:20, 72:23, 103:23, 104:2, 104:3
**clarified** [1] - 102:23
**clarify** [2] - 68:25, 69:4
**clarity** [1] - 161:12
**clause** [4] - 101:25, 102:5, 102:13, 102:16
**clear** [6] - 76:18, 98:16, 121:12, 147:8, 151:22, 169:12
**CLERK** [1] - 57:7
**clerk** [1] - 113:23
**clerks** [1] - 123:21
**click** [1] - 144:22
**client** [22] - 73:17, 73:19, 73:23, 84:7, 85:24, 90:2, 90:4, 113:19, 115:11, 117:2, 124:17, 124:18, 125:11, 126:9, 130:13, 133:3, 133:4, 181:25, 182:4, 194:10, 198:2, 201:3
**client's** [4] - 63:20, 89:23, 198:15, 199:5
**clients** [11] - 82:22, 83:2, 88:7, 89:11, 89:20, 90:16, 90:19, 177:8, 181:19, 181:21, 198:8
**clinical** [1] - 142:5
**clinically** [1] - 141:21
**closed** [1] - 152:13
**co** [2] - 57:9, 165:21
**co-Counsel** [1] - 57:9
**co-judgment** [1] - 165:21
**collect** [36] - 61:7, 67:10, 67:22, 67:25, 70:4, 73:19, 74:15, 75:25, 76:8, 86:16, 108:9, 110:13, 110:16, 121:5, 125:4, 132:13,

134:7, 135:21, 139:10, 140:8, 140:10, 145:17, 145:18, 154:24, 159:6, 159:13, 159:15, 159:24, 165:9, 175:4, 180:25, 181:12, 183:19, 191:22, 195:24, 196:21
**collected** [16] - 70:16, 71:23, 133:5, 133:7, 133:20, 133:22, 153:18, 159:4, 163:2, 164:17, 164:20, 165:20, 175:22, 181:3, 182:2, 182:15
**collecting** [3] - 74:19, 139:7, 146:3
**collection** [19] - 73:21, 74:10, 76:5, 77:20, 105:3, 108:11, 119:7, 120:13, 122:2, 122:3, 143:17, 159:12, 172:16, 176:9, 178:24, 182:19, 182:22, 190:23, 195:3
**collections** [8] - 110:4, 110:6, 110:7, 114:13, 121:25, 144:19, 188:3, 197:17
**Collin** [7] - 70:22, 71:7, 71:16, 72:5, 74:23, 76:14, 136:11
**coming** [1] - 59:15
**commence** [1] - 108:18
**common** [3] - 111:17, 123:14, 123:15
**communicate** [1] - 195:8
**communication** [1] - 149:18
**communications** [10] - 83:2, 88:6, 107:22, 107:25, 108:2, 192:19, 192:20, 192:25, 193:3, 195:13
**company** [15] - 107:23, 108:4, 118:10, 118:14, 119:11, 189:3, 189:5, 192:15, 192:22, 192:24, 193:4, 193:19, 193:21, 195:10, 195:14
**complaint** [9] - 86:19, 132:7, 132:9, 132:12, 173:6, 173:8, 184:20, 188:7, 188:16
**Complaint** [1] - 204:12
**complaints** [1] - 79:24
**completed** [2] - 122:21, 127:7
**computer** [28] - 71:11, 71:21, 73:5, 73:10, 74:22, 86:14, 92:14, 95:21, 96:4, 109:12, 115:18, 125:19, 126:24, 127:3, 136:22,

151:11, 151:13, 151:19, 152:20, 154:23, 155:7, 160:14, 177:3, 177:15, 185:7, 185:13, 185:17, 199:3
**computers** [1] - 126:18
**concerned** [1] - 141:21
**confused** [1] - 170:12
**confuses** [1] - 170:11
**consciousness** [1] - 183:21
**considered** [1] - 181:22
**constructed** [1] - 102:17
**consumer** [19] - 93:13, 93:16, 93:20, 93:24, 96:11, 114:21, 114:22, 135:22, 149:15, 149:19, 149:24, 150:20, 153:22, 155:9, 156:5, 162:19, 163:6, 183:17, 186:25
**consumer's** [2] - 186:20, 187:2
**consumers** [1] - 88:7
**contact** [3] - 156:7, 157:3, 194:21
**contemporaneous** [2] - 130:14, 197:11
**contingency** [1] - 181:22
**continue** [2] - 164:13, 192:10
**CONTINUED** [1] - 56:16
**continuing** [1] - 95:6
**contract** [3] - 176:3, 177:22, 179:25
**contracts** [1] - 106:2
**contractural** [1] - 175:17
**control** [2] - 131:18, 135:2
**convey** [2] - 156:14, 156:15
**copied** [1] - 130:12
**copies** [1] - 127:5
**copy** [18] - 58:14, 58:17, 93:19, 124:15, 124:22, 125:3, 125:12, 127:19, 128:18, 129:19, 188:12, 190:23, 191:8, 193:16, 195:22, 196:6, 196:10, 196:15
**copying** [1] - 171:12
**corporate** [2] - 107:20, 107:25
**correct** [150] - 64:6, 65:5, 65:10, 65:13, 66:2, 66:3, 66:12, 66:13, 66:16, 66:17, 67:20, 68:15, 70:11, 70:13, 71:10, 72:12, 72:13, 72:17, 75:23, 76:2, 77:18, 77:21, 77:22, 78:9, 83:13, 84:17,

92:16, 93:2, 93:6, 93:7, 93:10, 93:25, 94:2, 94:4, 95:16, 95:17, 95:18, 95:24, 95:25, 96:3, 96:5, 96:9, 96:13, 97:23, 98:5, 98:25, 99:19, 101:5, 101:6, 101:8, 101:12, 101:13, 103:12, 105:4, 107:3, 107:16, 108:8, 108:11, 109:19, 110:12, 111:9, 112:5, 112:8, 113:13, 114:23, 120:20, 121:6, 121:11, 121:17, 121:20, 123:7, 124:13, 128:10, 128:11, 128:19, 129:18, 131:2, 131:20, 132:14, 133:10, 135:4, 135:5, 136:7, 136:14, 136:18, 137:24, 138:19, 138:21, 139:6, 139:11, 147:19, 147:22, 148:8, 148:24, 149:4, 149:7, 149:16, 150:2, 150:3, 150:8, 150:11, 150:23, 151:10, 152:25, 153:11, 153:22, 153:23, 157:15, 157:22, 158:11, 158:21, 160:12, 160:22, 160:24, 161:14, 162:7, 162:11, 164:4, 164:5, 164:7, 164:8, 170:8, 172:5, 178:2, 179:19, 179:25, 180:16, 182:2, 182:16, 182:24, 182:25, 183:14, 184:22, 185:5, 185:14, 185:19, 186:19, 188:9, 188:13, 189:12, 190:10, 191:2, 191:9, 193:5, 193:6, 195:5, 197:14, 200:3, 203:9
**corrected** [1] - 153:15
**correctly** [2] - 143:9, 148:18
**costs** [8] - 94:20, 95:17, 96:23, 102:7, 102:14, 102:17, 174:23, 181:14
**Counsel** [2] - 57:9, 204:17
**counsel** [3] - 58:6, 58:17, 119:18
**COUNTY** [1] - 205:5
**couple** [2] - 81:25, 143:8
**course** [2] - 78:5, 182:9
**court** [47] - 74:2, 74:6, 76:8, 78:3, 82:22, 83:9, 83:13, 83:17, 83:23, 84:3, 85:19, 111:25, 112:10, 112:20, 113:6, 113:14, 113:18, 113:22, 114:23, 115:10, 120:9, 123:13,

123:21, 125:18, 125:20, 126:10, 126:20, 126:24, 129:12, 145:3, 145:4, 145:11, 145:13, 174:24, 181:14, 185:8, 185:13, 188:4, 190:3, 190:7, 196:11, 197:2, 199:3, 199:25, 200:5, 200:7
**COURT** [1] - 56:2
**Court** [3] - 56:22, 57:5, 58:13
**court's** [1] - 126:15
**courthouse** [2] - 126:17, 185:17
**courts** [4] - 83:3, 126:19, 126:23
**cover** [1] - 156:25
**covers** [1] - 83:6
**CPLR** [1] - 93:6
**crazy** [1] - 88:21
**created** [1] - 94:4
**credit** [2] - 149:25, 152:23
**credited** [1] - 70:3
**creditor's** [1] - 156:8
**credits** [1] - 161:7
**cue** [1] - 74:22
**current** [4] - 135:23, 138:23, 153:25, 161:5
**custody** [2] - 131:17, 134:25
**cutting** [1] - 171:13

## D

**damages** [3] - 174:20, 179:15, 179:17
**data** [2] - 98:17, 103:8
**date** [33] - 63:14, 64:17, 66:5, 98:23, 99:16, 100:23, 102:12, 103:10, 104:20, 105:21, 106:6, 107:6, 113:6, 132:3, 138:13, 143:15, 149:2, 149:17, 153:7, 158:8, 160:11, 161:2, 161:6, 168:2, 168:18, 170:15, 171:22, 172:10, 178:19, 182:21, 187:21, 189:24
**DATE** [1] - 56:13
**dated** [1] - 61:21
**dates** [1] - 172:6
**daughter** [1] - 118:24
**day** [6] - 65:7, 76:20, 82:19, 151:24, 203:19, 205:20
**days** [2] - 58:16, 86:22
**dead** [1] - 130:7
**deal** [1] - 119:20
**debt** [19] - 76:8, 81:10,

105:19, 105:22, 106:5, 106:16, 117:7, 125:4, 133:15, 134:7, 134:8, 135:19, 159:12, 172:18, 174:5, 182:2, 183:19, 193:2, 199:23
**debtor** [14] - 69:19, 80:11, 81:10, 93:2, 93:3, 137:7, 156:22, 156:25, 157:4, 163:16, 163:17, 165:20, 165:21, 167:6
**debtor's** [1] - 163:24
**debtors** [10] - 73:11, 83:3, 115:16, 124:8, 124:16, 139:16, 141:2, 141:3, 144:18, 146:24
**debts** [1] - 108:9
**December** [3] - 192:11, 201:12, 205:20
**decide** [1] - 72:22
**decided** [2] - 89:20, 118:3
**deciding** [1] - 71:8
**decision** [5] - 72:10, 72:14, 72:25, 117:11, 197:15
**decisions** [2] - 120:11, 120:12
**decreasing** [3] - 83:20, 170:8, 170:18
**deem** [1] - 174:25
**default** [2] - 175:21, 180:11
**defendant** [2] - 123:9, 174:20
**defendants** [6] - 113:4, 114:6, 114:16, 124:23, 190:14, 190:18
**DEFENDANTS** [1] - 56:11
**Defendants** [2] - 56:17, 57:14
**defending** [1] - 180:11
**definitely** [2] - 96:18, 129:16
**definitively** [1] - 115:24
**deleted** [1] - 102:10
**delineation** [2] - 113:10, 123:18
**demand** [13] - 78:16, 78:24, 79:2, 79:3, 79:6, 79:11, 79:12, 79:23, 79:25, 86:23, 91:7, 175:3, 175:6
**demanding** [1] - 179:22
**demonstrates** [1] - 133:15
**deny** [2] - 70:24, 71:4
**department** [1] - 171:4
**departure** [1] - 167:8

**depending** [4] - 143:6, 153:9, 153:12, 182:8
**deposition** [10] - 58:8, 58:9, 58:14, 59:22, 60:20, 79:7, 85:12, 109:16, 116:7, 192:9
**DEPOSITION** [1] - 56:16
**depositions** [1] - 107:19
**DESCRIPTION** [1] - 204:7
**destroy** [1] - 130:8
**destroyed** [1] - 129:24
**details** [1] - 89:3
**determination** [6] - 75:21, 177:25, 185:20, 197:3, 197:4, 198:24
**determine** [13] - 71:25, 106:14, 117:7, 119:6, 120:15, 120:18, 122:22, 135:13, 136:6, 136:23, 176:11, 176:24, 177:16
**determined** [2] - 105:16, 176:15
**determines** [2] - 136:12, 136:16
**Development** [1] - 118:12
**device** [2] - 70:15, 164:22
**devices** [4] - 68:7, 70:9, 80:12, 164:9
**did it** [3] - 75:8, 75:11, 139:12
**did she** [2] - 119:24, 120:3
**did you** [11] - 64:16, 76:7, 85:25, 90:20, 97:8, 98:8, 125:2, 142:22, 153:24, 192:17, 197:4
**different** [8] - 109:21, 116:10, 116:11, 137:25, 140:9, 145:18, 163:5, 165:23
**differentiate** [1] - 163:14
**difficult** [2] - 154:5, 154:19
**direct** [2] - 120:17, 137:15
**directed** [1] - 72:16
**direction** [1] - 75:19
**directs** [1] - 76:15
**disagree** [1] - 102:3
**disbursements** [2] - 174:23, 180:8
**discontinuance** [3] - 132:20, 184:9, 190:17
**Discontinuance** [4] - 190:3, 190:24, 191:9, 204:15
**discontinued** [4] -

132:16, 132:24, 132:25, 190:10
**discretion** [1] - 188:22
**discussion** [1] - 62:16
**dispute** [2] - 81:9, 144:21
**disputes** [1] - 81:12
**distinguish** [3] - 73:4, 73:25, 110:5
**DISTRICT** [2] - 56:2, 56:2
**DIVISION** [1] - 56:3
**divorce** [1] - 88:21
**do they** [1] - 196:10
**do you** [67] - 59:11, 59:18, 61:9, 67:4, 67:9, 67:14, 69:17, 73:14, 76:19, 78:13, 79:15, 79:19, 80:8, 80:13, 81:8, 81:11, 81:15, 81:22, 82:18, 83:7, 84:5, 84:11, 84:20, 85:6, 86:12, 86:24, 87:20, 88:8, 91:25, 94:8, 97:4, 107:4, 108:13, 111:3, 111:4, 112:22, 116:23, 117:16, 118:16, 118:20, 118:25, 120:5, 124:22, 125:20, 127:10, 127:18, 128:14, 129:18, 135:21, 145:24, 149:10, 156:6, 169:4, 169:5, 169:16, 170:24, 174:11, 174:25, 175:9, 176:5, 181:19, 188:24, 191:17, 194:16, 195:7, 201:16, 201:20
**docs** [1] - 204:11
**document** [29] - 64:14, 66:21, 97:4, 97:5, 100:8, 100:9, 104:5, 104:18, 107:5, 107:10, 109:2, 129:20, 130:24, 131:18, 131:25, 132:6, 135:22, 137:17, 138:4, 138:9, 138:25, 155:5, 157:14, 157:17, 165:7, 178:17, 187:19, 189:9, 189:22
**DOCUMENTS** [2] - 204:23, 204:24
**Documents** [1] - 204:8
**documents** [34] - 62:18, 62:25, 63:12, 74:4, 75:15, 76:13, 78:13, 82:7, 82:13, 91:5, 91:16, 92:3, 109:13, 125:25, 128:23, 128:24, 130:6, 130:22, 131:3, 131:13, 134:25, 151:17, 166:10, 184:15, 186:19, 186:24, 187:3, 187:7, 187:24, 188:6, 193:15, 195:22, 197:10, 198:22

**Doe** [3] - 164:25, 165:3, 165:5
**does it** [5] - 93:15, 128:8, 164:11, 164:16, 166:22
**does that** [9] - 84:24, 93:12, 99:5, 101:14, 102:10, 158:16, 160:13, 190:2, 195:10
**does this** [1] - 138:8
**doesn't** [4] - 145:20, 149:25, 162:8, 182:4
**dollar** [5] - 158:13, 160:13, 168:8, 168:23, 175:2
**dollars** [29] - 94:20, 96:24, 99:4, 99:5, 99:15, 99:17, 99:18, 101:7, 101:9, 102:15, 103:11, 158:16, 163:3, 167:22, 168:25, 169:3, 169:4, 169:5, 169:19, 169:22, 170:3, 170:5, 170:21, 170:22, 172:2, 174:21, 175:7, 179:22, 183:3
**down** [11] - 91:14, 95:10, 100:11, 100:21, 126:23, 136:25, 140:17, 140:20, 174:18, 195:21, 195:25
**dozen** [2] - 74:13, 194:3
**due** [67] - 64:3, 64:5, 66:5, 69:11, 86:20, 87:2, 87:7, 87:8, 87:9, 92:13, 94:12, 94:16, 94:22, 94:23, 94:24, 94:25, 95:3, 96:25, 97:5, 97:7, 99:22, 101:11, 101:15, 101:16, 101:24, 102:15, 104:4, 136:2, 136:17, 136:23, 137:3, 138:9, 138:14, 138:23, 139:5, 140:11, 147:21, 148:8, 148:22, 148:25, 149:20, 150:7, 150:21, 151:8, 152:2, 152:7, 152:10, 152:13, 152:21, 153:6, 153:20, 153:25, 154:3, 160:9, 161:20, 162:9, 165:14, 166:17, 168:12, 168:19, 171:18, 171:20, 171:25, 172:22, 172:25, 174:14, 191:18
**duly** [3] - 59:3, 203:5, 205:11

## E

**E-courts** [2] - 126:19
**e-mail** [4] - 83:2, 163:12, 201:19, 201:24
**e-mailed** [1] - 197:22
**e-mails** [8] - 61:5, 61:9,

61:11, 61:14, 61:15, 62:2, 88:6, 201:13
**earlier** [2] - 197:11, 199:7
**easier** [1] - 140:22
**effect** [2] - 58:12, 58:15
**efficient** [1] - 83:24
**eggs** [1] - 142:3
**eight** [1] - 85:17
**ELIZABETH** [2] - 205:7, 205:23
**Elizabeth** [1] - 56:24
**else's** [1] - 83:24
**employed** [1] - 67:18
**employer** [2] - 72:20, 137:7
**employment** [1] - 137:12
**end** [4] - 71:18, 137:22, 142:24, 169:4
**enforcement** [16] - 68:7, 70:8, 70:15, 71:9, 72:2, 72:7, 72:11, 72:15, 73:2, 76:15, 79:16, 80:12, 91:7, 117:9, 119:8, 136:13
**engage** [2] - 73:20, 82:25, 122:4
**engaged** [1] - 122:4
**engaging** [1] - 113:21
**English** [1] - 173:5
**entail** [1] - 84:24
**enter** [4] - 75:18, 84:9, 117:4, 118:2
**entered** [16] - 73:13, 95:9, 95:14, 98:23, 100:23, 113:24, 114:5, 114:8, 114:25, 119:7, 145:6, 148:14, 176:16, 185:9, 196:17
**entering** [2] - 116:22, 116:23
**enters** [1] - 115:18
**entire** [2] - 144:19, 169:14
**entirely** [3] - 103:18, 133:17, 133:18
**entity** [1] - 67:11
**entry** [10] - 78:19, 81:21, 81:22, 82:5, 102:12, 109:8, 128:12, 138:13, 164:21, 174:3
**error** [8] - 95:21, 96:16, 97:21, 98:3, 98:7, 98:11, 98:12, 152:17
**especially** [1] - 117:15
**ESQ** [4] - 57:6, 57:11, 57:13, 57:17
**essence** [1] - 95:13
**established** [1] - 96:12
**Estate** [1] - 179:6
**estimate** [1] - 85:19
**et** [1] - 96:7

**Evans** [2] - 189:15
**every** [5] - 148:4, 167:19, 175:3, 175:18, 176:8
**everything** [2] - 88:24, 98:13
**evict** [3] - 110:11, 111:3, 122:12
**evicted** [2] - 121:2, 122:18
**evicting** [1] - 121:10
**evidence** [2] - 126:3, 128:16
**exact** [3] - 104:9, 113:9, 123:17
**exactly** [8] - 60:17, 107:9, 113:15, 118:18, 135:10, 142:16, 156:23, 186:5
**examination** [2] - 205:10, 205:12
**EXAMINATION** - 59:6, 204:20
**Examination** [1] - 202:3
**examined** [3] - 59:5
**example** [8] - 86:16, 86:17, 140:17, 162:17, 165:19, 168:22, 169:11, 176:16
**examples** [1] - 86:18
**except** [3] - 58:21, 64:3, 152:14
**execute** [5] - 87:8, 136:9, 166:12, 166:15
**executed** [1] - 143:6
**executing** [1] - 136:7
**execution** [35] - 63:3, 67:20, 92:20, 92:21, 97:2, 97:8, 98:9, 104:9, 135:11, 135:12, 137:5, 137:23, 139:7, 139:22, 139:24, 139:25, 146:2, 147:23, 147:25, 148:3, 149:8, 156:19, 157:13, 158:23, 161:7, 163:23, 164:9, 164:21, 164:22, 164:25, 165:22, 170:14, 171:22, 172:11, 200:2
**executions** [10] - 65:2, 68:5, 74:23, 77:9, 97:22, 143:13, 143:14, 159:10, 165:17, 166:8
**exempt** [3] - 146:18, 146:19, 201:4
**exemption** [1] - 201:6
**exhibit** [1] - 62:11
**EXHIBIT** [2] - 204:6
**Exhibit 1** [25] - 63:23, 65:9, 69:8, 76:14, 92:11, 93:12, 93:22, 93:23, 106:13, 106:18, 108:19,

137:16, 138:6, 146:4, 146:7, 146:11, 147:3, 147:10, 147:11, 148:6, 148:12, 149:12, 149:14, 153:21, 186:6
**Exhibit 2** [14] - 63:24, 92:20, 93:8, 93:9, 94:3, 95:23, 96:16, 97:13, 98:2, 103:2, 156:18, 157:11, 157:12, 160:23
**Exhibit 3** [2] - 63:25, 64:2
**Exhibit 4** [10] - 104:19, 104:25, 106:20, 108:23, 145:21, 162:21, 162:23, 163:21, 164:16, 183:24
**Exhibit 5** [6] - 132:2, 172:16, 173:20, 173:24, 178:24, 183:12
**Exhibit 6** [1] - 178:18
**Exhibit 7** [1] - 187:20
**Exhibit 8** [3] - 189:23, 190:15, 190:19
**exhibit I** [1] - 62:18
**exhibits** [1] - 63:9
**EXHIBITS** [1] - 204:4
**Exhibits** [3] - 63:13, 63:17, 204:17
**existent** [1] - 191:23
**exists** [1] - 120:16
**expedite** [1] - 120:14
**expenses** [4] - 179:18, 180:17, 180:19, 181:20
**expensive** [2] - 154:6, 154:7
**experience** [4] - 111:21, 115:3, 115:9, 119:10
**expert** [1] - 134:16
**expiration** [1] - 105:16
**expire** [1] - 107:8
**expired** [1] - 106:15
**extent** [2] - 112:17, 122:3

## F

**F/K/A** [2] - 56:10, 57:15
**face** [1] - 163:8
**fact** [12] - 66:4, 108:17, 152:9, 153:5, 165:8, 185:4, 185:10, 190:25, 191:7, 191:8, 196:22, 201:15
**factual** [2] - 103:15, 186:24
**factually** [1] - 186:22
**fair** [5] - 60:11, 60:25, 117:21, 147:13, 147:15
**fairly** [2] - 134:16, 134:18
**false** [2] - 190:11, 190:12
**far** [2] - 108:5, 154:10

**Father** [1] - 119:16
**fax** [2] - 197:24, 198:11
**FDCPA** [1] - 102:24
**FDPCA** [2] - 150:18, 151:6
**February** [3] - 116:2, 116:4, 116:14
**Federal** [1] - 56:21
**fee** [4] - 181:22, 181:23, 182:13, 182:14
**feel** [1] - 155:12
**fees** [29] - 64:9, 174:22, 175:3, 175:7, 175:9, 175:16, 175:20, 175:23, 176:5, 176:12, 176:17, 176:25, 177:7, 177:17, 177:21, 179:19, 179:23, 180:8, 180:17, 180:19, 181:8, 181:9, 181:20, 181:21, 182:3, 182:5, 182:6, 182:10, 182:23
**fell** [1] - 130:11
**few** [5] - 74:25, 80:3, 95:7, 124:2, 144:12
**fields** [2] - 96:6, 98:17
**fifteen** [3] - 81:24, 82:4, 84:13
**fifty** [5] - 63:22, 77:13, 85:23, 163:3, 167:22
**fifty-five** [1] - 167:22
**fifty-one** [1] - 63:22
**fifty-three** [1] - 163:3
**figure** [4] - 76:25, 154:18, 156:8, 186:7
**file** [55] - 73:19, 74:4, 75:11, 75:15, 76:4, 76:7, 77:20, 84:8, 87:6, 110:10, 110:15, 111:17, 112:4, 112:18, 113:20, 115:15, 115:20, 116:25, 117:8, 120:13, 125:17, 127:2, 130:6, 130:10, 130:13, 130:15, 132:8, 137:4, 152:13, 166:5, 175:3, 175:25, 176:8, 179:24, 180:24, 181:2, 181:12, 182:18, 182:21, 183:16, 184:24, 185:3, 186:20, 187:2, 187:13, 196:2, 196:6, 196:8, 196:11, 196:22, 197:5, 198:15, 199:25, 201:6
**filed** [18] - 71:15, 75:24, 102:24, 111:21, 112:12, 112:16, 121:4, 121:19, 151:6, 173:8, 183:11, 184:6, 184:8, 187:12, 188:3, 188:11, 190:3, 201:2
**files** [7] - 127:4, 187:4,

193:14, 195:20, 198:8, 198:9, 198:10
**filing** [5] - 58:7, 79:13, 181:9, 194:5, 195:24
**fill** [5] - 96:24, 149:6, 151:9, 151:12, 152:4
**filled** [2] - 151:6, 151:13
**fills** [2] - 96:4, 96:6
**final** [5] - 129:7, 129:8, 130:20, 185:21, 186:9
**find** [5] - 85:11, 113:22, 126:22, 162:10, 194:14
**finish** [1] - 177:13
**fired** [1] - 130:4
**firm** [18] - 68:15, 68:19, 70:24, 78:15, 88:19, 89:4, 103:16, 105:7, 107:4, 107:6, 112:3, 112:12, 114:3, 114:20, 116:13, 116:17, 121:12, 124:6
**firm's** [2] - 109:24, 183:5
**first** [23] - 59:3, 61:17, 61:19, 62:22, 63:22, 63:23, 64:11, 92:18, 114:24, 116:21, 117:22, 125:5, 137:8, 137:19, 141:16, 146:16, 156:12, 156:21, 164:15, 166:17, 179:4, 191:25, 203:5
**five** [18] - 74:15, 74:18, 74:20, 80:2, 83:21, 87:22, 119:13, 119:14, 136:4, 167:22, 170:20, 172:2, 174:21, 175:2, 175:7, 176:22, 179:22, 183:3
**FJ** [7] - 129:5, 129:6, 130:16, 130:17, 184:22, 199:7, 199:14
**Flatbush** [1] - 57:10
**folks** [1] - 120:25
**follow** [3] - 102:14, 119:19, 166:5
**follow-up** [1] - 119:19
**following** [1] - 180:19
**follows** [2] - 59:5, 164:18
**forbid** [1] - 197:24
**force** [2] - 58:15, 111:12
**foregoing** [1] - 203:8
**foremost** [1] - 116:21
**FORERO** [2] - 205:7, 205:23
**Forero** [1] - 56:24
**forever** [1] - 155:13
**forget** [1] - 115:25
**form** [15] - 58:21, 60:13, 95:23, 97:20, 103:6, 105:12, 105:14, 150:4, 156:6, 156:10, 157:7, 177:9, 179:3, 179:5, 201:7
**formal** [1] - 119:24

**format** [1] - 98:3
**forms** [1] - 103:6
**forth** [8] - 65:2, 88:6, 96:8, 151:18, 159:10, 193:2, 195:8, 205:11
**forty** [2] - 86:22, 101:22
**forty-three** [1] - 101:22
**forward** [4] - 71:12, 74:10, 93:9, 98:13
**forwarded** [5] - 75:6, 93:13, 93:15, 93:24, 149:14
**forwards** [2] - 92:25, 156:5
**found** [1] - 130:2
**four** [3] - 96:22, 170:21, 170:23
**friends** [1] - 144:12
**front** [6] - 92:4, 92:6, 128:21, 134:24, 135:4, 184:15
**full** [8] - 133:5, 133:8, 133:15, 134:2, 134:3, 171:21, 172:9, 173:7
**FURTHER** [2] - 58:20, 203:8
**further** [2] - 174:24, 205:14

# G

**Garden** [1] - 74:9
**GARDENS** [4] - 56:9, 56:10, 57:15, 57:15
**Gardens** [1] - 108:7
**garnish** [1] - 156:2
**garnished** [4] - 69:22, 69:23, 70:2, 155:21
**garnishee** [7] - 92:21, 92:22, 93:4, 97:3, 97:22, 157:13, 158:24
**garnishing** [2] - 140:22, 155:10
**garnishment** [2] - 137:13, 148:2
**garnishments** [2] - 80:19, 91:9
**GARY** [5] - 56:9, 56:18, 57:14, 203:15
**Gary** [2] - 59:10, 195:18
**gave** [4] - 61:12, 62:5, 62:7, 203:6
**general** [3] - 60:16, 124:21, 159:11
**generally** [17] - 60:7, 67:9, 75:5, 84:24, 91:25, 92:4, 92:5, 117:10, 120:22, 126:14, 126:25, 141:4, 153:11, 166:18, 195:7, 197:18, 199:13

**generated** [3] - 95:23, 157:14, 160:23
**generates** [1] - 158:23
**gentleman** [1] - 189:6
**gets** [4] - 137:6, 142:8, 149:14, 158:17
**gift** [1] - 194:11
**Gigante** [1] - 119:16
**give** [13] - 74:3, 79:9, 91:10, 91:17, 113:9, 117:4, 144:6, 152:22, 171:7, 171:8, 172:5, 195:17, 198:12
**given** [9] - 75:17, 75:18, 100:8, 108:21, 114:3, 115:11, 125:13, 203:10, 205:13
**gives** [2] - 106:21, 168:5
**God** [1] - 197:24
**goes** [10] - 63:2, 66:22, 67:2, 71:12, 71:24, 80:10, 135:14, 140:17, 148:15, 149:12
**good** [8] - 59:14, 80:4, 108:17, 134:13, 134:20, 194:10, 194:14, 201:11
**got** [23] - 61:22, 61:23, 73:15, 73:16, 73:18, 95:22, 114:13, 115:21, 122:15, 122:19, 124:4, 124:17, 130:13, 133:4, 154:21, 163:18, 164:12, 165:10, 165:12, 167:20, 194:10, 196:20, 197:4
**grab** [1] - 198:10
**Grace** [1] - 59:12
**graduated** [2] - 118:25, 119:3
**greater** [3] - 85:20, 140:14, 158:10
**guess** [7] - 63:4, 133:8, 137:8, 142:5, 155:21, 180:13, 195:7
**Gutman** [17] - 89:4, 89:24, 90:3, 90:4, 90:9, 109:20, 112:3, 112:8, 112:15, 121:18, 121:20, 141:16, 143:10, 143:16, 183:6, 183:8, 191:19
**Guttman** [2] - 90:12, 109:18
**guy** [7] - 126:22, 130:3, 134:17, 187:5, 194:18, 194:24
**guys** [1] - 194:24

# H

**half** [2] - 181:18
**hand** [1] - 205:20

**handful** [1] - 90:15
**handled** [1] - 198:3
**hands** [1] - 90:6
**handwriting** [1] - 130:16
**handwritten** [1] - 186:2
**happen** [2] - 122:9, 170:24
**happened** [10] - 89:19, 125:21, 125:23, 125:24, 126:12, 129:25, 141:18, 155:14, 165:15, 167:7
**happening** [1] - 140:15
**happens** [2] - 86:15, 165:18
**hard** [1] - 144:13
**hats** [2] - 109:21, 117:19
**have you** [4] - 102:25, 188:25, 191:21, 193:8
**haven't** [2] - 123:25, 180:3
**he's** [3] - 182:10, 182:11
**head** [1] - 184:7
**headache** [1] - 166:4
**hear** [1] - 97:24
**hearing** [1] - 121:19
**held** [2] - 56:21, 62:16
**help** [1] - 61:3
**HEREBY** [1] - 58:5
**hereby** [2] - 203:4, 205:9
**herein** [1] - 58:7
**hereinbefore** [2] - 203:11, 205:11
**hereunto** [1] - 205:19
**high** [4] - 118:22, 118:24, 119:2, 119:4
**hindsight** [1] - 199:19
**hired** [5] - 115:2, 116:2, 118:2, 118:17, 181:12
**hiring** [1] - 182:18
**history** [2] - 171:8, 172:4
**hold** [1] - 138:2
**holders** [1] - 113:13
**hooked** [1] - 194:9
**hope** [1] - 110:17
**hour** [1] - 91:21
**housing** [16] - 74:6, 113:18, 118:10, 119:11, 125:17, 125:18, 125:20, 126:20, 126:23, 126:24, 145:4, 145:11, 145:13, 199:3, 200:5, 200:7
**how did** [1] - 183:2
**how do** [7] - 69:14, 104:13, 110:5, 127:16, 158:7, 185:24, 186:9
**how many** [18] - 74:8, 76:18, 76:21, 77:3, 77:9, 77:23, 78:10, 78:23, 81:14, 81:18, 81:22, 83:16, 90:8, 90:19,

101:18, 159:3, 193:22, 194:2
**how often** [1] - 75:4
**human** [1] - 152:17
**hundred** [19] - 101:22, 119:13, 119:14, 130:12, 163:3, 168:7, 168:8, 168:9, 169:4, 169:21, 170:3, 170:4, 170:21, 170:23, 174:21, 175:2, 175:7, 179:22, 183:3
**Huntington** [1] - 57:17

**I**

**identification** [10] - 63:14, 104:19, 131:23, 132:2, 178:15, 178:18, 187:17, 187:20, 189:20, 189:23
**identify** [4] - 62:19, 104:25, 132:5, 148:15
**illegal** [1] - 180:9
**imagine** [4] - 123:3, 165:16, 170:19, 170:22
**IN** [1] - 205:19
**inartful** [2] - 98:20, 100:18
**inartfully** [1] - 96:18
**INC** [3] - 56:10, 57:9, 57:16
**incline** [1] - 75:19
**include** [1] - 190:19
**included** [4] - 84:21, 130:25, 172:24, 172:25
**includes** [1] - 61:20
**including** [5] - 94:20, 95:17, 96:23, 102:7, 174:16
**income** [16] - 65:2, 67:19, 68:5, 74:23, 77:9, 104:9, 135:12, 137:5, 139:7, 143:13, 163:23, 164:21, 164:24, 165:17, 165:22, 166:8
**inconsistent** [1] - 140:13
**incorrect** [3] - 65:18, 69:11, 98:19
**incur** [1] - 182:5
**incurred** [3] - 180:20, 182:7, 182:23
**incurs** [2] - 182:10, 182:18
**independent** [1] - 184:17
**independently** [2] - 75:22, 184:13
**index** [13] - 65:20, 96:8, 126:21, 141:3, 143:4, 144:25, 145:2, 145:5, 145:7, 145:10, 145:14,

158:11, 165:10
**indicate** [6] - 106:13, 107:6, 115:19, 127:23, 128:17, 190:23
**indicated** [6] - 64:17, 69:10, 70:7, 166:20, 186:12, 186:14
**indicates** [2] - 130:15, 135:7
**indication** [1] - 196:25
**individual** [2] - 111:19, 194:17
**INFORMATION** [2] - 204:23, 204:24
**information** [40] - 62:22, 63:19, 64:12, 64:22, 64:25, 66:6, 66:11, 66:14, 66:22, 66:25, 67:4, 67:10, 67:14, 67:15, 68:3, 68:4, 69:9, 76:19, 76:23, 77:4, 80:17, 80:18, 84:9, 91:8, 92:2, 92:12, 93:19, 106:14, 115:18, 125:16, 137:16, 138:6, 144:6, 146:5, 148:5, 149:9, 156:3, 156:14, 157:12, 193:8
**informative** [1] - 106:18
**informed** [1] - 171:18
**initially** [3] - 73:15, 75:24, 144:4
**inputs** [1] - 103:8
**inquiry** [1] - 122:25
**insist** [2] - 124:22, 125:2
**instance** [5] - 137:6, 139:23, 155:6, 165:16, 199:17
**institution** [1] - 146:25
**instructed** [1] - 184:4
**intellectually** [1] - 68:20
**intelligent** [2] - 134:16, 134:18
**intend** [1] - 93:9
**intended** [1] - 93:23
**intentionally** [5] - 130:4, 130:5, 130:8, 186:18, 192:2
**interest** [59] - 64:8, 94:21, 94:25, 96:24, 99:4, 99:5, 99:6, 99:16, 99:17, 99:18, 99:23, 101:8, 101:9, 101:15, 101:24, 102:5, 102:8, 102:11, 133:25, 134:21, 135:9, 135:17, 135:19, 135:25, 138:12, 153:16, 158:14, 158:16, 158:18, 160:8, 160:10, 161:10, 161:16, 161:17, 161:18, 161:21, 162:16, 162:25, 168:10,

168:16, 168:19, 168:21, 168:24, 169:5, 169:7, 169:8, 169:10, 169:14, 169:24, 170:3, 170:7, 170:14, 170:16, 170:17, 170:22, 170:25, 171:20, 172:9
**interested** [1] - 103:9, 205:17
**interpret** [3] - 100:8, 176:24, 177:5
**interpretation** [1] - 100:9
**intra** [3] - 82:21, 84:23, 85:15
**intra-office** [2] - 82:21, 85:15
**investigation** [1] - 171:4
**involved** [6] - 71:14, 112:14, 135:14, 147:24, 155:20, 197:25
**IS** [2] - 58:5, 58:20
**is it your** [2] - 105:6, 107:20
**is that** [53] - 60:10, 60:25, 64:5, 64:13, 66:2, 69:11, 70:6, 72:3, 77:25, 83:22, 84:14, 87:17, 87:23, 88:15, 92:14, 95:10, 101:5, 103:18, 111:8, 113:6, 113:8, 114:6, 114:7, 118:13, 120:20, 122:24, 130:23, 140:13, 144:24, 144:25, 145:19, 147:12, 149:25, 152:11, 153:8, 157:4, 157:21, 158:2, 170:8, 171:22, 177:17, 181:6, 181:17, 182:7, 185:5, 186:23, 188:13, 190:10, 190:12, 191:9, 192:11, 193:17, 199:9
**is there** [9] - 95:14, 111:3, 126:3, 127:22, 128:23, 135:6, 136:22, 144:15, 189:8
**is this** [3] - 116:6, 178:22, 187:6
**Island** [2] - 194:12, 194:13
**issuance** [1] - 185:22
**issue** [13] - 71:9, 72:6, 72:12, 73:2, 78:19, 86:22, 87:10, 89:22, 136:13, 149:5, 153:7, 166:11, 176:10
**issued** [5] - 76:16, 86:20, 138:7, 153:4, 179:6
**issues** [1] - 85:3
**issuing** [1] - 79:16
**IT** [6] - 58:5, 58:20,

154:4, 154:10, 154:11,
168:14

## J

**James** [5] - 65:15, 72:24,
132:22, 139:24, 183:13
**JAMES** [3] - 56:4, 57:4,
57:10
**Jane** [1] - 165:4
**January** [3] - 116:2,
116:4, 116:13
**JESSICA** [1] - 57:7
**job** [3] - 85:3, 87:4
**John** [2] - 164:25, 165:3
**Judge** [1] - 58:13
**judge** [1] - 161:8
**judgement** [118] - 64:7,
65:14, 69:21, 70:8, 71:9,
72:5, 74:6, 75:2, 93:2,
96:23, 98:23, 101:4,
101:23, 103:12, 103:21,
104:2, 105:4, 109:10,
110:19, 110:23, 111:7,
111:9, 111:13, 113:5,
113:19, 113:24, 114:9,
114:15, 119:8, 120:16,
120:19, 121:9, 122:10,
122:23, 123:5, 123:6,
123:25, 124:7, 124:15,
124:23, 125:12, 126:7,
128:14, 129:9, 129:11,
129:12, 130:19, 130:20,
131:4, 131:16, 133:19,
133:23, 135:3, 135:8,
135:21, 135:23, 135:25,
136:9, 136:23, 138:13,
138:18, 139:5, 139:11,
139:22, 140:20, 141:14,
145:9, 147:22, 148:7,
148:13, 148:16, 150:7,
150:23, 152:22, 152:24,
153:18, 158:10, 158:25,
160:21, 163:9, 165:4,
166:13, 168:17, 168:18,
169:2, 169:15, 169:19,
170:15, 171:21, 172:10,
173:2, 183:13, 183:17,
183:23, 183:25, 184:2,
184:4, 184:25, 185:4,
185:11, 185:15, 185:16,
186:9, 191:22, 196:7,
196:16, 196:21, 196:23,
197:7, 198:24, 199:8,
199:21, 199:23, 200:17,
200:18, 200:19, 201:16
**judgements** [6] - 67:22,
68:2, 74:21, 86:16, 126:5,
162:5
**judgment** [130] - 65:18,
66:5, 68:7, 70:8, 70:14,

71:25, 72:2, 72:6, 72:11,
72:15, 73:2, 73:7, 73:11,
73:20, 74:2, 74:6, 74:15,
75:8, 75:20, 76:15, 79:9,
79:16, 79:20, 80:11,
80:12, 87:8, 87:9, 91:6,
93:3, 94:13, 95:8, 95:14,
100:22, 103:17, 103:22,
103:25, 104:3, 105:12,
105:14, 108:10, 110:21,
113:25, 114:5, 114:21,
115:7, 117:9, 120:14,
122:13, 122:24, 123:4,
123:10, 123:23, 124:11,
125:3, 127:20, 128:2,
128:7, 128:18, 128:25,
129:7, 129:8, 129:14,
129:19, 130:17, 132:24,
133:2, 134:19, 136:7,
136:13, 136:20, 138:10,
140:11, 140:12, 140:16,
140:18, 140:21, 141:2,
141:3, 141:11, 141:16,
143:4, 143:17, 144:17,
145:6, 146:23, 149:21,
151:10, 152:3, 152:11,
153:7, 153:15, 156:7,
156:22, 156:25, 157:3,
160:11, 161:13, 161:20,
162:24, 163:4, 163:16,
163:17, 163:24, 164:9,
165:2, 165:14, 165:21,
167:6, 167:16, 167:18,
168:23, 170:17, 170:21,
172:19, 172:23, 173:25,
174:3, 174:7, 174:12,
183:18, 185:8, 185:12,
185:21, 195:23, 196:7,
196:16, 197:6, 197:16,
200:10
**judgments** [5] - 67:10,
71:22, 74:19, 121:25,
136:5
**July** [2] - 132:10, 186:8
**jumble** [1] - 117:24
**jump** [1] - 186:16
**June** [2] - 71:19, 167:21
**jury** [1] - 79:10

## K

**Kavulich** [12] - 59:10,
61:4, 104:23, 173:15,
173:21, 178:22, 179:10,
187:25, 188:2, 192:7
**KAVULICH** [8] - 56:9,
56:9, 56:17, 56:18, 56:19,
57:14, 57:15, 203:15
**keep** [7] - 82:23, 100:6,
139:18, 140:5, 140:23,
166:4, 168:11

**keeps** [1] - 165:13
**kept** [2] - 132:21, 132:22
**KESHAVARZ** [22] - 57:3,
57:6, 59:7, 60:6, 60:12,
61:2, 61:19, 62:7, 62:14,
63:8, 92:7, 104:15,
131:21, 160:2, 173:18,
178:13, 187:15, 189:18,
191:13, 192:6, 201:23,
204:21
**Keshavarz** [1] - 56:22
**KINGS** [1] - 205:5
**know** [113] - 59:17,
59:21, 60:9, 60:17, 60:22,
61:9, 66:8, 68:11, 69:14,
69:23, 83:7, 85:17, 88:4,
90:14, 91:23, 97:11, 98:6,
98:7, 99:13, 101:18,
101:20, 103:5, 104:10,
104:13, 108:7, 112:18,
113:10, 114:12, 115:24,
118:16, 118:18, 118:20,
118:23, 118:25, 119:3,
119:12, 120:2, 120:5,
120:7, 121:22, 123:18,
125:21, 126:13, 127:16,
127:18, 128:12, 128:14,
128:15, 130:18, 133:18,
133:24, 134:5, 134:8,
137:2, 138:22, 141:19,
141:22, 144:7, 146:16,
152:9, 153:6, 154:21,
155:25, 156:7, 156:11,
156:13, 156:16, 156:23,
157:10, 158:22, 161:13,
161:15, 161:16, 162:25,
163:9, 164:14, 165:25,
167:2, 167:3, 169:7,
169:17, 170:6, 170:24,
171:3, 172:12, 175:8,
183:10, 184:7, 185:24,
186:9, 186:22, 188:15,
188:18, 188:20, 188:24,
189:4, 189:10, 191:7,
191:11, 191:12, 192:5,
193:15, 194:12, 194:16,
196:2, 197:21, 199:10,
199:12, 201:16, 201:20,
201:22
**knowing** [1] - 150:19
**knowledge** [4] - 108:6,
123:16, 131:12, 183:8
**KOVEN** [1] - 57:11

## L

**lady** [1] - 155:20
**landlord** [45] - 109:19,
109:25, 110:6, 110:8,
110:10, 110:15, 111:6,
111:18, 111:22, 111:24,

112:5, 112:11, 112:15,
113:2, 114:17, 114:22,
115:3, 115:8, 115:14,
119:18, 120:20, 121:4,
121:15, 121:19, 122:20,
123:9, 124:6, 124:24,
125:14, 126:5, 127:6,
145:2, 145:7, 172:15,
173:25, 174:6, 174:8,
176:2, 176:8, 180:25,
181:13, 182:18, 182:22,
185:10, 196:12
**landlord's** [1] - 181:17
**landlord-tenant** [38] -
109:19, 109:25, 110:6,
110:8, 110:10, 110:15,
111:18, 111:22, 111:24,
112:5, 112:11, 112:15,
113:2, 114:17, 114:22,
115:3, 115:8, 115:14,
119:18, 120:20, 121:4,
121:15, 121:19, 122:20,
123:9, 124:6, 124:24,
125:14, 126:5, 127:6,
145:2, 172:15, 173:25,
174:6, 174:8, 176:2,
185:10, 196:12
**landlords** [3] - 179:7,
181:7, 181:15
**language** [3] - 146:9,
146:17, 179:21
**Laos** [3] - 71:16, 136:11
**lapse** [1] - 118:10
**large** [1] - 118:10
**last** [7] - 61:16, 83:21,
94:7, 95:4, 115:25,
144:23, 176:22
**late** [3] - 59:17, 176:17,
177:7
**later** [6] - 85:11, 113:18,
115:10, 165:7, 169:3,
169:20
**law** [3] - 68:15, 68:19,
123:19
**Law** [1] - 56:22
**LAW** [2] - 57:3, 57:7
**Lawrence** [1] - 189:7
**lawsuit** [21] - 71:15, 79:5,
79:13, 108:18, 113:16,
120:14, 150:14, 150:18,
151:4, 151:6, 172:16,
173:8, 175:3, 178:24,
182:19, 182:22, 183:12,
183:16, 188:3, 190:8,
197:17
**lawsuits** [7] - 77:20,
109:19, 112:5, 112:11,
112:15, 180:11
**layout** [2] - 156:20
**learned** [1] - 171:12

**Lease** [1] - 204:13
**lease** [22] - 106:4, 107:11, 113:13, 115:12, 175:8, 175:12, 175:18, 175:24, 176:4, 176:10, 176:18, 176:24, 177:2, 177:5, 177:10, 177:16, 178:11, 178:23, 179:3, 179:5, 180:7, 180:10
**lease-holders** [1] - 113:13
**leases** [3] - 177:25, 178:8, 179:8
**least** [2] - 59:23, 129:23
**leave** [5] - 59:18, 89:8, 115:13, 166:6, 192:8
**left** [12] - 59:16, 72:9, 122:11, 134:4, 138:18, 141:16, 141:19, 143:14, 143:15, 154:9, 164:18, 170:22
**LEGAL** [1] - 57:9
**legal** [12] - 118:9, 119:19, 119:20, 119:25, 120:3, 120:6, 175:23, 176:17, 177:7, 180:8, 181:23, 182:13
**let's** [22] - 59:15, 59:16, 63:8, 64:11, 76:13, 76:16, 76:18, 79:22, 92:7, 95:5, 100:14, 100:16, 100:21, 148:11, 157:11, 165:6, 165:7, 168:22, 170:4, 172:14, 191:13, 193:7
**letter** [5] - 108:16, 144:21, 156:10, 156:25, 157:8
**letters** [4] - 78:24, 91:7, 108:11, 156:6
**level** [1] - 144:10
**levy** [2] - 63:4, 63:6
**liability** [1] - 191:17
**liaison** [1] - 119:18
**likelihood** [1] - 134:20
**limitation** [1] - 107:7
**limitations** [8] - 105:11, 105:17, 105:21, 106:2, 106:9, 106:11, 106:15, 106:25
**line** [5] - 95:4, 98:24, 109:6, 164:15, 177:13
**lines** [2] - 95:7, 157:5
**lingo** [2] - 129:10, 130:17
**list** [4] - 74:3, 75:14, 164:6, 195:19
**listed** [3] - 64:3, 72:23, 73:11
**lists** [4] - 71:24, 82:23, 86:11, 86:24
**litigation** [2] - 109:22,

113:21
**little** [6] - 80:21, 85:10, 88:11, 91:14, 152:5, 163:5
**logistics** [1] - 59:17
**Long** [2] - 194:12, 194:13
**long** [5] - 91:22, 118:16, 118:19, 144:9, 180:4
**longer** [2] - 122:7, 194:5
**look** [25] - 87:6, 92:19, 94:3, 94:6, 123:4, 125:16, 126:10, 126:23, 127:2, 134:18, 138:3, 138:4, 138:5, 148:12, 154:14, 159:3, 170:12, 176:2, 176:3, 176:10, 177:6, 177:11, 177:24, 178:7, 189:13
**looked** [6] - 125:7, 156:17, 157:7, 180:3, 184:24, 196:5
**looking** [16] - 97:2, 108:19, 109:5, 132:17, 133:9, 133:12, 133:13, 146:20, 155:7, 162:20, 162:23, 164:3, 164:6, 185:3, 195:16, 200:23
**looks** [3] - 129:3, 136:12, 173:4
**losing** [2] - 182:10, 182:11
**lost** [1] - 130:13
**lot** [3] - 86:9, 86:10, 144:8
**LP** [2] - 56:9, 57:15

## M

**mail** [8] - 83:2, 117:2, 163:12, 197:23, 198:10, 198:11, 201:19, 201:24
**mailed** [5] - 190:13, 190:16, 190:25, 191:8, 197:22
**mails** [8] - 61:5, 61:9, 61:11, 61:14, 61:15, 62:2, 88:6, 201:13
**main** [1] - 71:12
**major** [4] - 67:24, 83:4, 86:24, 90:24
**management** [12] - 107:23, 108:3, 118:13, 119:15, 192:15, 192:21, 192:24, 193:4, 193:18, 193:20, 195:9, 195:14
**manually** [4] - 161:23, 162:9, 162:10, 167:4
**March** [20] - 64:17, 66:7, 94:21, 95:9, 95:14, 101:10, 101:25, 108:24,

109:8, 114:12, 115:21, 116:18, 128:10, 138:8, 138:24, 148:14, 148:16, 149:2, 174:14, 174:16
**mark** [8] - 62:11, 62:17, 63:8, 104:15, 131:21, 178:13, 187:15, 189:18
**marked** [11] - 63:12, 63:17, 104:18, 104:22, 131:25, 132:5, 178:17, 178:21, 187:19, 187:23, 189:22
**marriage** [1] - 205:16
**Marsh** [3] - 189:7, 189:13, 189:16
**Marshal** [1] - 63:4
**marshal** [74] - 63:25, 64:5, 64:8, 64:9, 64:10, 70:9, 92:24, 92:25, 93:5, 93:9, 93:16, 134:6, 135:12, 135:14, 137:4, 137:6, 139:3, 139:5, 139:10, 139:15, 139:16, 139:23, 139:25, 140:2, 140:8, 140:10, 140:11, 141:5, 141:11, 141:17, 141:23, 141:25, 142:9, 142:14, 142:18, 142:20, 142:23, 143:5, 143:9, 143:16, 144:4, 144:18, 145:17, 145:18, 147:20, 149:7, 155:17, 163:12, 165:11, 165:12, 165:19, 166:6, 166:7, 166:11, 166:14, 166:15, 166:17, 166:21, 166:25, 167:10, 167:11, 167:14, 167:25, 168:5, 168:11, 170:25, 171:8, 171:18, 171:19, 171:24, 172:8, 172:13, 201:14, 201:20
**marshals** [3] - 141:6, 165:9, 165:23
**matches** [1] - 81:5
**math** [6] - 134:12, 134:13, 134:16, 154:24, 161:22, 161:23
**matter** [3] - 154:10, 186:24, 205:18
**mean** [29] - 68:8, 68:18, 68:22, 68:24, 69:17, 73:14, 80:9, 81:8, 84:6, 86:12, 99:6, 101:14, 101:21, 111:3, 111:4, 111:24, 112:23, 116:23, 120:5, 141:15, 143:11, 144:10, 144:24, 147:25, 167:12, 169:9, 179:3, 192:3, 195:11
**meaning** [2] - 82:15,

122:6
**means** [3] - 99:17, 129:6, 130:17
**meant** [1] - 199:14
**measures** [1] - 111:5
**mechanism** [5] - 72:7, 72:11, 72:16, 73:3, 136:14
**mechanisms** [5] - 67:25, 72:3, 76:16, 79:17, 91:7
**meet** [1] - 83:2
**meetings** [4] - 82:21, 84:23, 85:15, 85:24
**MELISSA** [1] - 57:11
**members** [1] - 85:2
**mentioned** [3] - 134:10, 197:20, 197:25
**Mercedes** [11] - 115:25, 116:12, 118:7, 119:5, 125:7, 125:24, 176:19, 176:23, 177:14, 178:9, 198:12
**Mercedes'** [1] - 197:15
**metaphysical** [1] - 123:2
**metaphysically** [3] - 171:2, 191:10, 191:11
**Metropolitan** [4] - 192:18, 194:7, 194:24, 198:20
**middle** [1] - 164:16
**mind** [3] - 78:22, 82:10, 192:3
**minimum** [1] - 82:23
**miniscule** [1] - 159:4
**minor** [2] - 157:23, 158:2
**Mintz** [18] - 89:4, 89:24, 90:3, 90:4, 90:9, 109:18, 109:20, 112:3, 112:8, 112:15, 121:18, 121:20, 141:16, 143:10, 143:16, 183:6, 183:9, 191:19
**minute** [2] - 76:13, 180:23
**minutes** [1] - 143:8
**mischaracterizing** [1] - 134:9
**misread** [2] - 125:24, 126:12
**Miss** [49] - 70:2, 70:16, 73:10, 75:7, 75:25, 76:9, 108:21, 115:20, 124:4, 126:6, 127:7, 127:20, 128:2, 128:14, 128:19, 129:2, 129:15, 129:20, 131:4, 131:17, 132:9, 133:6, 133:16, 135:2, 136:21, 139:7, 139:25, 140:8, 145:6, 145:17, 152:16, 163:6, 163:16, 165:11, 167:21, 172:17, 172:18, 173:9, 173:23,

188:8, 188:17, 190:7,
190:9, 190:25, 191:7,
198:25, 199:9, 199:20,
199:25
**missing** [1] - 65:20
**mistake** [3] - 97:9,
101:20, 139:12
**mistaken** [2] - 61:13,
64:24
**mistakenly** [1] - 152:17
**Mitch** [2] - 61:12, 62:6
**MITCHELL** [2] - 57:13,
57:17
**moment** [2] - 165:6,
165:8
**momentary** [1] - 183:20
**Monday** [1] - 156:12
**monetary** [1] - 131:16
**money** [58] - 66:23,
105:9, 105:12, 105:13,
105:18, 110:14, 110:16,
113:5, 113:24, 114:4,
114:15, 114:20, 115:7,
120:19, 122:24, 123:5,
123:10, 123:11, 123:23,
123:24, 124:22, 125:3,
125:12, 126:7, 127:19,
128:2, 128:13, 128:18,
128:25, 129:14, 129:19,
130:17, 132:23, 133:4,
133:6, 137:3, 137:6,
144:8, 145:5, 148:17,
148:21, 152:16, 154:9,
159:6, 166:12, 172:19,
173:25, 174:3, 174:7,
182:11, 185:4, 185:8,
185:15, 185:16, 197:7,
199:8, 201:3
**monies** [16] - 69:24,
69:25, 70:16, 90:6,
140:19, 146:18, 146:19,
152:13, 153:14, 170:10,
174:13, 174:14, 174:15,
182:11, 182:15, 196:4
**month** [9] - 76:21, 77:11,
77:13, 169:3, 169:12,
169:20, 169:24
**MOODY** [1] - 57:7
**MORALES** [3] - 56:4,
57:4, 57:10
**morales** [6] - 190:6,
192:3, 193:10, 199:22,
199:24, 200:20
**Morales** [55] - 61:6, 62:3,
62:13, 62:19, 63:18,
65:15, 70:4, 72:24, 73:10,
73:21, 75:7, 76:2, 76:8,
93:10, 98:19, 103:21,
103:23, 103:25, 104:23,
105:8, 105:9, 105:22,

106:6, 106:16, 108:21,
115:21, 124:5, 126:6,
127:8, 131:5, 132:10,
132:22, 133:16, 135:2,
139:24, 140:21, 145:10,
145:19, 152:18, 163:7,
163:17, 165:13, 172:17,
173:9, 173:16, 183:13,
185:5, 185:9, 188:8,
188:17, 190:4, 190:9,
190:25, 191:8, 198:25
**Morales'** [1] - 106:3
**morning** [1] - 59:14
**Moses** [6] - 141:8,
141:17, 142:12, 143:10,
143:16, 144:4
**mostly** [3] - 175:5,
175:11, 175:19
**motion** [2] - 87:9, 112:21
**motions** [1] - 78:7
**move** [5] - 94:5, 100:16,
101:21, 172:14
**moved** [5] - 71:16, 102:6,
120:25, 122:16, 122:17
**Mr** [52] - 61:4, 61:5, 62:3,
70:4, 73:10, 75:7, 76:2,
76:8, 93:10, 98:19,
103:21, 103:23, 103:25,
105:7, 105:9, 105:22,
106:3, 106:16, 108:21,
115:21, 124:4, 126:6,
127:7, 131:4, 132:9,
133:16, 140:21, 145:19,
152:18, 163:7, 163:17,
165:13, 172:17, 173:9,
185:5, 185:9, 188:8,
188:17, 189:15, 189:16,
190:4, 190:6, 190:9,
190:25, 191:7, 192:3,
192:7, 193:10, 198:25,
199:22, 199:24, 200:19
**MR** [36] - 59:7, 59:25,
60:2, 60:8, 60:12, 60:14,
61:2, 61:16, 61:19, 62:7,
62:9, 62:14, 63:8, 74:11,
74:16, 89:12, 89:16,
90:10, 90:22, 91:2, 92:7,
100:5, 104:15, 108:14,
131:21, 160:2, 173:18,
178:13, 187:15, 189:18,
191:13, 192:6, 192:12,
201:10, 201:23, 204:21
**Mrs** [1] - 189:15
**Ms** [1] - 190:4
**multiple** [4] - 113:3,
123:9, 144:17
**myself** [1] - 183:24

## N

**name** [5] - 59:8, 115:25,

117:4, 163:24, 189:6
**named** [1] - 95:8
**names** [3] - 96:5, 96:7,
113:20
**narrow** [1] - 100:11
**necessarily** [2] - 66:15,
115:23
**necessary** [2] - 84:9,
193:15
**need** [4] - 79:10, 89:2,
130:18, 155:16
**neglected** [2] - 139:2,
139:4
**never** [8] - 111:21,
112:21, 129:14, 139:21,
153:14, 156:15, 191:25,
194:14
**NEW** [2] - 56:2, 205:4
**next** [3] - 98:24, 155:24,
201:25
**nice** [1] - 142:4
**night** [1] - 61:17
**nine** [3] - 77:19, 169:3,
169:21
**ninety** [3] - 77:19,
168:25, 169:5
**ninety-nine** [1] - 77:19
**nobody** [1] - 130:7
**non** [5] - 134:16, 136:11,
142:5, 191:23, 199:23
**non-attorney** [1] -
136:11
**non-clinical** [1] - 142:5
**non-existent** [1] - 191:23
**non-judgement** [1] -
199:23
**non-math** [1] - 134:16
**none** [1] - 78:21
**NONE** [1] - 204:25
**normally** [2] - 196:10,
196:15
**notarized** [1] - 189:11
**Notary** [3] - 56:24, 59:4,
205:7
**NOTARY** [1] - 203:22
**notation** [2] - 124:19,
130:23
**note** [5] - 186:13, 197:15,
198:16, 199:4, 199:6
**noted** [1] - 136:3
**notes** [14] - 105:3,
127:17, 130:14, 176:17,
177:3, 178:9, 183:23,
184:12, 186:3, 186:5,
190:23, 197:11
**nothing** [4] - 164:23,
190:22, 195:2, 195:3
**Notice** [5] - 56:20, 190:2,
190:24, 191:9, 204:15
**notice** [31] - 62:23,

64:13, 66:7, 67:2, 67:5,
79:3, 79:6, 79:11, 79:12,
79:19, 79:23, 80:8, 80:10,
86:23, 87:2, 87:10, 92:20,
93:20, 97:3, 97:22,
112:19, 137:17, 138:7,
150:5, 151:7, 151:25,
152:8, 157:13, 158:23,
184:8
**notices** [19] - 68:5,
78:16, 78:18, 78:19, 79:2,
79:25, 80:20, 81:4, 81:17,
81:18, 81:21, 81:22, 82:5,
91:8, 153:21, 170:13,
170:14, 190:16
**notify** [1] - 190:8
**noting** [1] - 136:17
**November** [2] - 61:22,
61:23
**november** [1] - 56:13
**nowadays** [1] - 113:7
**number** [21] - 64:12,
65:7, 65:20, 71:21, 95:4,
96:8, 104:7, 104:11,
109:21, 126:21, 141:3,
143:4, 145:10, 145:14,
158:11, 158:17, 159:4,
162:19, 165:10, 183:2,
193:25
**NUMBER** [1] - 204:7
**numbers** [8] - 76:17,
81:2, 81:6, 96:5, 140:6,
151:15, 151:16, 166:9

## O

**oath** [1] - 58:12
**object** [2] - 60:9, 60:24
**objected** [1] - 60:12
**objection** [8] - 74:11,
74:16, 89:12, 89:16,
90:10, 90:22, 91:2, 108:14
**objections** [1] - 58:21
**obligation** [1] - 182:17
**obtain** [2] - 124:14,
183:17
**obtained** [1] - 127:19
**obviously** [1] - 106:7
**occupancy** [2] - 175:15,
176:18
**occurring** [1] - 99:6
**October** [2] - 106:23,
106:24
**OF** [4] - 56:2, 57:3,
205:4, 205:5
**off-the-record** [1] - 62:15
**office** [50] - 71:7, 75:17,
77:17, 79:12, 81:3, 82:12,
82:21, 84:23, 85:15,
88:18, 91:13, 94:4, 95:24,

96:12, 104:24, 107:15, 109:13, 117:23, 125:11, 126:4, 126:15, 127:18, 128:25, 129:13, 131:10, 132:8, 136:5, 138:7, 138:22, 139:9, 139:20, 141:4, 144:16, 146:13, 147:12, 147:21, 151:4, 152:9, 153:5, 157:15, 158:22, 160:23, 161:12, 168:13, 188:13, 190:8, 192:10, 193:13, 193:16, 199:5

**OFFICE** [1] - 57:3
**Office** [1] - 56:22
**office's** [2] - 114:14, 126:2
**okay** [2] - 61:25, 68:12
**old** [8] - 88:19, 89:4, 118:20, 141:14, 141:15, 163:25, 166:21, 183:4
**once** [8] - 70:7, 75:5, 80:13, 126:21, 135:11, 135:14, 155:25, 156:2
**one-year** [1] - 169:16
**ones** [3] - 62:20, 82:10, 103:5
**open** [4] - 82:20, 117:17, 199:17, 199:19
**opened** [13] - 88:18, 117:22, 128:4, 128:5, 129:23, 146:13, 146:16, 147:12, 151:4, 183:22, 196:2, 199:20, 199:21
**opening** [4] - 84:5, 84:6, 84:21, 193:9
**opens** [1] - 177:15
**operation** [1] - 154:14
**opposed** [5] - 117:9, 119:7, 141:11, 159:9, 186:10
**oral** [1] - 81:11
**order** [4] - 63:21, 111:12, 115:6, 120:19
**orders** [1] - 120:21
**original** [3] - 58:9, 58:17, 105:19
**otherwise** [2] - 175:14, 182:9
**ourselves** [1] - 133:3
**outcome** [1] - 205:17
**oversight** [2] - 70:18, 153:3
**owe** [6] - 105:17, 134:15, 155:13, 162:17, 168:25, 169:5
**owed** [15] - 105:12, 105:13, 117:5, 132:13, 132:23, 134:8, 134:21, 135:8, 135:9, 152:16,

154:25, 155:3, 155:4, 170:10, 182:12
**owes** [2] - 105:8, 105:9
**owing** [2] - 133:4, 196:4
**owned** [1] - 152:18
**owner** [7] - 110:24, 179:15, 179:16, 180:10, 180:12, 180:18, 180:20
**owner's** [2] - 179:18, 180:18

## P

**P.C** [3] - 56:9, 56:17, 57:14
**P.M** [1] - 202:2
**page** [13] - 62:22, 63:3, 109:2, 128:9, 146:21, 146:23, 156:20, 164:4, 164:16, 179:4, 180:6, 180:7, 180:21
**PAGE** [3] - 204:6, 204:20, 204:24
**pages** [5] - 62:20, 62:24, 130:11, 130:12, 173:20
**paid** [10] - 134:2, 134:3, 134:19, 155:22, 161:15, 163:8, 163:15, 171:9, 181:13, 182:15
**paper** [1] - 64:20
**papers** [2] - 120:10, 131:2
**paragraph** [5] - 92:19, 137:19, 179:11, 180:21, 180:22
**paranoia** [1] - 142:6
**paranoid** [2] - 141:20, 141:21
**parenthesis** [2] - 104:23, 173:16
**Park** [1] - 57:16
**part** [4] - 89:14, 95:11, 157:2, 194:23
**partially** [1] - 137:14
**particular** [10] - 64:19, 71:13, 72:15, 75:16, 124:18, 141:9, 166:5, 193:20, 194:4, 198:13
**parties** [9] - 58:7, 95:8, 96:7, 112:25, 115:5, 117:5, 148:15, 190:17, 205:15
**PASHKIN** [18] - 57:13, 57:17, 59:25, 60:8, 60:14, 61:16, 62:9, 74:11, 74:16, 89:12, 89:16, 90:10, 90:22, 91:2, 100:5, 108:14, 192:12, 201:10
**pasting** [1] - 171:13
**pay** [6] - 155:25, 169:3,

179:14, 179:16, 181:2, 182:6
**paying** [3] - 123:20, 123:22, 155:13
**payment** [10] - 110:20, 112:24, 155:3, 165:10, 168:8, 169:12, 169:18, 169:25, 171:7, 172:4
**payments** [22] - 104:8, 148:9, 149:25, 152:23, 153:18, 155:8, 160:20, 161:7, 161:21, 161:25, 162:2, 162:6, 163:15, 164:7, 164:12, 165:2, 165:12, 166:14, 167:20, 168:20, 169:16, 172:6
**pays** [2] - 140:19, 169:21
**people** [11] - 115:12, 115:16, 116:11, 133:2, 142:4, 154:4, 155:6, 165:4, 168:15, 196:3, 199:15
**people's** [1] - 118:4
**percent** [16] - 77:19, 82:16, 83:10, 83:11, 83:19, 83:20, 84:2, 84:13, 85:7, 85:9, 85:23, 86:5, 87:14, 87:22, 168:24, 170:2
**percentage** [16] - 83:8, 84:11, 84:19, 85:5, 85:14, 85:21, 85:25, 87:12, 88:8, 159:5, 159:13, 159:14, 159:16, 159:17, 181:3, 181:25
**percentage-wise** [1] - 159:5
**period** [5] - 76:20, 142:17, 142:22, 151:2, 169:16
**person** [17] - 70:19, 70:20, 71:7, 71:12, 110:9, 114:8, 115:12, 115:17, 116:10, 117:6, 118:9, 137:11, 140:24, 154:23, 154:24, 163:19
**person's** [2] - 130:5, 130:6
**personality** [1] - 194:9
**personally** [3] - 71:3, 144:11, 198:3
**persons** [3] - 72:23, 73:6, 145:14
**petition** [1] - 112:19
**photocopy** [1] - 196:6
**phrase** [3] - 100:12, 100:22, 102:9
**phrases** [1] - 102:19
**physical** [3] - 124:15, 125:3, 126:17

**physically** [4] - 193:13, 198:13, 198:14, 198:15
**pick** [10] - 59:15, 74:3, 84:8, 148:10, 195:18, 197:19, 197:23, 198:6, 198:8, 201:24
**picked** [3] - 129:4, 130:15, 198:4
**piece** [1] - 64:19
**pile** [1] - 130:25
**place** [3] - 90:5, 203:11
**placed** [2] - 89:23, 142:20
**PLAINTIFF** [1] - 56:5
**plaintiff** [2] - 74:9, 174:19
**Plaintiff** [3] - 56:19, 57:4, 57:9
**PLAINTIFF'S** [1] - 204:4
**Plaintiff's** [23] - 63:10, 63:12, 66:2, 104:16, 104:18, 104:22, 131:22, 131:25, 132:5, 133:9, 133:13, 133:14, 144:25, 173:19, 178:14, 178:17, 178:21, 187:16, 187:19, 187:23, 189:19, 189:22, 189:25
**play** [1] - 181:7
**pleadings** [1] - 77:17
**Please** [1] - 59:8
**please** [5] - 131:21, 138:5, 178:13, 187:16, 189:19
**plus** [4] - 135:25, 153:16, 161:9, 169:24
**point** [12] - 73:9, 118:9, 121:24, 122:15, 129:23, 139:14, 167:15, 171:17, 179:9, 182:23, 194:21, 201:11
**policy** [5] - 150:25, 151:3, 167:8, 167:9, 167:12
**pop** [1] - 86:14
**pop-up** [1] - 86:14
**pops** [4] - 71:24, 75:2, 136:10, 136:21
**position** [3] - 103:16, 105:7, 105:20
**possession** [15] - 107:5, 110:19, 110:22, 110:25, 111:2, 111:7, 111:9, 111:14, 122:5, 126:4, 128:13, 129:14, 130:24, 131:6, 134:25
**possessor** [1] - 130:18
**possessory** [11] - 120:18, 120:21, 121:9, 121:24, 122:10, 122:13,

122:23, 123:3, 123:6, 126:7, 129:9
**possibility** [2] - 120:23, 123:2
**post** [18] - 71:9, 72:2, 72:6, 72:11, 72:15, 73:2, 73:20, 74:2, 74:6, 76:15, 79:16, 79:20, 91:6, 110:8, 122:5, 124:24, 136:13, 143:17
**post-judgement** [1] - 71:9
**post-judgment** [12] - 72:2, 72:6, 72:15, 73:20, 74:2, 74:6, 76:15, 79:16, 79:20, 91:6, 136:13, 143:17
**Potter** [63] - 69:20, 70:2, 70:16, 72:24, 73:11, 73:22, 75:7, 75:25, 76:9, 103:23, 104:2, 104:4, 108:21, 115:21, 124:4, 126:6, 127:7, 127:20, 128:3, 128:14, 128:19, 129:2, 129:15, 129:20, 131:4, 131:17, 132:9, 133:6, 133:16, 135:2, 136:21, 139:8, 140:2, 140:8, 140:18, 140:19, 145:6, 145:10, 145:17, 152:16, 163:7, 163:16, 163:21, 163:22, 165:11, 167:21, 172:17, 172:18, 173:9, 173:24, 174:7, 188:8, 188:17, 190:4, 190:7, 190:9, 190:25, 191:7, 198:25, 199:9, 199:20, 199:25
**poundage** [6] - 64:3, 64:10, 135:13, 135:17, 135:18, 135:19
**practice** [3] - 109:24, 115:10, 117:22
**Prage** [1] - 201:9
**premises** [1] - 127:14
**present** [6] - 79:10, 97:23, 98:4, 150:6, 150:11, 157:21
**presently** [1] - 102:17
**pretty** [3] - 83:6, 92:3, 171:5
**prevent** [1] - 144:23
**primarily** [3] - 72:10, 109:18, 110:2
**primary** [7] - 109:22, 109:24, 111:8, 111:10, 111:16, 116:19, 116:21
**principal** [2] - 168:9, 168:17
**print** [1] - 154:16

**printed** [1] - 70:22
**prints** [1] - 64:24
**prior** [9] - 79:12, 79:15, 107:18, 109:10, 109:16, 116:6, 125:3, 128:7, 196:11
**probably** [11] - 77:6, 85:7, 85:16, 87:18, 87:25, 142:25, 157:6, 157:23, 166:22, 200:12
**problematic** [1] - 165:24
**problems** [2] - 82:24, 87:19
**Procedure** [1] - 56:21
**procedure** [3] - 111:11, 114:14, 191:12
**proceed** [2] - 74:5, 75:20
**proceedings** [1] - 180:9
**process** [12] - 63:18, 63:21, 121:10, 150:12, 181:10, 184:4, 188:11, 188:24, 188:25, 189:12, 189:16, 198:18
**produced** [3] - 62:4, 187:9, 187:24
**production** [4] - 109:2, 128:24, 129:21, 131:19
**productive** [1] - 101:22
**program** [1] - 71:21
**progressed** [1] - 195:6
**Properties** [3] - 192:18, 192:24, 198:21
**properties** [1] - 196:4
**property** [22] - 63:3, 107:23, 108:3, 110:12, 110:19, 110:24, 111:13, 118:13, 121:11, 135:11, 137:23, 143:13, 146:2, 148:3, 149:8, 164:21, 192:15, 192:21, 193:3, 193:18, 195:9, 195:14
**provide** [4] - 106:14, 125:11, 126:9
**provided** [7] - 107:15, 109:13, 131:5, 131:6, 131:10, 188:12, 193:9
**provision** [1] - 176:4
**Public** [3] - 56:24, 59:4, 205:7
**PUBLIC** [1] - 203:22
**pull** [3] - 75:15, 113:19, 127:2
**punishing** [1] - 89:9
**punitive** [7] - 105:4, 105:22, 140:12, 141:2, 141:10, 143:4, 163:17
**pure** [1] - 74:7
**purpose** [3] - 109:23, 111:8, 111:10
**purposely** [2] - 139:21,

139:23
**purposes** [4] - 59:24, 60:3, 60:7, 130:19
**pursuant** [2] - 56:19, 197:10
**pursue** [1] - 137:12
**pursued** [1] - 73:7
**puts** [2] - 109:11, 176:20
**putting** [4] - 103:14, 140:25, 161:18, 161:21

## Q

**qualifications** [1] - 118:6
**quantify** [1] - 86:10
**Queens** [1] - 141:23
**question** [19] - 60:21, 69:3, 69:6, 79:5, 85:13, 97:24, 99:7, 99:9, 99:25, 103:15, 124:21, 125:10, 134:24, 147:8, 151:24, 152:19, 154:21, 154:22, 173:23
**questioning** [1] - 177:13
**questions** [4] - 59:20, 60:5, 79:9, 157:2
**quick** [1] - 191:14

## R

**ran** [1] - 105:21
**range** [3] - 77:12, 106:21, 106:22
**rare** [1] - 165:18
**rate** [2] - 175:17, 180:18
**raw** [1] - 144:7
**re** [1] - 179:14
**re-rented** [1] - 179:14
**reached** [1] - 125:7
**reaching** [1] - 142:7
**read** [15] - 74:4, 94:17, 95:2, 95:19, 101:17, 101:19, 102:3, 102:4, 103:13, 103:14, 137:18, 179:11, 180:14, 180:23, 200:13
**reading** [3] - 97:3, 148:17, 183:23
**Real** [1] - 179:6
**realized** [2] - 184:3, 186:8
**rearranged** [1] - 102:20
**reason** [7] - 60:21, 121:5, 121:8, 141:10, 155:20, 194:4, 200:23
**reasonable** [4] - 69:4, 82:3, 98:14, 174:22
**reasons** [2] - 89:15, 115:2
**recalculate** [1] - 169:6

**recall** [4] - 147:6, 184:10, 184:12, 197:13
**receive** [2] - 81:9, 198:9
**received** [6] - 61:5, 127:24, 127:25, 128:25, 140:19, 198:11
**recently** [3] - 71:14, 171:15, 172:3
**recess** [3] - 92:9, 160:4, 191:15
**recollecting** [1] - 183:24
**recollection** [10] - 76:3, 76:10, 104:14, 105:15, 105:24, 105:25, 114:7, 147:9, 174:13, 184:18
**recommended** [1] - 194:25
**record** [4] - 59:9, 62:14, 62:15, 205:12
**records** [8] - 115:19, 115:23, 126:3, 127:23, 128:17, 128:20, 135:7, 168:4
**recover** [1] - 174:19
**recovery** [2] - 175:9, 176:5
**reduce** [1] - 169:13
**referenced** [1] - 199:7
**referencing** [1] - 190:15
**referring** [3] - 134:12, 163:21, 201:21
**reflect** [3] - 161:5, 168:3, 185:8
**reflected** [1] - 153:19, 154:2
**regain** [1] - 110:25, 111:2
**regarding** [3] - 61:5, 115:20, 131:3
**regardless** [1] - 187:11
**regrettably** [1] - 198:3
**regular** [2] - 71:23, 86:15
**regularly** [1] - 82:8
**rehash** [1] - 160:7
**reimburse** [1] - 180:18
**related** [2] - 62:3, 205:15
**relationship** [3] - 115:14, 142:8, 146:24
**relevance** [4] - 60:10, 60:24, 89:17, 108:15
**relevancy** [4] - 74:12, 89:13, 90:11, 90:23
**relevant** [4] - 85:3, 120:23, 122:2, 123:4
**relied** [1] - 178:8
**relief** [1] - 174:24
**rely** [3] - 135:12, 135:15, 147:20
**remaining** [4] - 65:17, 103:11, 152:21, 167:22
**remains** [15] - 94:22,

95:3, 96:25, 101:11, 101:16, 101:24, 102:15, 138:14, 148:22, 150:21, 151:8, 152:2, 152:21, 154:3, 158:8
**remedies** [1] - 180:15
**remedy** [1] - 180:17
**remember** [18] - 64:19, 71:20, 97:12, 106:7, 113:15, 113:17, 125:6, 132:16, 132:18, 134:11, 142:16, 154:8, 156:16, 175:22, 186:4, 200:11, 200:22
**remind** [1] - 74:22
**remittent** [1] - 167:24
**remove** [1] - 115:13
**rent** [22] - 73:20, 75:12, 75:25, 110:14, 110:16, 117:8, 119:7, 121:5, 132:13, 172:22, 172:25, 174:2, 174:6, 175:4, 175:13, 175:14, 176:9, 177:8, 179:7, 179:24, 180:25, 181:12
**rent-stabilized** [1] - 177:8
**rented** [1] - 179:14
**rents** [1] - 195:24
**rephrase** [3] - 99:9, 105:6, 152:19
**Reporter** [6] - 63:15, 104:20, 132:3, 178:19, 187:21, 189:24
**represent** [2] - 73:24, 193:12
**representations** [1] - 64:4
**representative** [1] - 107:20
**representing** [1] - 174:21
**request** [2] - 124:14, 124:16
**REQUESTED** [1] - 204:23
**require** [2] - 125:11, 126:9
**required** [3] - 93:5, 93:18, 146:23
**requires** [1] - 146:8
**research** [1] - 194:13
**reserve** [4] - 60:18, 60:23, 120:23, 123:2
**reserved** [1] - 58:22
**reside** [1] - 59:11
**residents** [1] - 122:7
**resolved** [1] - 90:7
**respective** [2] - 58:6, 190:17
**respond** [1] - 82:25

**responding** [1] - 88:5
**Response** [2] - 61:18, 61:20
**response** [1] - 146:23
**responsibilities** [2] - 116:20, 118:4
**responsibility** [4] - 70:25, 71:4, 116:22, 178:7
**responsible** [2] - 71:8, 177:14
**rest** [1] - 130:22
**restate** [1] - 158:15
**restaurant** [1] - 194:11
**restaurants** [1] - 194:12
**restrain** [2] - 146:19, 204:8
**restraining** [14] - 62:23, 64:13, 66:6, 67:2, 67:5, 68:4, 137:17, 138:7, 146:18, 150:5, 151:7, 151:25, 152:8, 153:20
**restraint** [18] - 63:20, 64:21, 66:15, 66:19, 69:10, 77:5, 92:12, 93:20, 146:6, 148:2, 148:5, 149:6, 149:9, 149:18, 150:19, 153:8, 156:4, 170:13
**restraints** [7] - 64:25, 80:18, 80:24, 149:23, 151:17, 151:21, 153:5
**retained** [1] - 204:17
**retrospect** [1] - 185:6
**return** [1] - 188:12
**returns** [1] - 137:4
**review** [14] - 71:25, 82:23, 84:8, 86:11, 86:13, 86:25, 87:6, 92:2, 115:15, 167:23, 177:16, 197:10, 199:2, 200:14
**reviewing** [1] - 198:21
**right** [46] - 59:24, 60:9, 60:23, 62:9, 69:12, 70:5, 70:6, 72:3, 92:15, 99:14, 120:22, 132:15, 135:4, 135:19, 137:7, 146:9, 158:2, 158:12, 159:8, 159:18, 159:20, 159:21, 163:11, 164:13, 166:17, 168:4, 171:9, 171:22, 172:20, 172:23, 176:25, 177:3, 177:17, 177:18, 177:21, 179:15, 181:4, 181:15, 181:16, 182:5, 182:7, 186:15, 187:13, 199:3, 200:14
**rights** [2] - 60:18, 176:11
**Ronald** [3] - 141:8, 141:17, 142:12
**Ronnie** [1] - 142:6,

142:11
**ROSEWALL** [6] - 56:9, 56:10, 56:10, 57:15, 57:15, 57:16
**Rosewall** [28] - 74:9, 75:6, 105:8, 105:10, 105:23, 106:17, 107:15, 107:22, 108:3, 108:7, 108:22, 109:14, 114:3, 114:14, 115:20, 133:16, 172:18, 192:14, 192:20, 193:4, 194:2, 194:6, 194:21, 195:4, 195:7, 195:9, 195:13, 198:19
**Rosewall's** [1] - 107:20
**rough** [1] - 85:18
**roughly** [10] - 78:10, 78:23, 79:25, 80:16, 81:3, 86:8, 88:12, 88:15, 91:20, 154:13
**rudimentary** [1] - 173:3
**Rules** [1] - 56:21
**run** [7] - 107:3, 168:19, 168:21, 169:11, 170:2, 170:7, 171:20
**running** [5] - 59:17, 106:12, 168:16, 169:9, 169:14
**runs** [1] - 169:8
**Rye** [1] - 59:12

**S**

**same** [18] - 58:12, 58:15, 58:17, 77:6, 85:16, 95:11, 97:14, 139:16, 140:23, 146:12, 148:20, 150:15, 154:22, 157:20, 166:7, 167:11, 172:18, 194:16
**sat** [3] - 136:25, 151:14, 195:25
**satisfied** [6] - 103:18, 133:17, 133:19, 137:9, 137:14, 167:19
**saw** [2] - 132:19, 199:8
**saying** [34] - 69:25, 95:13, 96:15, 98:2, 99:5, 99:8, 99:22, 102:18, 102:21, 103:9, 103:19, 103:20, 103:22, 117:25, 121:22, 122:14, 129:13, 129:17, 130:16, 134:15, 134:22, 140:13, 140:14, 140:16, 147:19, 155:12, 159:11, 161:4, 176:12, 176:13, 176:23, 194:23, 199:10
**scan** [1] - 130:3, 130:4, 130:5
**scanned** [2] - 173:4,

187:3
**scans** [1] - 173:10
**school** [4] - 118:22, 118:24, 119:2, 119:4
**screen** [8] - 61:21, 127:3, 136:12, 136:22, 138:3, 155:7, 162:21, 162:22
**screwed** [4] - 95:22, 103:7, 133:3, 199:13
**screwy** [1] - 132:15
**sealing** [1] - 58:7
**search** [3] - 74:24, 82:20, 84:16
**second** [8] - 62:11, 63:3, 69:18, 146:5, 161:19, 169:11, 177:12, 186:16
**secondhand** [1] - 111:20
**section** [2] - 65:8, 180:3
**seeing** [1] - 124:22
**seeking** [2] - 70:3, 183:19
**seeks** [2] - 174:15, 174:19
**seemed** [1] - 183:22
**seems** [1] - 201:10
**seen** [4] - 123:25, 156:13, 156:21, 175:18
**send** [32] - 67:4, 67:9, 67:14, 67:19, 79:11, 80:11, 80:13, 81:10, 81:11, 81:15, 81:19, 89:6, 93:19, 97:8, 108:11, 108:16, 125:17, 126:22, 129:21, 139:24, 139:25, 140:7, 141:10, 149:6, 149:24, 150:20, 156:22, 157:8, 165:16, 166:14, 167:10, 167:20
**sending** [1] - 159:9
**sends** [5] - 74:22, 79:12, 81:3, 84:7, 156:6
**sense** [1] - 140:3
**sent** [17] - 61:5, 70:9, 79:19, 86:21, 92:23, 135:22, 140:9, 149:10, 149:18, 150:19, 151:25, 152:8, 153:21, 156:4, 166:24, 191:11, 194:10
**sentence** [7] - 94:17, 94:18, 95:3, 95:11, 95:20, 99:3, 148:13
**separate** [3] - 63:9, 66:20, 162:24
**separated** [1] - 137:11
**Sepco** [1] - 118:12
**serve** [1] - 79:6, 184:5
**served** [5] - 188:8, 188:16, 188:21, 190:7
**server** [6] - 184:5, 188:11, 188:25, 189:12,

189:16

**service** [7] - 58:16, 80:5, 108:17, 188:3, 188:12, 188:18, 190:20
**SERVICES** [1] - 57:9
**serving** [1] - 181:10
**settlement** [1] - 200:6
**sheets** [1] - 167:24
**Sheryl** [1] - 189:13
**short** [2] - 92:9, 160:4, 191:15
**shorthand** [1] - 66:11
**shot** [2] - 82:24, 89:6
**shots** [1] - 61:21
**show** [13] - 115:24, 123:13, 128:22, 128:24, 131:14, 162:8, 163:20, 164:24, 165:2, 165:4, 185:15, 185:18, 195:20
**showed** [1] - 113:23
**showing** [9] - 62:10, 62:12, 62:18, 63:16, 104:21, 132:4, 178:20, 187:22, 189:25
**shows** [2] - 162:4, 162:5
**side** [1] - 115:4
**sign** [23] - 64:16, 65:3, 66:11, 76:19, 77:5, 77:10, 78:7, 78:14, 79:23, 79:24, 80:16, 80:20, 80:21, 81:19, 81:22, 82:8, 91:18, 92:3, 92:5, 93:8, 97:8, 120:10
**signature** [4] - 64:14, 103:10, 149:2, 189:11
**signed** [15] - 58:10, 58:12, 58:15, 65:7, 66:5, 70:22, 77:16, 91:16, 93:22, 104:5, 106:4, 138:8, 138:24, 157:17, 161:6
**signing** [5] - 64:19, 82:12, 91:5, 91:12, 91:21
**simple** [1] - 121:24
**sisters** [1] - 116:7
**sit** [1] - 195:21
**sitting** [2] - 191:6, 199:5
**situations** [1] - 199:16
**six** [2] - 106:4, 106:25
**sixty** [1] - 130:11
**skip** [1] - 95:9
**slate** [1] - 164:24
**slowly** [1] - 134:20
**small** [6] - 142:9, 154:14, 159:12, 159:14, 159:15, 159:16
**snapshot** [1] - 105:2
**Snapshot** [1] - 204:10
**software** [2] - 162:4, 162:8

**solely** [2] - 184:14, 199:21
**somebody** [6] - 132:25, 151:14, 162:12, 162:14, 184:3, 195:20
**somehow** [2] - 115:13, 183:25
**someone** [11] - 67:17, 75:17, 122:12, 125:17, 126:15, 143:20, 143:21, 169:21, 184:24, 186:10, 194:25
**something** [9] - 95:22, 96:21, 97:20, 100:16, 109:11, 132:19, 132:20, 157:4, 189:8
**sometime** [2] - 106:12, 106:23, 106:24
**sometimes** [12] - 103:7, 125:15, 137:10, 139:9, 153:13, 187:2, 187:4, 196:13, 196:14, 196:18, 196:19, 197:21
**somewhere** [2] - 119:13, 187:14
**sorry** [1] - 139:22
**sort** [4] - 96:22, 144:10, 156:16, 196:25
**source** [1] - 90:24
**SOUTHERN** [1] - 56:2
**space** [1] - 110:25
**Spanish** [2] - 173:4, 173:6
**speak** [1] - 84:25
**speaking** [10] - 78:10, 79:25, 88:2, 88:13, 88:15, 91:20, 91:25, 92:5, 123:20, 154:13
**specific** [9] - 68:21, 99:14, 100:12, 100:21, 134:23, 148:13, 161:2, 176:4, 176:10
**specifically** [2] - 98:17, 200:21
**specifics** [1] - 96:11
**specified** [1] - 203:11
**spend** [9] - 83:9, 84:12, 84:20, 85:6, 85:25, 87:12, 87:20, 88:9, 91:20
**spending** [1] - 85:21
**spent** [1] - 84:2
**spit** [2] - 92:14, 151:18
**spits** [1] - 152:20
**SS** [1] - 205:4
**stabilized** [2] - 177:8, 179:8
**stack** [5] - 64:24, 65:3, 82:12, 91:11, 91:17
**staff** [8] - 64:24, 84:25, 109:11, 126:16, 126:25,

141:25, 186:11, 186:18
**stage** [1] - 137:8
**stamp** [1] - 173:13
**stamped** [10] - 62:13, 62:19, 63:6, 104:22, 173:15, 178:21, 179:10, 180:7, 180:20, 204:10
**standard** [3] - 177:9, 179:2, 179:5
**start** [5] - 79:5, 91:12, 107:2, 142:13, 193:7
**started** [16] - 90:2, 106:5, 116:12, 118:21, 123:19, 123:21, 141:25, 143:2, 146:2, 150:15, 151:3, 155:23, 160:6, 171:11, 171:14, 193:9
**starting** [1] - 117:23
**State** [4] - 56:25, 59:4, 106:3, 205:8
**state** [1] - 59:8
**STATE** [1] - 205:4
**statement** [3] - 106:3, 147:13, 147:16
**statements** [2] - 65:9, 65:12
**states** [2] - 186:5, 188:21
**STATES** [1] - 56:2
**stating** [1] - 101:4
**stature** [1] - 105:11
**statute** [9] - 105:17, 105:21, 106:2, 106:9, 106:11, 106:15, 106:25, 107:7, 146:8
**statutory** [1] - 64:9
**stay** [1] - 144:18
**stayed** [1] - 90:3
**step** [3] - 64:12, 111:10, 111:16
**steps** [2] - 122:21, 136:6
**Steven** [1] - 141:8
**stip** [1] - 200:13
**STIPULATED** [2] - 58:5, 58:20
**stipulation** [7] - 112:20, 112:22, 129:11, 164:22, 200:4, 200:6, 200:24
**stipulations** [1] - 112:2
**stop** [1] - 169:9
**stopping** [1] - 201:11
**Street** [3] - 56:23, 57:5, 59:12
**stretched** [1] - 118:5
**strike** [1] - 184:21
**stuff** [1] - 130:3
**sub** [3] - 179:18, 180:7, 180:22
**sub-paragraph** [1] - 180:22
**subject** [1] - 60:8

**subparagraph** [1] - 180:22
**subpoena** [14] - 62:23, 63:19, 64:12, 66:6, 66:22, 66:25, 67:16, 69:9, 92:12, 93:19, 137:16, 138:6, 146:6, 148:5
**subpoenas** [15] - 64:22, 64:25, 66:11, 66:14, 67:5, 67:10, 67:15, 68:3, 68:4, 76:19, 76:23, 77:4, 80:17, 80:18, 91:8
**Subscribed** [1] - 203:18
**subsequent** [1] - 173:20
**subsequently** [2] - 105:16, 130:2
**substantive** [2] - 157:25, 158:5
**subtract** [2] - 162:11, 162:13
**subtraction** [1] - 162:3
**sue** [3] - 105:14, 175:13, 175:24
**sued** [2] - 88:19, 144:7
**suing** [3] - 172:17, 173:24, 174:2
**suit** [14] - 75:12, 75:25, 76:5, 89:19, 113:3, 117:8, 151:25, 152:6, 176:9, 181:2, 181:7, 181:12, 182:3, 190:9
**suitable** [1] - 188:22
**Suite** [1] - 57:16
**suits** [4] - 172:15, 176:2, 180:24, 195:24
**sum** [1] - 174:20
**summary** [1] - 79:8
**Summons** [1] - 204:12
**summons** [16] - 86:19, 87:7, 132:7, 132:8, 132:12, 144:23, 154:16, 173:5, 173:7, 174:15, 176:14, 183:5, 184:5, 185:23, 188:7, 188:16
**supervised** [1] - 171:3
**Supplemental** [2] - 61:18, 61:20
**supposed** [6] - 95:10, 139:13, 148:10, 158:19, 177:4, 177:6
**sure** [14] - 78:21, 89:14, 98:6, 100:14, 115:15, 121:3, 124:25, 125:23, 126:13, 127:5, 144:16, 151:23, 171:2, 176:7
**surely** [1] - 115:4
**sworn** [5] - 58:10, 59:3, 203:5, 203:18, 205:11
**system** [26] - 84:10, 109:12, 115:19, 126:24,

127:17, 144:16, 144:20,
148:9, 153:25, 160:14,
161:19, 163:14, 163:18,
163:25, 164:2, 164:11,
166:2, 166:13, 166:16,
166:21, 167:4, 176:20,
177:16, 185:7, 185:17,
187:8

## T

**table** [2] - 195:21, 195:25
**take** [16] - 60:19, 79:22,
89:10, 92:7, 92:19, 111:6,
122:21, 130:8, 136:6,
160:2, 171:19, 177:11,
180:5, 191:13, 193:14,
195:21
**taken** [4] - 56:19, 92:10,
160:5, 191:16
**taking** [3] - 79:7, 91:14,
155:11
**talk** [1] - 155:6
**talked** [7] - 71:6, 91:6,
91:10, 98:17, 158:14,
166:9, 186:17
**talking** [5] - 69:8, 135:16,
135:17, 151:2, 160:6
**tasks** [1] - 85:4, 87:4,
87:5, 91:5
**TD** [1] - 63:5
**tell** [24] - 62:11, 62:25,
63:20, 75:8, 75:11, 75:13,
82:14, 88:4, 117:13,
134:14, 135:10, 137:9,
147:21, 161:19, 162:19,
162:22, 163:8, 163:18,
167:14, 167:18, 171:24,
172:3, 172:6, 179:10
**tells** [3] - 136:8, 167:25,
189:9
**template** [15] - 96:2,
96:10, 97:13, 97:14,
97:16, 98:8, 98:18,
102:19, 102:20, 102:25,
146:7, 146:11, 146:12,
147:11, 157:20
**ten** [5] - 78:12, 86:5,
87:14, 88:10, 193:24
**tenancy** [1] - 110:8
**tenant** [46] - 109:19,
109:25, 110:6, 110:8,
110:9, 110:10, 110:15,
111:3, 111:12, 111:18,
111:22, 111:24, 112:5,
112:11, 112:15, 113:2,
113:5, 114:17, 114:22,
115:3, 115:8, 115:14,
119:18, 120:20, 121:4,
121:11, 121:15, 121:19,
122:15, 122:20, 123:9,

123:12, 124:6, 124:24,
125:14, 126:5, 127:6,
145:2, 172:15, 173:25,
174:6, 174:8, 176:2,
185:10, 196:12
**tenants** [7] - 110:11,
113:3, 113:12, 113:14,
113:23, 123:11, 123:24
**tenants/debtors/
defendants** [1] - 122:6
**term** [1] - 68:6
**terms** [1] - 66:10
**test** [1] - 146:8
**testified** [6] - 59:5,
64:23, 65:24, 76:17, 89:3,
109:17
**testify** [1] - 203:5
**testifying** [1] - 68:14
**testimony** [6] - 59:22,
184:14, 194:20, 203:6,
203:10, 205:13
**text** [9] - 96:10, 96:12,
96:16, 97:20, 98:3, 98:4,
98:11, 98:12, 98:18
**thank** [3] - 59:14, 102:23,
194:10
**thanked** [1] - 194:15
**thanks** [1] - 61:25
**there's** [2] - 138:16,
169:18
**thereafter** [1] - 88:19
**thereon** [11] - 94:21,
99:4, 99:16, 101:10,
101:25, 102:5, 102:8,
102:12, 138:12, 158:16,
160:8
**thing** [6] - 144:22,
155:25, 170:11, 180:14,
181:24, 194:9
**things** [15] - 65:25,
68:22, 71:22, 82:13,
82:17, 91:9, 91:22,
101:22, 110:25, 111:15,
139:18, 154:15, 156:9,
164:19
**think** [31] - 89:3, 109:17,
125:22, 127:10, 133:7,
134:2, 137:24, 139:14,
141:20, 143:2, 147:7,
147:9, 147:14, 147:15,
147:17, 157:9, 158:3,
158:4, 158:6, 165:21,
166:19, 167:17, 167:23,
168:5, 192:4, 194:20,
200:11, 200:15, 200:16,
201:5, 201:8
**thinking** [1] - 200:10
**third** [2] - 109:2, 174:18
**thirty** [1] - 80:7
**thousand** [13] - 74:15,

74:18, 74:20, 96:22,
119:14, 136:5, 168:23,
168:25, 169:2, 169:19,
169:23, 170:20, 172:2
**three** [7] - 67:24, 68:8,
101:22, 119:14, 128:9,
163:3, 170:5
**thrilled** [1] - 162:14
**through** [35] - 59:20,
60:4, 62:24, 64:11, 65:3,
66:9, 71:24, 76:12, 76:17,
88:21, 91:11, 104:23,
107:23, 108:3, 144:13,
165:7, 167:4, 172:10,
173:21, 174:14, 174:15,
178:22, 192:14, 192:21,
193:3, 193:14, 193:18,
194:7, 195:9, 196:5,
197:5, 198:7, 198:14,
200:2, 204:11
**tickler** [2] - 86:21, 136:4
**ticklers** [1] - 86:13
**tight** [1] - 144:9
**TIME** [1] - 56:14
**time** [61] - 58:22, 59:18,
65:4, 73:9, 73:24, 73:25,
74:14, 74:17, 75:16,
76:20, 79:23, 82:11,
82:15, 83:8, 83:12, 83:24,
84:2, 84:20, 85:14, 85:21,
85:25, 87:20, 88:8, 88:22,
89:22, 91:12, 91:18,
91:23, 91:24, 100:12,
106:8, 112:4, 113:10,
117:15, 118:19, 118:23,
130:14, 136:9, 142:5,
142:17, 142:22, 144:9,
144:19, 144:23, 147:11,
148:4, 150:6, 150:15,
150:18, 151:5, 156:12,
156:21, 176:8, 176:13,
176:14, 180:4, 180:5,
182:20, 197:12, 201:25,
203:10
**times** [4] - 74:25, 83:16,
144:8, 144:13
**today** [5] - 59:18, 97:14,
103:3, 191:6, 192:8
**together** [5] - 62:21,
62:25, 138:12, 174:22,
198:9
**tomorrow** [1] - 103:4
**total** [9] - 69:10, 137:20,
137:21, 148:16, 160:9,
164:17, 165:13, 171:9,
193:25
**totals** [1] - 162:2
**tough** [1] - 171:5
**towards** [1] - 72:16
**track** [6] - 139:18, 140:5,

140:23, 165:13, 166:4,
168:12
**training** [5] - 119:5,
119:25, 120:4, 120:6
**transcript** [3] - 65:8,
203:9
**treated** [2] - 141:24,
144:14
**trial** [7] - 58:22, 78:18,
79:8, 81:17, 81:18, 87:2,
87:10
**trials** [1] - 112:21
**tried** [1] - 141:22
**trouble** [1] - 82:24
**trouble-shot** [1] - 82:24
**troubleshoot** [1] - 87:19
**true** [36] - 65:9, 65:25,
84:14, 85:8, 86:6, 86:8,
87:15, 87:17, 87:23, 88:3,
88:12, 88:16, 98:4, 113:4,
113:6, 113:7, 113:8,
114:6, 122:24, 136:19,
138:20, 145:19, 152:11,
152:15, 153:8, 153:10,
153:11, 153:13, 157:4,
159:3, 181:5, 181:6,
185:6, 186:22, 203:9,
205:12
**trust** [2] - 134:12, 141:19
**truth** [1] - 203:5
**try** [4] - 60:19, 82:22,
145:18, 167:9
**trying** [15] - 70:24, 71:3,
85:18, 89:6, 100:11,
110:11, 110:13, 110:18,
117:18, 154:18, 158:15,
160:7, 161:11, 186:7,
187:6
**Tuesday** [1] - 156:12
**turn** [1] - 113:18
**tweaking** [2] - 157:25,
158:2
**tweaks** [1] - 157:24
**twenty** [3] - 87:22,
119:13, 119:14
**twenty-five** [3] - 87:22,
119:13, 119:14
**twice** [1] - 155:21
**typed** [1] - 151:15
**typical** [3] - 77:12, 82:18,
82:19
**typically** [2] - 66:18,
78:14

## U

**ultimately** [2] - 133:8,
175:20
**unclear** [3] - 68:10,
68:24, 100:3

**uncommon** [2] - 123:7, 123:8
**under** [3] - 93:6, 119:15, 145:14
**underneath** [1] - 94:6
**understand** [6] - 68:8, 68:18, 68:20, 121:3, 143:9, 171:6
**understanding** [2] - 107:21, 115:5
**understood** [2] - 69:5, 144:11
**unfolded** [1] - 115:9
**UNITED** [1] - 56:2
**unlike** [1] - 137:23
**unlikely** [1] - 185:13
**unpaid** [20] - 94:22, 95:3, 96:25, 101:13, 101:16, 101:24, 102:16, 138:14, 148:22, 148:25, 149:20, 150:7, 150:22, 151:8, 152:3, 152:7, 152:10, 152:21, 154:3, 158:8
**unrelated** [2] - 193:11, 194:8
**unsigned** [1] - 58:14
**updated** [1] - 186:13
**upstate** [2] - 143:20, 143:21
**useless** [1] - 126:19
**uses** [2] - 139:10, 150:7
**usually** [6] - 66:23, 80:3, 126:8, 155:18, 171:10, 177:7

## V

**vacated** [4] - 127:12, 127:13, 191:23, 196:3
**value** [1] - 163:9
**variable** [1] - 96:6
**variables** [1] - 98:19
**varies** [2] - 77:11, 77:24
**various** [3] - 82:25, 91:5, 126:23
**verbiage** [1] - 137:24
**verification** [1] - 81:10
**verifications** [3] - 78:16, 81:7, 81:8
**version** [2] - 173:5, 173:6
**view** [1] - 138:15
**voluntarily** [1] - 122:11

## W

**wage** [3] - 80:19, 91:8, 148:2
**wages** [1] - 155:11
**waived** [2] - 58:9, 175:21
**want** [12] - 60:4, 60:16,

60:17, 60:18, 60:23, 92:17, 101:18, 124:25, 139:16, 151:22, 163:13, 179:9
**wanted** [1] - 142:7
**was it** [3] - 114:14, 195:22, 197:14
**was she** [2] - 118:21, 120:7
**was that** [10] - 71:17, 85:8, 86:8, 87:15, 88:12, 89:19, 106:6, 123:15, 189:5, 200:9
**was there** [3] - 109:22, 125:8, 194:4
**ways** [2] - 101:18, 108:13
**wearing** [1] - 117:19
**website** [1] - 126:16
**week** [31] - 76:20, 76:24, 77:5, 77:7, 77:14, 77:23, 78:4, 78:14, 80:2, 80:6, 80:17, 80:19, 80:21, 81:4, 81:15, 81:19, 81:23, 82:3, 82:5, 82:8, 82:18, 83:12, 83:16, 84:11, 85:6, 87:12, 87:21, 88:8, 91:4, 91:21
**were you** [3] - 85:21, 173:24, 174:2
**what are** [1] - 86:18
**what did** [3] - 111:24, 143:10, 179:3
**what is** [16] - 66:4, 77:12, 79:3, 92:4, 92:5, 92:21, 99:7, 105:20, 106:22, 110:21, 154:25, 155:2, 155:4, 159:14, 173:13, 181:3
**what was** [3] - 154:11, 156:8, 194:14
**what were** [1] - 116:19
**when did** [2] - 116:16, 142:13
**when is** [1] - 86:21
**when you** [40] - 93:8, 93:22, 95:19, 104:4, 108:9, 108:10, 109:17, 110:10, 111:2, 111:23, 114:12, 115:17, 117:21, 122:19, 124:3, 124:17, 124:24, 135:20, 138:24, 142:11, 143:15, 149:5, 150:18, 151:4, 151:6, 152:8, 153:4, 156:4, 171:17, 175:6, 175:25, 179:2, 180:24, 181:11, 183:11, 186:17, 195:12, 196:5, 197:4, 201:2
**whenever** [1] - 123:17
**where is** [1] - 186:14
**WHEREOF** [1] - 205:19

**Whereupon** [11] - 62:15, 63:11, 92:9, 104:17, 131:24, 160:4, 178:16, 187:18, 189:21, 191:15, 202:2
**who are** [1] - 95:7
**who is** [2] - 70:20, 71:8
**whole** [2] - 95:3, 169:9
**why** [25] - 70:17, 83:22, 85:12, 97:8, 97:10, 97:11, 101:14, 117:16, 127:10, 139:17, 140:4, 141:10, 145:24, 153:2, 153:24, 154:18, 166:18, 166:24, 168:12, 174:11, 175:11, 183:16, 200:15, 200:16, 200:18
**wise** [1] - 159:5
**withdrawn** [1] - 184:21
**withheld** [1] - 131:13
**within** [2] - 58:8, 205:8
**without** [3] - 67:5, 122:12, 136:16
**witness** [8] - 56:18, 58:10, 58:16, 58:18, 59:3, 202:3, 205:10, 205:13
**WITNESS** [1] - 205:19
**woman** [2] - 114:8, 114:25
**word** [2] - 102:13, 158:18
**words** [11] - 60:10, 60:14, 60:15, 60:19, 90:2, 144:21, 167:19, 170:20, 194:15, 197:20, 198:6
**wore** [1] - 109:21
**work** [11] - 80:15, 111:24, 118:7, 121:13, 121:16, 142:7, 143:12, 143:24, 154:15, 195:10
**worked** [13] - 109:17, 109:20, 112:4, 116:7, 116:20, 118:16, 119:16, 143:10, 144:9, 178:4, 178:6, 189:16, 195:17
**working** [3] - 116:13, 116:16, 118:21
**works** [1] - 194:25
**world** [1] - 110:7
**worn** [1] - 142:6
**wouldn't** [3] - 89:10, 165:25, 170:9
**wounds** [1] - 144:7
**write** [2] - 111:25, 112:20
**written** [7] - 81:12, 96:19, 99:20, 99:21, 177:22, 179:24, 199:4
**wrong** [12] - 88:20, 97:20, 100:17, 123:8, 129:18, 147:20, 158:21, 160:22, 186:19, 186:20,

187:4, 197:14
**wrote** [2] - 198:15, 199:14

## Y

**yeah** [1] - 179:12
**year** [14] - 75:2, 75:5, 78:3, 78:5, 80:14, 83:10, 83:15, 83:18, 116:3, 117:18, 168:23, 169:4, 169:13, 169:16
**years** [13] - 83:19, 83:21, 85:17, 97:17, 106:4, 106:25, 113:10, 113:16, 119:9, 119:11, 119:17, 124:2, 176:22
**yes** [174] - 59:25, 61:2, 61:8, 63:7, 63:24, 64:7, 64:15, 67:6, 67:7, 67:12, 67:13, 67:21, 67:23, 68:5, 68:9, 68:16, 69:2, 69:7, 69:13, 69:21, 72:4, 72:18, 72:21, 77:8, 77:15, 78:6, 79:14, 81:6, 81:13, 82:6, 82:16, 83:14, 84:15, 84:18, 86:7, 86:17, 87:16, 87:18, 88:14, 88:25, 89:5, 90:13, 90:18, 91:19, 93:11, 93:14, 93:21, 94:5, 94:10, 95:12, 96:7, 96:14, 99:2, 99:20, 102:21, 106:21, 107:3, 107:9, 107:17, 108:5, 108:12, 109:4, 109:7, 109:9, 109:15, 110:4, 110:20, 111:6, 112:6, 112:9, 112:13, 112:17, 113:23, 114:18, 116:5, 116:15, 117:10, 117:12, 118:15, 120:16, 121:7, 121:12, 121:21, 122:13, 122:18, 124:25, 127:15, 129:3, 131:8, 131:11, 133:11, 136:15, 139:3, 143:19, 143:23, 144:2, 145:8, 145:12, 145:15, 145:22, 146:10, 146:22, 147:4, 147:24, 148:19, 148:23, 149:8, 149:13, 149:22, 150:9, 151:11, 151:20, 152:6, 156:19, 157:16, 157:19, 157:23, 158:12, 159:25, 160:25, 161:3, 161:9, 161:10, 161:17, 163:20, 167:8, 167:11, 167:13, 170:4, 170:9, 171:10, 171:16, 172:21, 173:17, 175:5, 175:19, 175:23, 176:7, 177:19, 178:5, 178:10, 178:12,

178:25, 179:17, 179:20,
181:10, 182:3, 182:9,
183:7, 184:16, 184:19,
184:23, 187:4, 187:10,
188:5, 188:10, 188:14,
189:17, 190:5, 190:16,
192:12, 192:16, 193:21,
194:7, 196:9, 197:8,
197:18, 198:21, 200:8,
200:20, 200:25
  **yesterday** [3] - 134:15,
155:14, 155:20
  **YORK** [2] - 56:2, 205:4
  **York** [11] - 56:23, 56:25,
57:5, 57:11, 57:17, 59:4,
59:13, 106:3, 143:25,
179:7, 205:8
  **yourself** [1] - 103:16

## Z

  **zero** [27] - 94:16, 94:20,
94:22, 94:24, 95:2, 95:4,
97:6, 97:7, 99:4, 99:5,
99:15, 99:17, 99:18,
101:7, 101:9, 101:24,
102:2, 103:11, 104:11,
158:13, 158:15, 160:8,
160:13, 160:15, 160:17,
161:5

## °

  ° [4] - 202:6